# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

RUBEN O. FAVELA,

      Plaintiff,

vs.                                    No. CIV 17-0568 JB\SMV

CITY OF LAS CRUCES ex rel. LAS CRUCES
POLICE DEPARTMENT; LAS CRUCES POLICE
OFFICERS MATTHEW DOLLAR and MANUEL
SOTO; PHC-LAS CRUCES, INC., a New Mexico
Corporation, d/b/a MEMORIAL MEDICAL
CENTER; DANIELLE WILHELM, M.D.; JAMES
PROCTOR, R.N.; JAMIE PITTS, R.N.;
JOSE REVELES, R.N.; CASSANDRIA
BRANCH, R.N., and JOHN DOE SECURITY
GUARDS 1 and 2,

      Defendants.

## MEMORANDUM OPINION[1]

**THIS MATTER** comes before the Court on Defendants[] [Matthew Dollar and Manuel

Soto's] Motion and Supporting Memorandum for Qualified Immunity and Summary Judgment,

filed February 6, 2018 (Doc. 30)("Motion"). The Court held a hearing on July 2, 2018. The

primary issue is whether Defendants Matthew Dollar and Manuel Soto are entitled to qualified

immunity and summary judgment with respect to: (i) Counts I and IX of the Complaint to Recover

Damages for Deprivation of Civil Rights and Personal Injury at 1, filed in state court on May 2,

2017, filed in federal court on May 18, 2017 (Doc. 1-1)("Complaint"), because probable cause

---

[1]The Court previously entered an Order, filed September 21, 2019 (Doc. 47)("Order")
granting the requests in the Defendants' Motion and Supporting Memorandum for Qualified
Immunity and Summary Judgment, filed February 6, 2018 (Doc. 30). The Order terminated
Matthew Dollar and Manuel Soto as Defendants in this action. In the Order, the Court stated that
it would "issue a Memorandum Opinion at a later date more fully detailing its rationale for this
decision." Order at 1 n.1. This Memorandum Opinion is the promised opinion that details the
Court's rationale for the previous Order.

supported the traffic stop and subsequent detention, and (ii) the Complaint's Counts II-III and VIII-IX, because neither Dollar nor Soto participated in the catheterization of which Plaintiff Ruben O. Favela complains. Counts I-III and Counts VIII-IX are the only counts that Favela brings against Dollar and Soto. The Court concludes that probable cause supports the traffic stop and subsequent detention, and that neither Dollar nor Soto participated in the catheterization, so they cannot be liable for any harm it caused. Further, the Court concludes that if Soto violated Favela's rights by not stopping the forced catheterization, this right was not clearly established when Soto acted. Accordingly, the Court determines that Dollar and Soto are entitled qualified immunity, because they did not violate Favela's clearly established constitutional rights, and grants the Motion.

## FACTUAL BACKGROUND

The Court draws the factual background from the parties' undisputed material facts in the Motion; in the Response to Defendants' Motion and Supporting Memorandum for Qualified Immunity and Summary Judgment, filed March 15, 2018 (Doc. 36)("Response"); and in the Defendants' Reply in Support of Motion and Supporting Memorandum for Qualified Immunity and Summary Judgment, filed March 29, 2018 (Doc. 37)("Reply"). The facts of this case are essentially undisputed. See Response at 2 (not disputing all but one of Dollar and Soto's thirty-nine proffered undisputed material facts); Reply ¶¶ 1-9, at 2 (not disputing the substantive content of any of Favela's twenty-four proffered undisputed material facts).

On April 13, 2016, Dollar, a police officer with the Las Cruces Police Department ("LCPD"), observed Favela riding his motorcycle at approximately ninety miles an hour through an intersection that had a posted speed limit of thirty-five miles an hour. See Motion ¶¶ 1-2, at 4 (setting forth this fact)(citing Affidavit of Matthew Dollar ¶¶ 3-7, at 1-2 (dated February 1, 2018),

filed February 6, 2018 (Doc. 30-1)("Dollar Aff.")); Response at 2 (not disputing this fact). Upon seeing Favela, Dollar activated the emergency lights on his police unit and pursued Favela for a distance, pacing Favela at approximately seventy-five miles an hour. See Motion ¶¶ 3-4, at 4 (setting forth this fact)(citing Dollar Aff. ¶¶ 8-9, at 2); Response at 2 (not disputing this fact). Favela eventually slowed after Dollar activated the sirens on his police unit, but did not stop for another nine blocks, at which point Favela made a sharp U-turn and stopped his motorcycle on a city sidewalk in a position directly in front of Dollar's police unit. See Motion ¶¶ 4-5, at 4 (setting forth this fact)(citing Dollar Aff. ¶¶ 9-10, at 2); Response at 2 (not disputing this fact). Dollar informed dispatch of his location, requested back up, and parked his police unit in front of Favela, who had not yet dismounted his motorcycle nor shut off its power. See Motion ¶¶ 6-8, at 4 (setting forth this fact)(citing Dollar Aff. ¶¶ 11-15, at 2); Response at 2 (not disputing this fact). Dollar then exited his police unit with his sidearm drawn and ordered Favela to cut the power to his motorcycle. See Motion ¶ 8, at 4 (setting forth this fact)(citing Dollar Aff. ¶¶ 13-15, at 2); Response at 2 (not disputing this fact). After revving his motorcycle engine, Favela complied, at which point Dollar holstered his sidearm. See Motion ¶ 8, at 4 (setting forth this fact)(citing Dollar Aff. ¶¶ 13-15, at 2); Response at 2 (not disputing this fact).

After Favela had shut off the power to this motorcycle, Dollar activated his lapel footage. See Motion ¶ 9, at 5 (setting forth this fact)(citing Dollar Aff. ¶¶ 5,16, at 2; Matthew Dollar Lapel Video 1 at 00:35-00:40 (dated April 13, 2016), filed February 6, 2018 (Doc. 30-1)("Dollar Video 1")); Response at 2 (not disputing this fact). As Favela was dismounting his motorcycle, Dollar noticed what he believed to be a handgun protruding from underneath Favela's jacket. See Motion ¶¶ 10, 15, at 5 (setting forth this fact)(citing Dollar Aff. ¶¶ 17, 22, at 2-3; Dollar Video 1

at 03:45-04:00, 01:30-01:35); Response at 2 (not disputing this fact).  Upon seeing the weapon, Dollar ordered Favela to turn around so Dollar could pat him down.  See Motion ¶ 11, at 5 (setting forth this fact)(citing Dollar Aff. ¶¶ 18 at 3; Dollar Video 1 at 00:35-00:40); Response at 2 (not disputing this fact).  Dollar eventually threatened to taser Favela before Dollar was able to pat down Favela.  See Motion ¶¶ 11-13, at 5 (setting forth this fact)(citing Dollar Aff. ¶¶ 18-20, at 3; Dollar Video 1 at 00:30-00:45, 00:40-01:00); Response at 2 (not disputing this fact).  Dollar then secured the handgun on Favela's person and placed Favela in handcuffs.  See Motion ¶¶ 13-15, at 5 (setting forth this fact)(citing Dollar Aff. ¶¶ 20- 22, at 3; Dollar Video 1 at 00:40-01:00, 01:15-01:20, 01:30-01:35); Response at 2 (not disputing this fact).  During this time, Favela began sweating profusely in a manner that indicated to Dollar that Favela was under the influence of an intoxicating substance.  See Motion ¶ 16, at 5 (setting forth this fact)(citing Dollar Aff. ¶ 23, at 3; Dollar Video 1 at 01:50-1:55); Response at 2 (not disputing this fact).  Dollar then placed a handcuffed Favela in the back of his police unit.  See Motion ¶ 17, at 5 (setting forth this fact)(citing Dollar Video 1 at 01:50-01:55); Response at 2 (not disputing this fact).

Once in the back of Dollar's police unit, Favela began to express that he was hot and felt that he may pass out.  See Motion ¶ 19, at 6 (setting forth this fact)(citing Dollar Aff. ¶ 25, at 3; Dollar Video 1 at 03:30-05:10); Response at 2 (not disputing this fact).  Favela repeatedly requested that Dollar take off Favela's jacket and neckband.  See Motion ¶ 19, at 6 (setting forth this fact)(citing Dollar Aff. ¶ 25, at 3; Dollar Video 1 at 03:30-05:10); Response at 2 (not disputing this fact).  After waiting for backup to arrive, Dollar removed Favela's neckband and opened the door of the police unit for Favela.  See Motion ¶ 21, at 6 (setting forth this fact)(citing Dollar Aff. ¶ 26, at 3; Dollar Video 1 at 05:20-06:45); Response at 2 (not disputing this fact).  Dollar then

attempted to read Favela his <u>Miranda</u>[2] rights; Favela, however, passed out in the back of Dollar's

police unit as his <u>Miranda</u> rights were read to him. <u>See</u> Motion ¶¶ 22-23, at 6 (setting forth this

fact)(citing Dollar Aff. ¶ 27-29, at 3; Dollar Video 1 at 07:10-07:45, 08:00-08:15); Response at 2

(not disputing this fact). At this point, other officers at the scene contacted emergency services to

tend to Favela. <u>See</u> Motion ¶ 23, at 6 (setting forth this fact)(citing Dollar Aff. ¶¶ 28-29, at 3;

Dollar Video 1 at 08:00-08:15); Response at 2 (not disputing this fact). Officers removed Favela

from the back of Dollar's police unit and laid Favela on the sidewalk while waiting for emergency

services. <u>See</u> Motion ¶ 25, at 6 (setting forth this fact)(citing Dollar Aff. ¶ 30, at 4; Dollar Video

1 at 10:20-10:45); Response at 2 (not disputing this fact). Favela faded in and out of consciousness

while being moved from the police unit to the sidewalk. <u>See</u> Motion ¶ 25, at 6 (setting forth this

fact)(citing Dollar Aff. ¶ 30, at 4; Dollar Video 1 at 10:20-10:45); Response at 2 (not disputing

this fact).

---

[2] <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966), "requires that procedural safeguards be administered to a criminal suspect prior to 'custodial interrogation.'" <u>United States v. Perdue</u>, 8 F.3d 1455, 1463 (10th Cir. 1993)(quoting <u>Miranda v. Arizona</u>, 384 U.S. at 444). The Supreme Court of the United States provided the substance of the warning that must be given to a defendant to meet these procedural safeguard requirements:

> Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed. The defendant may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly and intelligently. If, however, he indicates in any manner and at any stage of the process that he wishes to consult with an attorney before speaking there can be no questioning. Likewise, if the individual is alone and indicates in any manner that he does not wish to be interrogated, the police may not question him.

<u>Miranda v. Arizona</u>, 384 U.S. at 444-45.

While the officers were waiting for emergency personnel, Dollar requested that dispatch run a "Triple-I check"[3] on Favela to determine whether Favela had any warrants. Motion ¶ 24, at 6 (setting forth this fact)(citing Dollar Aff. ¶ 30, at 4; Dollar Video 1 at 13:10-13:50). See Response at 2 (not disputing this fact). While waiting for this information from dispatch, Dollar informed other officers at the scene that Favela would be under arrest regardless what dispatch informed, because Favela had concealed a firearm without a permit. See Motion ¶ 27, at 7 (setting forth this fact)(citing Dollar Aff. ¶ 31, at 4; Dollar Video 1 at 16:20-16:20); Response at 2 (not disputing this fact). Dispatch then informed Dollar that Favela had a previous felony conviction for shooting from a vehicle. See Motion ¶ 26, at 7 (setting forth this fact)(citing Dollar Aff. ¶¶ 30-32; Dollar Video 1 at 17:15-17:25; Response at 2 (not disputing this fact).

Once emergency services arrived on the scene, Favela was loaded into an ambulance. See Motion ¶¶ 28-29, at 7 (setting forth this fact)(citing Affidavit of Manuel Soto ¶¶ 6-8, at 1-2 (dated February 5, 2018), filed February 6, 2018 (Doc. 30-2)("Soto Aff."); Officer Manuel Soto Lapel Video 1 at 04:40-05:10, 13:30, 16:45-17:05 (dated April 13, 2016), filed February 6, 2018 (Doc. 30-2)("Soto Video 1"); Dollar Aff. ¶ 33, at 4; Officer Matthew Dollar Video 2 at 00:45-01:45 (dated April 13, 2016), filed February 6, 2018 (Doc. 30-1)("Dollar Video 2")); Response at 2 (not disputing this fact). At this point, Favela regained consciousness and began asking what happened. See Motion ¶ 29, at 7 (setting forth this fact)(citing Dollar Aff. ¶ 33, at 4; Dollar Video

_____

[3]An Interstate Identification Index report, or "Triple-I report," provides law enforcement with information regarding an individual's criminal history and previous police encounters. See Courtney v. Oklahoma, 722 F.3d 1216, 1221 (10th Cir. 2013). The Court offers this information solely as background for the reader's edification, and not as the truth or as fact material to the issues in this opinion.

2 at 00:45-01:45); Response at 2 (not disputing this fact). Dollar informed Favela that he was under arrest for concealing a firearm and that officers were further investigating Favela as a felon in possession of a firearm. See Motion ¶ 29, at 7 (setting forth this fact)(citing Dollar Aff. ¶ 33, at 4; Dollar Video 2 at 00:45-01:45); Response at 2 (not disputing this fact). Favela was further informed that he could either leave the ambulance if he answered emergency personnel's questions or go to the hospital if he did not answer questions. See Motion ¶ 30, at 7 (setting forth this fact)(citing Dollar Video 2 at 00:45-01:45); Response at 2 (not disputing this fact). Favela was instructed that he was going to jail regardless whether he answered emergency personnel's questions. See Motion ¶ 30, at 7 (setting forth this fact)(citing Dollar Video 2 at 00:45-01:45); Response at 2 (not disputing this fact). Favela refused to answer questions, and emergency personnel accordingly transported Favela to Memorial Medical Center ("Memorial Medical") hospital. See Motion ¶ 31, at 7 (setting forth this fact)(citing Dollar Aff. ¶ 34, at 4); Response at 2 (not disputing this fact). Dollar remained at the scene and Soto, an officer with LCPD, followed Favela and emergency personnel to Memorial Medical. See Motion ¶ 32, at 7 (setting forth this fact)(citing Dollar Aff. ¶ 34, at 4); Response at 2 (not disputing this fact). Dollar no longer had any contact with Favela. See Transcript of Hearing at 9:14-21 (taken July 2, 2018)(Court, Coronado, Martinez), filed October 31, 2018 (Doc. 52)("Tr.")(noting the undisputed nature of this fact).

Staff at Memorial Medical informed Favela that they would need a blood test and a urine sample to clear him for transportation to the jail. See Motion ¶ 35, at 8 (setting forth this fact)(citing Soto Aff. at ¶¶ 13-14, at 2; Officer Manuel Soto Lapel Video 2 at 00:45-01:00, 01:15-01:25 (dated April 13, 2016), filed February 6, 2018 (Doc. 30-2)("Soto Video 2")); Response at 2

(not disputing this fact). Favela was also informed that his failure to give a urine sample would result in staff catheterizing Favela to collect the urine. <u>See</u> Motion ¶ 35, at 8 (setting forth this fact)(citing Soto Aff. at ¶¶ 13-14, at 2; Soto Video 2 at 00:45-01:00, 01:15-01:25); Response at 2 (not disputing this fact). Soto was standing in the doorway of the hospital room while Memorial Medical staff attempted to collect urine samples from Favela. <u>See</u> Response ¶ 15, at 4 (setting forth this fact)(citing Soto Video 2); Reply ¶ 6, at 2 (admitting this fact). Favela was handcuffed to a floor mattress with Soto's police-issued handcuffs. <u>See</u> Response ¶ 2, at 2 (setting forth this fact)(citing Soto Video 2); Reply ¶ 1, at 2 (admitting this fact). Favela was provided with water so he could provide a urine sample. <u>See</u> Response ¶ 10, at 3 (setting forth this fact)(citing Transcript of Officer Manuel Soto's April 13, 2016 Lapel Video at 4:1-2, filed March 3, 2018 (Doc. 36-1)("Tr. of Soto Lapel")); Reply ¶ 3, at 2 (admitting this fact). Favela became agitated, began screaming and crying, and had to be restrained by seven male nurses. <u>See</u> Response ¶ 13, at 3 (setting forth this fact)(citing Tr. of Soto Lapel at 7:16-25, 8:1-25; Soto Video 2); Reply ¶ 4, at 2 (admitting this fact). At this point, Soto entered the hospital room and removed the handcuffs from Favela, and Memorial Medical staff placed Favela in soft restraints. <u>See</u> Response ¶ 14, at 4 (setting forth this fact)(citing Tr. of Soto Lapel at 8:5-13; Soto Video 2); Reply ¶ 7, at 2 (not disputing this fact). While Favela was placed in soft restraints, Soto received an incoming call on his cellular telephone. <u>See</u> Response ¶ 16, at 4 (setting forth this fact)(citing Tr. of Soto Lapel at 9:12); Reply ¶ 4, at 2 (not disputing this fact). This call informed Soto that the District Attorney was not going to charge Favela with felony possession of a deadly weapon, because the District Attorney was waiting on a report regarding Favela's felony status. <u>See</u> Motion ¶ 38, at 8 (setting forth this fact)(citing Soto Aff. ¶¶ 18-19, at 2-3; Soto Video 2 at 06:55-07:45); Response at 2 (not

disputing this fact).  After receiving this information, Soto remained in the room with Favela while Memorial Medical staff attempted to collect a urine sample from Favela.  See Response ¶ 23, at 4-5 (setting forth this fact)(citing Tr. of Soto Lapel at 12:1-25; Soto Video 2); Reply ¶ 8, at 2 (admitting this fact).  Favela was not willing to provide a urine sample; Memorial Medical staff subsequently used a straight catheter on Favel to obtain a urine sample.  See Tr. at 9:2-8 (Coronado)(stating a catheterization of Favela occurred at Memorial Medical); id. at 11:19-25 (Martinez)(noting the undisputed nature of this fact).[4]  As Favela was not yet charged, Favela was then released from the hospital of his own recognizance.  See Motion ¶ 38, at 8 (setting forth this fact)(citing Soto Aff. at ¶¶ 18-19, at 2-3; Soto Video 2 at 06:55-07:45); Response at 2 (not disputing this fact).

## PROCEDURAL BACKGROUND

Favela filed his Complaint in state court on May 2, 2017.  He brings nine counts against the Defendants.  See Complaint ¶¶ 63-107, at 9-15.  In Count I, Favela alleges Defendants City of Las Cruces, Dollar, and Solo violated his rights under the Fourth Amendment of the Constitution of the United States by detaining him for an unreasonable amount of time without probable cause, constituting a constructive arrest, and bringing him to Memorial Medical to conduct a search of

---

[4]The Court derives support for this fact from the hearing held on July 2, 2018, because neither the Motion nor the Response sets forth as undisputed fact that Favela was catheterized.  It is apparent, however, from the Motion, Response, Reply, and the July 2, 2018, hearing that the parties do not dispute that Favela was catheterized.  The Court finds no basis to determine that Favela was not catheterized and will accept Favela's catheterization as an undisputed fact despite the parties' failure to provide support.  See Fed. R. Civ. P. 56(e)(2); N.M. Consol. Constr, LLC v. City Council of the City of Santa Fe, 97 F. Supp. 3d 1287, 1292 n.6 (D.N.M. 2015)(Browning, J.)(accepting a fact as undisputed pursuant to Rule 56(e)(2), because it was not disputed, and the Court had no independent reason to doubt its accuracy).

his body without a warrant.  See Complaint ¶¶ 63-69, 72 at 9-10.  In Count II, Favela alleges

Dollar, Solo, and the Memorial Medical Defendants -- Memorial Medical, Dr. Danielle Wilhelm,

Jamie Pitts, James Proctor, Jose Reveles, and Cassandria Branch -- violated Favela's Fourth

Amendment rights by forcibly inserting a straight catheter[5] without a valid arrest or law

enforcement authority.  See Complaint ¶¶ 75-78, at 10.  In Count III, Favela alleges Dollar, Solo,

and the Memorial Medical Defendants violated his Fourth Amendment rights by extracting his

urine without probable cause or a warrant.  See Complaint ¶¶ 81-84, at 11.  Favela alleges in Count

IV that the Memorial Medical Defendants breached their duty to conform to professional standards

by forcibly obtaining Favela's urine sample without consent or probable cause via straight

catheterization.  See Complaint ¶¶ 87-89, at 11-12.  In Count V, Favela alleges thatMemorial

Medical and Dr. Wilhelm failed to obtain his informed consent to treatment, as the law requires,

or should have known it was given "under duress and/or revoked by Plaintiff prior to treatment,"

Complaint ¶ 95, at 13, and thus "failed to comport with professional standards," Complaint ¶ 96,

at 13.  See id. ¶¶ 93-96, at 13.  In Count VI, Favela alleges that, if Dr. Wilhelm is not Memorial

Medical's employee, Memorial Medical was negligent in selecting Dr. Wilhelm as a staff

physician and granting her staff privileges, or, alternatively, that Memorial Medical was negligent

in failing to supervise Dr. Wilhelm and determining whether she possessed the care and skill an

emergency room doctor requires.  See Complaint ¶¶ 99-100, at 13-14.  In Count VII, Favela alleges

---

[5]A straight catheter "is a soft, thin tube used to pass urine from the body."  What is a Straight Catheter?, Home Care Delivered®, https://www.hcd.com/urology/straight-catheter/ (last visited June 20, 2019).  The straight catheter, usually made of PVC plastic, is "inserted through the urethra and into the bladder."  What is a Straight Catheter?, supra.  Straight catheters do not attach to a collection bag, and consist of the PVC tubing attached to a funnel, which is used to direct the urine into a waste receptacle.  What is a Straight Catheter?, supra.

Memorial Medical and Dr. Wilhelm are "engaging in commerce by providing services," the New Mexico Unfair Practices Act, N.M. Stat. Ann. §§ 57-12-1 to-26 ("NMUPA"), binds them, and they violated the NMUPA by "engaging in unconscionable trade practices" when they billed Favela for a medical service he refused and did not request. See Complaint ¶¶ 101-04, at 14. In Count VIII, Favela alleges Soto, Memorial Medical, Dr. Wilhelm, and Memorial Medical personnel acted in concert to commit assault and battery against Favela by physically inserting a straight catheter into him to extract urine. See Complaint ¶¶ 108-11, at 15. Finally, Favela alleges in Count IX that Soto, Memorial Medical, Dr. Wilhelm, and Memorial Medical personnel intentionally and unlawfully confined him in room 18 of Memorial Medical without his consent or a valid arrest, constituting false imprisonment. See Complaint ¶¶ 113-16, at 15.

### 1.    The Motion.

Dollar and Soto move the Court to grant them qualified immunity and summary judgment under rule 56 of the Federal Rules of Civil Procedure by filing their Motion on February 6, 2018. See Motion at 1. Regarding Count I, Soto argues that he could not have invaded Favela's Fourth Amendment rights during the traffic stop, because he was not involved with the stop and an officer can be liable only if his own actions proximately violate the Fourth Amendment. See Motion at 10 (citing Martinez v. Carson, 697 F.3d 1252, 1255 (10th Cir. 2012)). Dollar argues that Favela's reckless driving provided reasonable suspicion to conduct the traffic stop, while Favela's "concealed weapon and felony possession of a firearm supplied probable cause for continued detention until his release." Motion at 10-11. Dollar asserts that an officer may perform a pat-down search for weapons when he has specific information leading him to believe the individual is armed or dangerous. See Motion at 15. Dollar and Soto thus argue that there is no constitutional

violation nor clearly established law to prevent their asserting qualified immunity as to the traffic stop and pat-down search. See Motion at 17-18. Finally, Dollar and Soto contend that the Triple-I report showing Favela's lack of a concealed firearm permit and his felony conviction for shooting from a motor vehicle provide probable cause for his arrest, and that Dollar and Soto were thus acting appropriately in their continued detention of Favela. See Motion at 20-21.

Regarding Counts II, III, VIII, and IX, Dollar and Soto assert that the evidence clearly shows that they were not involved in Favela's catheterization, or any of Memorial Medical and its staff's alleged wrongful acts. See Motion at 21. Dollar and Soto also contend that any force which they used was reasonable. See Motion at 21-22. Dollar and Soto further assert that there is probable cause to support Favela's detention, and thus any false imprisonment claims alleged under the federal Constitution or the Constitution of the State of New Mexico must fail. See Motion at 22-24.

### 2.    The Response.

Favela responded to the Motion on March 15, 2018. See Response at 1. Favela concedes that the law which Dollar and Soto cites regarding Count I shows that they had probable cause to conduct the traffic stop and reasonable suspicion to conduct the pat down, and thus will not resist the Court's ruling in their favor on this Count. See Response at 1-2.

Favela challenges, however, the assertion that Soto had no part in Favela's treatment or catheterization, and thus disputes that Soto is entitled to qualified immunity on Counts II, III, VIII, and IX. See Response at 5. Favela asserts that Soto "set into motion a chain of events that he knew would lead to the deprivation of [Favela's] constitutional rights." Response at 5-7. Favela relies on Martinez v. Carson, and Trask v. Franco, 446 F.3d 1036 (10th Cir. 2006), to establish the

proposition that an actor can be held liable for harm caused when he or she "sets in motion a series of events that are reasonably likely to cause the deprivation of a constitutional right." Response at 7. See id. at 8. Favela contends that the Memorial Medical Defendants only insisted on taking a blood and urine sample from him, because Soto told them he was under arrest and had to be medically cleared before being transported to the detention center. See Response at 8. Favela notes that Soto knew before the forced catheterization that Favela would not be held in the detention center and was free to go but did not tell the nurses that there was no longer a reason to clear Favela for confinement. See Response at 8-9. Favela alleges that Soto knew or should have known that the catheterization, as an intrusion into the human body, requires a search warrant to perform absent exigent circumstances. See Response at 9 (citing Schmerber v. California, 384 U.S. 757 (1966)). Favela further contends that Soto knew or should have known that a catheterization without informed consent, a search warrant, or an emergency would shock the conscience. See Response at 10 (citing Rochin v. California, 342 U.S. 165 (1952); Yanez v. Romero, 619 F.2d 851 (10th Cir. 1980); Woods v. Brumlop, 1962-NMSC-133, 377 P.2d 520). Favela asserts that Soto is thus proximately liable for the harm that the Memorial Medical Defendants caused, "because at least some of this harm would not have occurred but for Soto's failure to inform them that [Favela] was free to go, that there was no need for a medical clearance." Response at 11.

###    3.    **The Reply**.

Dollar and Soto replied to Favela's Response on March 29, 2018. See Reply at 1. Soto reasserts his entitlement to qualified immunity under Counts II, III, VIII, and IX by noting that Favela was transported to Memorial Medical because he lost consciousness during the traffic stop

and not for any "criminal investigatory purpose." Reply at 3. Soto alleges that he "had no reason to believe that Plaintiff's medical clearance was part of, or would lead to, any violation of his rights." Reply at 3. Soto asserts that, even if the Memorial Medical Defendants violated Favela's rights, he was not a but-for cause of the violation. See Reply at 4. Soto states that Favela "was under MMC's exclusive care and control until he would have been released to Soto's custody," and that Favela has not cited to any clearly established law so as to waive Soto or Dollar's qualified immunity. Reply at 4.

Soto proceeds to note that Favela concedes probable cause supported his arrest and does not dispute the probable cause supporting his detention at Memorial Medical. See Reply at 5. While Favela argues that the District Attorney's decision not to charge Favela terminated the basis for continued detention, Soto asserts that the District Attorney's "decision does not implicate the probable cause supporting" detention. Reply at 5. Soto alleges that Favela's loss of consciousness instituted the responsibility of the arresting officers to provide him with medical treatment. See Reply at 6. Further, Soto argues that the forced catheterization was done only to ensure Favela's health and not to support criminal charges. See Reply at 6-7. Soto notes that Favela was not arrested on drug-related charges, or any other charges supporting the need for a urine or blood sample. See Reply at 7.

Regarding the state law claims, Soto states that he "did not unlawfully touch, attempt to touch, threaten, insult, or in any way batter or assault" Favela. Reply at 8. Soto alleges that his "interactions with Plaintiff were limited to removing his handcuffs and verbally confirming that failure to comply with MMC staff would force staff to catheterize" him. Reply at 8. Soto states that this contact was "sanctioned by his law enforcement authority and probable cause." Reply at

8 (citing <u>Santillo v. N.M. Dep't of Pub. Safety</u>, 2007-NMCA-159, ¶ 14, 173 P.3d 6, 10-11).

Finally, Soto argues that probable cause supports the arrest and continued detention of Favela, thus

no false imprisonment claims can stand.  <u>See</u> Reply at 9.

### 4. The Hearing.

The Court held a hearing on July 2, 2018, to hear argument regarding Dollar and Soto's

Motion.  <u>See</u> Tr. at 7:18-21 (Court).  The Court quickly determined that all claims against Dollar

should be dismissed, allowing the parties to argue only regarding Soto's conduct.  <u>See</u> Tr. at 9:11-

16 (Court, Coronado).  Accordingly, Dollar and Soto started with arguments regarding whether

Soto is entitled to qualified immunity on Fourth Amendment unreasonable search and excessive

force claims.  <u>See</u> Tr. at 9:17-10:7 (Court, Martinez).  Dollar and Soto argued that there was no

constitutional violation resulting from their handcuffing of Favela, because the initial search and

seizure was proper -- as Favela conceded.  <u>See</u> Tr. at 11:12-18 (Martinez).  They further argued

that Soto cannot be liable for any excessive force claim from Favela's catheterization, because

Soto "was not involved in that aspect of the hospital process," did not transport Favela to the

hospital, and was at the hospital only because Favela was going to be arrested.  Tr. at 11:24-25

(Martinez).  <u>See</u> <u>id.</u> at 11:7-12:2 (Martinez).  All Soto did at the hospital, he argued, was remove

the handcuffs that he had placed on Favela so the medical staff could place Favela in soft restraints

and complete their medical clearance of him.  <u>See</u> Tr. at 12:2-5 (Martinez).  Favela argued in

response that Soto is liable, because he participated in the excessive force used against Favela by

permitting the hospital staff to catheterize Favela despite knowing that he was not going to be

charged or detained.  <u>See</u> Tr. at 13:16-14:19 (Coronado).  He also argued that Favela was no longer

under arrest once Soto learned charges were not going to be brought.  <u>See</u> Tr. at 15:16-21

(Coronado). Favela argued that this news meant the excessive force of the hospital staff in catheterizing Favela against his will and without any medical necessity can be imputed onto Soto for not stopping it. See Tr. at 22:8-22 (Coronado). Memorial Medical, Proctor, Pitts, Reveles, and Branch posited their belief that the catheter was medically necessary because of Favela's history of losing consciousness that night, although they conceded it was unclear whether he would be in the emergency room but for his interaction with the police. See Tr. at 28:13-17 (Brack Morrow); id. at 29:1-4, 13-20 (Brack Morrow). Dollar and Soto noted that Favela was only at Memorial Medical because Dollar responsibly called an ambulance to ensure Favela's health after he passed out during the arrest. See Tr. at 31:2-6 (Martinez). In response, Favela could not produce any cases with a similar factual situation to show the law is clearly established that this was excessive force on Soto's part. See Tr. at 38:25-39:2 (Coronado). Dollar and Soto asserted the requirement for Favela to tender a case on point establishing officers must stop any force in the medical providers catheterizing Favela. See Tr. at 42:2-12 (Martinez).

As to whether the catheterization constituted an unreasonable search, Dollar and Soto argued that the catheterization was done only to obtain a medical clearance and to ensure Favela was healthy, with no evidence showing the urine was used for any other purpose. See Tr. at 43:25-44:24 (Martinez). Favela responded that no bodily intrusion may be made, even in a non-criminal setting, without a search warrant unless there are exigent circumstances -- which were not present here. See Tr. at 45:23-46:8 (Coronado). He further argued that Soto is liable for this violation because he knew that the arrest was not enduring and that Favela was free to leave once Soto learned no charges would be brought that night, but still permitted Memorial Medical to conduct a search. See Tr. at 45:9-15 (Coronado). Dollar and Soto countered that the law is not clearly

established that what Soto did is a constitutional violation, and that officers are still entitled to qualified immunity when they should have known that probable cause to make an arrest has dissipated. See Tr. at 48:1-18 (Martinez). As to the state law claims of assault and battery, Dollar and Soto asserted that Soto cannot be held liable, because he had no contact with Favela during the catheterization. See Tr. at 51:1-9 (Martinez). Finally, as to the state law claim of false imprisonment, they argued that Soto again cannot be liable because there was probable cause to make the stop and seizure. See Tr. at 51:10-19 (Martinez). Favela reasserted that Soto was present during the catheterization and should have ended the encounter once he learned charges were going to be dropped, but because he did not stop the catheterization, he is liable for assault, battery, and false imprisonment. See Tr. at 52:15-20 (Coronado, Court).

## LAW REGARDING MOTIONS FOR SUMMARY JUDGMENT

Rule 56(a) states: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The movant bears the initial burden of 'show[ing] that there is an absence of evidence to support the nonmoving party's case.'" Herrera v. Santa Fe Pub. Sch., 956 F. Supp. 2d 1191, 1221 (D.N.M. 2013)(Browning, J.)(alteration in Herrera v. Santa Fe Pub. Sch.)(quoting Bacchus Indus., Inc. v. Arvin Indus., Inc., 939 F.2d 887, 891 (10th Cir. 1991)). See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)("Celotex").

> Before the court can rule on a party's motion for summary judgment, the moving party must satisfy its burden of production in one of two ways: by putting evidence into the record that affirmatively disproves an element of the nonmoving party's case, or by directing the court's attention to the fact that the non-moving party lacks evidence on an element of its claim, "since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Celotex, 477 U.S. at 323-25. On those issues for which it bears

the burden of proof at trial, the nonmovant "must go beyond the pleadings and designate specific facts to make a showing sufficient to establish the existence of an element essential to his case in order to survive summary judgment." *Cardoso v. Calbone*, 490 F.3d 1194, 1197 (10th Cir. 2007)(internal quotations and brackets omitted).

Plustwik v. Voss of Nor. ASA, No. 2:11CV00757 DS, 2013 WL 1945082, at *1 (D. Utah May 9, 2013)(Sam, J.). "If the *moving* party will bear the burden of persuasion at trial, that party must support its motion with credible evidence -- using any of the materials specified in Rule 56(c) -- that would entitle it to a directed verdict if not controverted at trial." Celotex, 477 U.S. at 331 (Brennan, J., dissenting)(emphasis in original).[6] Once the movant meets this burden, rule 56 requires the nonmoving party to designate specific facts showing that there is a genuine issue for trial. See Celotex, 477 U.S. at 324; Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986)("Liberty Lobby"). In American Mechanical Solutions, LLC v. Northland Piping, Inc., 184 F. Supp. 3d 1030 (D.N.M. 2016)(Browning, J.), the Court granted summary judgment for the defendant when the plaintiff did not offer expert evidence supporting causation or proximate causation in its breach-of-contract or breach-of-the-implied-warranty-of-merchantability claims. See 184 F. Supp. 3d at 1075-78. The Court reasoned that the plaintiff could prove neither the breach-of-contract claim's causation requirement nor the breach-of-the-implied-warranty-of-merchantability claim's proximate-causation requirement with mere common knowledge, and so New Mexico law required that the plaintiff bolster its arguments with expert testimony, which the

---

[6]Although the Honorable William J. Brennan, Jr., then-Associate Justice of the Supreme Court, dissented in Celotex, this sentence is widely understood to be an accurate statement of the law. See 10A Charles Allen Wright & Arthur R. Miller, Federal Practice and Procedure § 2727, at 470 (3d ed. 1998)("Although the Court issued a five-to-four decision, the majority and dissent both agreed as to how the summary-judgment burden of proof operates; they disagreed as to how the standard was applied to the facts of the case.").

plaintiff had not provided. <u>See</u> 184 F. Supp. 3d at 1067, 1073, 1075, 1079. Without the requisite evidence, the plaintiff, the Court determined, failed to prove "an essential element of the nonmoving party's case," rendering "all other facts immaterial." 184 F. Supp. 3d at 1075 (internal quotation marks omitted)(quoting <u>Plustwik v. Voss of Nor. ASA</u>, 2013 WL 1945082, at *1). Thus, if a plaintiff has the burden of proof, and the plaintiff has no competent evidence, the defendant may move, without any competent evidence itself, past the plaintiff's lack of competent evidence, and secure summary judgment. <u>See</u>, <u>e.g.</u>, <u>Celotex</u>, 477 U.S. at 323-25 (providing that summary judgment is proper where a plaintiff lacks evidence on an essential element of its case); <u>Am. Mech. Sols., LLC v. Northland Piping, Inc.</u>, 184 F. Supp. 3d at 1075 (granting summary judgment because plaintiff lacked evidence on causation); <u>Morales v. E.D. Entyre & Co.</u>, 382 F. Supp. 2d 1252, 1272 (D.N.M. 2005)(Browning, J.)(granting summary judgment because plaintiff lacked competent evidence that defendants defectively manufactured an oil distributor). A conclusory assertion that the plaintiff lacks evidence is insufficient, however, to secure summary judgment; the defendant must make some evidentiary showing that the plaintiff lacks competent evidence. <u>See</u> <u>Halley v. Huckaby</u>, 902 F.3d 1136, 1143 (10th Cir. 2018)(stating that summary judgment may be warranted if the movant notes a lack of evidence for an essential element of the claim). <u>See also</u> 11 James William Moore et al., <u>Moore's Federal Practice</u> § 56.40[1][b][iv], at 56-109 to -111 (3d ed. 2018).

The party opposing a motion for summary judgment must "set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof." <u>Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc.</u>, 912 F.2d 1238, 1241 (10th Cir. 1990). <u>See</u> <u>Vitkus v. Beatrice Co.</u>, 11 F.3d 1535, 1539 (10th Cir. 1993)("However, the nonmoving

party may not rest on its pleadings but must set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof." (internal quotation marks omitted)(quoting Applied Genetics Int'l Inc. v. First Affiliated Sec., Inc., 912 F.2d at 1241). Rule 56(c)(1) provides: "A party asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials . . . ." Fed. R. Civ. P. 56(c)(1)(A). It is not enough for the party opposing a properly supported motion for summary judgment to "rest on mere allegations or denials of his pleadings." Liberty Lobby, 477 U.S. at 259. See Abercrombie v. City of Catoosa, 896 F.2d 1228, 1231 (10th Cir. 1990); Otteson v. United States, 622 F.2d 516, 519 (10th Cir. 1980)("[O]nce a properly supported summary judgment motion is made, the opposing party may not rest on the allegations contained in his complaint, but must respond with specific facts showing the existence of a genuine factual issue to be tried." (internal quotation marks omitted)(quoting Coleman v. Darden, 595 F.2d 533, 536 (10th Cir. 1979)).

Nor can a party "avoid summary judgment by repeating conclusory opinions, allegations unsupported by specific facts, or speculation." Colony Nat'l Ins. v. Omer, No. 07-2123-JAR, 2008 WL 2309005, at *1 (D. Kan. June 2, 2008)(Robinson, J.)(citing Fed. R. Civ. P. 56(e); Argo v. Blue Cross & Blue Shield of Kan., Inc., 452 F.3d 1193, 1199 (10th Cir. 2006)(McConnell, J.)). "In responding to a motion for summary judgment, 'a party cannot rest on ignorance of facts, on speculation, or on suspicion and may not escape summary judgment in the mere hope that

something will turn up at trial.'"  Colony Nat'l Ins. v. Omer, 2008 WL 2309005, at *1 (quoting Conaway v. Smith, 853 F.2d 789, 794 (10th Cir. 1988)).

To deny a motion for summary judgment, genuine factual issues must exist that "can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Liberty Lobby, 477 U.S. at 250.  A mere "scintilla" of evidence will not avoid summary judgment. Vitkus v. Beatrice Co., 11 F.3d at 1539 (citing Liberty Lobby, 477 U.S. at 248).  Rather, there must be sufficient evidence on which the fact finder could reasonably find for the nonmoving party.  See Liberty Lobby, 477 U.S. at 251 (quoting Schuylkill & Dauphin Improvement Co. v. Munson, 81 U.S. (14 Wall.) 442, 448 (1871)("Schuylkill"); Vitkus v. Beatrice Co., 11 F.3d at 1539.  "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.  If the evidence is merely colorable or is not significantly probative, summary judgment may be granted."  Liberty Lobby, 477 U.S. at 249 (citations omitted).  Where a rational trier of fact, considering the record as a whole, cannot find for the nonmoving party, "there is no 'genuine issue for trial.'"  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)(quoting First Nat'l Bank of Ariz. v. Cities Serv. Co., 391 U.S. 253, 289 (1968)).

When reviewing a motion for summary judgment, the court should keep in mind certain principles.  First, the court's role is not to weigh the evidence, but to assess the threshold issue whether a genuine issue exists as to material facts requiring a trial.  See Liberty Lobby, 477 U.S. at 249.  Second, the ultimate standard of proof is relevant for purposes of ruling on a summary judgment, such that, when ruling on a summary judgment motion, the court must "bear in mind the actual quantum and quality of proof necessary to support liability."  Liberty Lobby, 477 U.S.

at 254. Third, the court must resolve all reasonable inferences and doubts in the nonmoving party's favor, and construe all evidence in the light most favorable to the nonmoving party. See Hunt v. Cromartie, 526 U.S. 541, 550-55 (1999); Liberty Lobby, 477 U.S. at 255 ("The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." (citation omitted)). Fourth, the court cannot decide any issues of credibility. See Liberty Lobby, 477 U.S. at 255.

There are, however, limited circumstances in which the court may disregard a party's version of the facts. This doctrine developed most robustly in the qualified immunity arena. In Scott v. Harris, 550 U.S. 372 (2007), the Supreme Court of the United States concluded that summary judgment is appropriate where video evidence quite clearly contradicted the plaintiff's version of the facts. See 550 U.S. at 378-81. The Supreme Court explained:

> At the summary judgment stage, facts must be viewed in the light most favorable to the nonmoving party only if there is a "genuine" dispute as to those facts. Fed. Rule Civ. Proc. 56(c). As we have emphasized, "[w]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. [at] 586-587 . . . (footnote omitted). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. [at] 247-248 . . . . When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.

> That was the case here with regard to the factual issue whether respondent was driving in such fashion as to endanger human life. Respondent's version of events is so utterly discredited by the record that no reasonable jury could have

believed him.  The Court of Appeals should not have relied on such visible fiction;
it should have viewed the facts in the light depicted by the videotape.

Scott v. Harris, 550 U.S. at 380-81 (alterations in Scott v. Harris)(emphasis in Liberty Lobby).

The Tenth Circuit applied this doctrine in Thomson v. Salt Lake County, 584 F.3d 1304

(10th Cir. 2009), and explained:

> [B]ecause at summary judgment we are beyond the pleading phase of the litigation,
> a plaintiff's version of the facts must find support in the record: more specifically,
> "[a]s with any motion for summary judgment, '[w]hen opposing parties tell two
> different stories, one of which is blatantly contradicted by the record, so that no
> reasonable jury could believe it, a court should not adopt that version of the
> facts[.]'" *York v. City of Las Cruces*, 523 F.3d 1205, 1210 (10th Cir. 2008)(quoting
> *Scott*, 550 U.S. at 380); *see also Estate of Larsen ex rel. Sturdivan v. Murr*, 511
> F.3d 1255, 1258 (10th Cir. 2008)[(Tymkovich, J.)].

Thomson v. Salt Lake Cty., 584 F.3d at 1312 (second alteration in Thomson v. Salt Lake Cty.,

third and fourth alterations in York v. City of Las Cruces).  "The Tenth Circuit, in *Rhoads v. Miller*,

[352 F. App'x 289 (10th Cir. 2009)(Tymkovich, J.)(unpublished),] explained that the blatant

contradictions of the record must be supported by more than other witnesses' testimony[.]" Lymon

v. Aramark Corp., 728 F. Supp. 2d 1222, 1249 (D.N.M. 2010)(Browning, J.), aff'd, 499 F. App'x

771 (10th Cir. 2012).

## LAW REGARDING QUALIFIED IMMUNITY

Qualified immunity recognizes the "need to protect officials who are required to exercise

their discretion and the related public interest in encouraging the vigorous exercise of official

authority." Butz v. Economou, 438 U.S. 478, 506 (1978).  "Qualified immunity protects federal

and state officials from liability for discretionary functions, and from 'the unwarranted demands

customarily imposed upon those defending a long drawn-out lawsuit.'" Roybal v. City of

Albuquerque, No. CIV 08-0181 JB/LFG, 2009 WL 1329834, at *10 (D.N.M. April 28,

2009)(Browning, J.)(quoting Siegert v. Gilley, 500 U.S. 226, 232 (1991)).  The Supreme Court deems it "untenable to draw a distinction for purposes of immunity law between suits brought against state officials under § 1983 and suits brought directly under the Constitution against federal officials."  Butz v. Economou, 438 U.S. at 504.  See Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics, 403 U.S. 388, 392 (1971)("Bivens").  "The qualified immunity analysis is the same whether the claims are brought under Bivens or pursuant to the post-Civil War Civil Rights Acts."  Breidenbach v. Bolish, 126 F.3d 1288, 1291 (10th Cir. 1997), overruled on other grounds as recognized by Currier v. Doran, 242 F.3d 905 (10th Cir. 2001).

Under § 1983 and Bivens, a plaintiff may seek money damages from government officials who have violated his or her constitutional or statutory rights.  To ensure, however, that fear of liability will not "unduly inhibit officials in the discharge of their duties," Anderson v. Creighton, 483 U.S. 635, 638 (1987), the officials may claim qualified immunity; so long as they have not violated a "clearly established" right, the officials are shielded from personal liability, Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).

> That means a court can often avoid ruling on the plaintiff's claim that a particular right exists.  If prior case law has not clearly settled the right, and so given officials fair notice of it, the court can simply dismiss the claim for money damages.  The court need never decide whether the plaintiff's claim, even though novel or otherwise unsettled, in fact has merit.

Camreta v. Greene, 563 U.S. 692, 705 (2011).

Qualified immunity shields government officials from liability where "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  Pearson v. Callahan, 555 U.S. 223, 231 (2009)(internal quotation marks omitted)(quoting Harlow v. Fitzgerald, 457 U.S. at 818).  Qualified immunity also shields officers

who have "reasonable, but mistaken beliefs," and operates "to protect officers from the sometimes 'hazy border[s]'" of the law. Saucier v. Katz, 533 U.S. 194, 205 (2001)(quoting Priester v. City of Riviera Beach, 208 F.3d 919, 926-27 (11th Cir. 2000)). When a defendant asserts qualified immunity, the plaintiff must demonstrate: (i) that the defendant's actions violated his or her constitutional or statutory rights; and (ii) that the right was clearly established at the time of the alleged misconduct. See Riggins v. Goodman, 572 F.3d 1101, 1107 (10th Cir. 2009)(citing Pearson v. Callahan, 555 U.S. at 232, 236). See also Pueblo of Pojoaque v. New Mexico, 214 F. Supp. 3d 1028, 1096 (D.N.M. 2016)(Browning, J.).

**1.      Procedural Approach to Qualified Immunity.**

The Supreme Court recently revisited the proper procedure for lower courts to evaluate a qualified immunity defense. In Pearson v. Callahan, the Supreme Court held that lower courts "should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances of the particular case at hand." 555 U.S. at 236. The Supreme Court also noted that, while no longer mandatory, Saucier v. Katz' protocol -- by which a court first decides if the defendant's actions violated the Constitution, and then the court determines if the right violated was clearly established -- will often be beneficial. See Pearson v. Callahan, 555 U.S. at 233, 236. In rejecting the prior mandatory approach, the Supreme Court recognizes that "[t]here are cases in which it is plain that a constitutional right is not clearly established but far from obvious whether in fact there is such a right," and that such an approach burdens district courts and courts of appeals with "what may seem to be an essentially academic exercise." 555 U.S. at 237. The Supreme Court also recognizes that the prior mandatory approach "departs from the general rule of constitutional avoidance and

runs counter to the 'older, wiser judicial counsel not to pass on questions of constitutionality . . . unless such adjudication is unavoidable.'" 555 U.S. at 241 (quoting Scott v. Harris, 550 U.S. at 388). See Reichle v. Howards, 566 U.S. 658, 664 (2012)(affirming Pearson v. Callahan's procedure and noting that deciding qualified immunity issues on the basis of a right being not "clearly established" by prior case law "comports with our usual reluctance to decide constitutional questions unnecessarily").

The Supreme Court recognizes seven circumstances where district courts "should address only"[7] the clearly established prong of the qualified immunity analysis, Kerns v. Bader, 663 F.3d 1173, 1180 (10th Cir. 2011)(internal quotation marks omitted)(quoting Camreta v. Greene, 563 U.S. at 707), when:

> (1) the first, constitutional violation question "is so factbound that the decision provides little guidance for future cases"; (2) "it appears that the question will soon be decided by a higher court"; (3) deciding the constitutional question requires "an uncertain interpretation of state law"; (4) "qualified immunity is asserted at the pleading stage," and "the precise factual basis for the . . . claim . . . may be hard to identify"; (5) tackling the first element "may create a risk of bad decisionmaking," due to inadequate briefing; (6) discussing both elements risks "bad decisionmaking," because the court is firmly convinced that the law is not clearly established and is thus inclined to give little thought to the existence of the constitutional right; or (7) the doctrine of "constitutional avoidance" suggests the

---

[7]In Camreta v. Greene, the Supreme Court, somewhat confusingly, states that there are seven circumstances in which the district courts "should address only" the clearly established prong, but, in the same sentence, notes that deciding the violation prong is left "to the discretion of the lower courts." 563 U.S. at 707. In Kerns v. Bader, the Tenth Circuit interpreted Camreta v. Greene to mean that district courts are restricted from considering the violation prong in seven particular circumstances. See Kerns v. Bader, 663 F.3d 1173, 1180-81 (10th Cir. 2011)(Gorsuch, J.). The Supreme Court, however, has not stressed the seven circumstances as mandatory. Instead, it has recently reaffirmed that lower courts only "'should think hard, and then think hard again,' before addressing both qualified immunity and the merits of an underlying constitutional claim." District of Columbia v. Wesby, 138 S. Ct. 577, 589 n.7 (2018)(quoting Camreta v. Green, 563 U.S. at 707. This language suggests that the inquiry is still discretionary, although the Court's discretion should be exercised carefully.

wisdom of passing on the first constitutional question when "it is plain that a constitutional right is not clearly established but far from obvious whether in fact there is such a right."

Kerns v. Bader, 663 F.3d at 1180-81 (quoting Pearson v. Callahan, 555 U.S. at 236-42). Regarding the last of these seven circumstances, the Supreme Court has clarified that courts may "avoid avoidance," and address the first prong before the second prong in cases involving a recurring fact pattern, where guidance on the constitutionality of the challenged conduct is necessary, and the conduct is likely to face challenges only in the qualified immunity context. Camreta v. Greene, 563 U.S. at 706. See Kerns v. Bader, 663 F.3d at 1181.[8] "Courts should think carefully before

--------

[8]In Kerns v. Bader, the Tenth Circuit -- in an opinion by the Honorable Neil Gorsuch, then-United States Circuit Judge for the Tenth Circuit -- reversed the Court's decision that an officer was not entitled to qualified immunity, noting that the Court "analyzed both aspects of the qualified immunity test before agreeing" with the plaintiff that the qualified immunity defense did not protect the officer. 663 F.3d at 1183. In reversing, the Tenth Circuit stated:

> Because we agree with Sheriff White on the latter (clearly established law) question, we reverse without addressing the former (constitutional violation) question. And we pursue this course because doing so allows us to avoid rendering a decision on important and contentious questions of constitutional law with the attendant needless (entirely avoidable) risk of reaching an improvident decision on these vital questions.

663 F.3d at 1183-84. The Tenth Circuit did not analyze whether the officer violated the plaintiff's constitutional rights and stated that guidance on the particular constitutional issue would be more appropriate in a case not involving qualified immunity: "Neither do we doubt that the scope of the Constitution's protection for a patient's hospital records can be adequately decided in future cases where the qualified immunity overlay isn't in play (e.g., through motions to suppress wrongly seized records or claims for injunctive or declaratory relief)." 663 F.3d at 1187 n.5. On remand, the Court stated:

> While the Court must faithfully follow the Tenth Circuit's decisions and opinions, the Court is troubled by this statement and the recent trend of the Supreme Court's hesitancy in § 1983 actions to address constitutional violations. A Reconstruction Congress, after the Civil War, passed § 1983 to provide a civil remedy for

constitutional violations.  See Mitchum v. Foster, 407 U.S. 225, 238-39 (1972).  In Mitchum v. Foster, the Supreme Court explained:

> Section 1983 was originally § 1 of the Civil Rights Act of 1871 . . . and was enacted for the express purpose of "enforc(ing) the Provisions of the Fourteenth Amendment." . . . The predecessor of § 1983 was thus an important part of the basic alteration in our federal system wrought in the Reconstruction era through federal legislation and constitutional amendment.

407 U.S. at 238-39.  Congress did not say it would remedy only violations of "clearly established" law, but that

> [e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable.

42 U.S.C. § 1983 (emphasis added).  The Supreme Court established the qualified immunity defense in Pierson v. Ray, 386 U.S. 547 (1967), and held that officials were not liable for constitutional violations where they reasonably believed that their conduct was constitutional.  See E. Clarke, Safford Unified Sch. Dist. No. 1 v. Redding: Why Qualified Immunity is a Poor Fit in Fourth Amendment School Search Cases, 24 B.Y.U. J. Pub. L. 313, 329 (2010).  The Supreme Court first introduced the "clearly established" prong in reference to an officer's good faith and held that a compensatory award would only be appropriate if an officer "acted with such an impermissible motivation or with such disregard of the [individual's] clearly established constitutional rights that his action cannot reasonably be characterized as being in good faith."  Wood v. Strickland, 420 U.S. 308, 322 (1975).  In Harlow v. Fitzgerald, when the Supreme Court moved to an objective test, the clearly-established prong became a part of the qualified immunity test.  See 457 U.S. at 818 ("We therefore hold that government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights.").  It seems ironic that the federal courts would restrict a

expending 'scarce judicial resources' to resolve difficult and novel questions of constitutional or

statutory interpretation that will 'have no effect on the outcome of the case.'" Ashcroft v. al-Kidd,

---

congressionally mandated remedy for constitutional violations -- presumably the rights of innocent people -- and discourage case law development on the civil side -- and restrict case law development to motions to suppress, which reward only the guilty and is a judicially created, rather than legislatively created, remedy. Commentators have noted that, "[o]ver the past three decades, the Supreme Court has drastically limited the availability of remedies for constitutional violations in" exclusionary rule litigation in a criminal case, habeas corpus challenges, and civil litigation under § 1983. J. Marceau, The Fourth Amendment at a Three-Way Stop, 62 Ala. L. Rev. 687, 687 (2011). Some commentators have also encouraged the courts to drop the suppression remedy and the legislature to provide more -- not less -- civil remedies for constitutional violations. See Christopher Slobogin, Why Liberals Should Chuck the Exclusionary Rule, 1999 U. Ill. L. Rev. 363, 390-91 (1999)("Behavioral theory suggests that the exclusionary rule is not very effective in scaring police into behaving. . . . These theories also suggest that a judicially administered damages regime . . . would fare significantly better at changing behavior at an officer level."); Hon. Malcolm R. Wilkey, Constitutional Alternatives to the Exclusionary Rule, 23 S. Tex. L.J. 531, 539 (1982)(criticizing the exclusionary rule and recommending alternatives). In Hudson v. Michigan, 547 U.S. 586 (2006), the Supreme Court noted that civil remedies were a viable alternative to a motion to suppress when it held that the exclusionary rule was inapplicable to cases in which police officers violate the Fourth Amendment when they fail to knock and announce their presence before entering. See 547 U.S. at 596-97. Rather than being a poor or discouraged means of developing constitutional law, § 1983 seems the better and preferable alternative to a motion to suppress. It is interesting that the current Supreme Court and Tenth Circuit appear more willing to suppress evidence and let criminal defendants go free, than have police pay damages for violations of innocent citizens' civil rights. It is odd that the Supreme Court has not adopted a clearly established prong for suppression claims; it seems strange to punish society for police violating unclear law in criminal cases, but protect municipalities from damages in § 1983 cases.

Kerns v. Bd. of Comm'rs of Bernalillo Cty., 888 F. Supp. 2d 1176, 1224 n.36 (D.N.M. 2012)(Browning, J.), abrogated on other grounds as recognized by Ysasi v. Brown, 3 F. Supp. 3d 1088, 1130 n.24 (D.N.M. 2014)(Browning, J.). See Richard E. Myers, Fourth Amendment Small Claims Court, 10 Ohio St. J. Crim. L. 571, 590-97 (2013)(arguing that municipalities should establish small-claims courts to adjudicate police officers' Fourth Amendment violations and award monetary judgments).

563 U.S. 731, 735 (2011)(quoting <u>Pearson v. Callahan</u>, 555 U.S. at 236-37).[9]  <u>See</u> <u>Camreta v.</u>

<u>Greene</u>, 563 U.S. at 707 ("In general, courts should think hard, and then think hard again, before

turning small cases into large ones.").  The Tenth Circuit will remand a case to the district court

for further consideration when the district court has given only cursory treatment to qualified

immunity's clearly established prong.  <u>See</u> <u>Kerns v. Bader</u>, 663 F.3d at 1182.  <u>See also</u> <u>Kerns v.</u>

<u>Bd. of Comm'rs of Bernalillo Cty.</u>, 888 F. Supp. 2d 1176, 1202 (D.N.M. 2012)(Browning, J.),

<u>abrogated on other grounds as recognized by</u> <u>Ysasi v. Brown</u>, 3 F. Supp. 3d 1088, 1130 n.24

(D.N.M. 2014)(Browning, J.).

      **2.**        **<u>Clearly Established Rights</u>.**

      To determine whether a right was clearly established, a court must consider whether the

right was sufficiently clear that a reasonable government employee would understand that what he

or she did violated a right.  <u>See</u> <u>Casey v. W. Las Vegas Indep. Sch. Dist.</u>, 473 F.3d 1323, 1327

(10th Cir. 2007)(Gorsuch, J.).  "A clearly established right is generally defined as a right so

thoroughly developed and consistently recognized under the law of the jurisdiction as to be

---

      [9]The appellate courts have little appreciation for how hard it is to do a clearly established prong review first without looking -- closely and thoroughly -- at whether there is a constitutional right and whether there is a violation.  It is difficult to review the facts, rights, and alleged violations in the comparative cases without looking at the facts, rights, and alleged violations on the merits in the case before the Court.  <u>Pearson v. Callahan</u> sounds like a good idea in theory, but it does not work well in practice.  The clearly established prong is a comparison between the case before the Court and previous cases, and <u>Pearson v. Callahan</u> suggests that the Court can compare before the Court fully understands what it is comparing.  In practice, <u>Saucier v. Katz</u> worked better.

'indisputable' and 'unquestioned.'" Lobozzo v. Colo. Dep't of Corr., 429 F. App'x 707, 710 (10th Cir. 2011)(unpublished)[10](quoting Zweibon v. Mitchell, 720 F.2d 162, 172-73 (D.C. Cir. 1983)).

"Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." Medina v. City & Cty. of Denver, 960 F.2d 1493, 1498 (10th Cir. 1992), overruled in part on other grounds by Cty. of Sacramento v. Lewis, 523 U.S. 833 (1998), as recognized by Morris v. Noe, 672 F.3d 1185, 1197 n.5 (10th Cir. 2012). "In determining whether the right was 'clearly established,' the court assesses the objective legal reasonableness of the action at the time of the alleged violation and asks whether 'the contours of the right [were] sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" Holland ex rel. Overdorff v. Harrington, 268 F.3d 1179, 1186 (10th Cir. 2001)(alteration in Holland ex rel. Overdorff v. Harrington)(quoting Saucier v. Katz, 533 U.S. at 202). A court should inquire "whether the law put officials on fair notice that the

---

[10]Lobozzo v. Colorado Department of Corrections is an unpublished Tenth Circuit opinion, but the Court can rely on an unpublished Tenth Circuit opinion to the extent its reasoned analysis is persuasive in the case before it. See 10th Cir. R. 32.1(A), 28 U.S.C. ("Unpublished decisions are not precedential, but may be cited for their persuasive value."). The Tenth Circuit has stated: "In this circuit, unpublished orders are not binding precedent, . . . and . . . citation to unpublished opinions is not favored. However, if an unpublished opinion . . . has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision." United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005)(citations omitted). The Court concludes that Lobozzo v. Colorado Department of Corrections, Malone v. Board of County Commissioners for County of Dona Ana, 707 F. App'x 552 (10th Cir. 2017), How v. City of Baxter Springs, 217 F. App'x 787 (10th Cir. 2007), Rife v. Jefferson, 742 F. App'x 377 (10th Cir. 2018), Brown v. City of Colorado Springs, 709 F. App'x 906 (10th Cir. 2017), United States v. Wilson, 96 F. App'x 643 (10th Cir. 2004), United States v. Ceballos, 355 F. App'x 226 (10th Cir. 2009)(unpublished), and United States v. Aragones, 483 F. App'x 415 (10th Cir. 2012)(unpublished), have persuasive value with respect to a material issue, and will assist the Court in its disposition of this Memorandum Opinion and Order.

described conduct was unconstitutional" rather than engage in "a scavenger hunt for cases with precisely the same facts." Pierce v. Gilchrist, 359 F.3d 1279, 1298 (10th Cir. 2004)(McConnell, J.).

The Supreme Court has clarified that qualified immunity's clearly established prong is a very high burden for the plaintiff: "A Government official's conduct violates clearly established law when, at the time of the challenged conduct, '[t]he contours of [a] right [are] sufficiently clear' that every 'reasonable official would have understood that what he is doing violates that right.'" Ashcroft v. al-Kidd, 563 U.S. at 741 (alterations in Ashcroft v. al-Kidd)(quoting Anderson v. Creighton, 483 U.S. at 640. "In other words, 'existing precedent must have placed the statutory or constitutional question beyond debate.'" Reichle v. Howards, 566 U.S. at 664 (quoting Ashcroft v. al-Kidd, 563 U.S. at 741). "The operation of this standard, however, depends substantially upon the level of generality at which the relevant 'legal rule' is to be identified." Anderson v. Creighton, 483 U.S. at 639. "The general proposition, for example, that an unreasonable search or seizure violates the Fourth Amendment is of little help in determining whether the violative nature of particular conduct is clearly established." Ashcroft v. al-Kidd, 563 U.S. at 742. The level of generality at which the legal rule is defined is important, because qualified immunity shields officers who have "reasonable, but mistaken beliefs" as to the application of law to facts and operates "to protect officers from the sometimes 'hazy border[s]'" of the law. Saucier v. Katz, 533 U.S. at 205 (quoting Priester v. City of Riviera Beach, 208 F.3d at 926-27).

"[A] case on point isn't required if the impropriety of the defendant's conduct is clear from existing case law," but the law is not clearly established where "a distinction *might* make a constitutional difference." Kerns v. Bader, 663 F.3d at 1186-87 (emphasis in original). In Kerns

v. Bader, dealing with the search of a home, the Tenth Circuit explained that the relevant question "wasn't whether we all have some general privacy interest in our homes," but "whether it was beyond debate in 2005 that the officers' entry and search lacked legal justification." 663 F.3d at 1183 (emphasis added). Furthermore, "general statements of the law are not inherently incapable of giving fair and clear warning." Hope v. Pelzer, 536 U.S. 730, 741 (2002).

Although the Tenth Circuit has recognized "a sliding scale" for qualified immunity's clearly established inquiry, Casey v. City of Fed. Heights, 509 F.3d 1278, 1284 (10th Cir. 2007)(McConnell, J.)("We have therefore adopted a sliding scale to determine when law is clearly established."), the Tenth Circuit may have since walked back its holding that a sliding scale is the appropriate approach, see Aldaba v. Pickens, 844 F.3d 870, 876 (10th Cir. 2016)("Aldaba II"). In Aldaba II, the Tenth Circuit reconsidered its ruling from Aldaba v. Pickens, 777 F.3d 1148 (10th Cir. 2015)("Aldaba I"), that officers were entitled to qualified immunity after the Supreme Court vacated its decision in light of Mullenix v. Luna, 136 S. Ct. 305 (2015)(per curiam). In concluding that it had previously erred in Aldaba I, the Tenth Circuit determined:

> We erred . . . by relying on excessive-force cases markedly different from this one. Although we cited *Graham v. Connor*, 490 U.S. 386 . . . (1989) to lead off our clearly-established-law discussion, we did not just repeat its general rule and conclude that the officers' conduct had violated it. Instead, we turned to our circuit's sliding-scale approach measuring degrees of egregiousness in affirming the denial of qualified immunity. *Aldaba*, 777 F.3d at 1159. We also relied on several cases resolving excessive-force claims. But none of those cases remotely involved a situation as here . . . .

Aldaba II, 844 F.3d at 876. The Tenth Circuit further noted that its sliding-scale approach may have fallen out of favor, because the sliding-scale test relies, in part, on Hope v. Pelzer, 536 U.S. at 739-41, and the Supreme Court's most recent qualified immunity decisions do not invoke that

case.  See Aldaba II, 844 F.3d at 874 n.1.  See also Lowe v. Raemisch, 864 F.3d 1205, 1211 n.10 (10th Cir. 2017)("But our sliding-scale approach may arguably conflict with recent Supreme Court precedent on qualified immunity.").  The Tenth Circuit explained:

> To show clearly established law, the *Hope* Court did not require earlier cases with "fundamentally similar" facts, noting that "officials can still be on notice that their conduct violates established law even in novel factual circumstances."  [Hope v. Pelzer, 536 U.S.] at 741 . . . .  This calls to mind our sliding-scale approach measuring the egregiousness of conduct.  *See Morris v. Noe*, 672 F.3d 1185, 1196 (10th Cir. 2012).  But the Supreme Court has vacated our opinion here and remanded for us to reconsider our opinion in view of *Mullenix*, which reversed the Fifth Circuit after finding that the cases it relied on were "simply too factually distinct to speak clearly to the specific circumstances here." 136 S. Ct. at 312.  We also note that the majority opinion in *Mullenix* does not cite *Hope v. Pelzer*, 536 U.S. 730 . . . (2002).  As can happen over time, the Supreme Court might be emphasizing different portions of its earlier decisions.

Aldaba II, 844 F.3d at 874 n.1.  Since Aldaba II, the Supreme Court has reversed, per curiam, another Tenth Circuit qualified immunity decision.  See White v. Pauly, 137 S. Ct. 548, 551 (2017)(per curiam).  In concluding that police officers were entitled to qualified immunity, the Supreme Court emphasized: "As this Court explained decades ago, the clearly established law must be 'particularized' to the facts of the case."  White v. Pauly, 137 S. Ct. at 552 (quoting Anderson v. Creighton, 483 U.S. at 640).  With that principle in mind, the Supreme Court explained that the Tenth Circuit "panel majority misunderstood the 'clearly established' analysis: It failed to identify a case where an officer acting under similar circumstances as Officer White was held to have violated the Fourth Amendment."  White v. Pauly, 137 S. Ct. at 552.  See District of Columbia v. Wesby, 138 S. Ct. 577, 591 (2018)("Tellingly, neither the panel majority nor the partygoers have identified a single precedent -- much less a controlling case or robust consensus of cases -- finding a Fourth Amendment violation 'under similar circumstances.'" (quoting White

v. Pauly, 137 S. Ct. at 552)).  Although the Supreme Court noted that "we have held that [Tennessee v. ]Garner[, 471 U.S. 1 (1985),] and Graham[ v. Connor] do not by themselves create clearly established law outside 'an obvious case,'" it concluded "[t]his is not a case where it is obvious that there was a violation of clearly established law under Garner and Graham." White v. Pauly, 137 S. Ct. at 552 (quoting Brosseau v. Haugen, 436 U.S. 194, 199 (2004)(per curiam).[11]

---

[11]If a district court in New Mexico is trying -- as it does diligently and faithfully -- to receive and read the unwritten signs of its superior courts, it would appear that the Supreme Court has signaled through its per curiam qualified immunity reversals that a near-identical case must exist for the law to be clearly established.  As former Tenth Circuit judge, and now Stanford law school professor, Michael McConnell, has noted, much of what lower courts do is read the implicit, unwritten signs that the superior courts send them through their opinions.  See Michael W. McConnell, Address at the Oliver Seth American Inn of Court, How Does the Supreme Court Communicate Its Intentions to the Lower Courts: Holdings, Hints and Missed Signals (Dec. 17, 2014).  Although still stating that there might be an obvious case under Graham v. Connor or Tennessee v. Garner that would make the law clearly established without a Supreme Court or Circuit Court case on point, see White v. Pauly, 137 S. Ct. at 552, the Supreme Court has sent unwritten signals to the lower courts that a factually identical or a highly similar factual case is required for the law to be clearly established, and the Tenth Circuit is now sending those unwritten signals to the district courts, see Malone v. Bd. of Cty. Comm'rs for Cty. of Dona Ana, 707 F. App'x 552, 556 (10th Cir. 2017)(unpublished)(reversing the Court's judgment that the case should proceed where a deceased plaintiff was backing away from the police and was not raising his gun when shot, because "the parties do not cite, nor could we find, any Supreme Court or Tenth Circuit case that is sufficiently close factually to the circumstances presented here to establish clearly the Fourth Amendment law that applies").

Factually identical or highly similar factual cases are not, however, the way the real world works.  Cases differ.  Many cases have so many facts that are unlikely to ever occur again in a significantly similar way.  See York v. City of Las Cruces, 523 F.3d 1205, 1212 (10th Cir. 2008)("However, [the clearly established prong] does not mean that there must be a published case involving identical facts; otherwise we would be required to 'find qualified immunity wherever we have a new fact pattern.'"  (quoting Casey v. City of Fed. Heights, 509 F.3d at 1284)).  The Supreme Court's obsession with the clearly established prong assumes that officers are routinely reading Supreme Court and Tenth Circuit opinions in their spare time, carefully comparing the facts in these qualified immunity cases with the circumstances they confront in their day-to-day police work.  It is hard enough for the federal judiciary to embark on such an exercise, let alone likely that police officers are endeavoring to parse opinions.  It is far more likely that, in their training and continuing education, police officers are taught general principles, and, in the intense atmosphere of an arrest, police officers rely on these general principles, rather than engaging in a

detailed comparison of their situation with a previous Supreme Court or published Tenth Circuit case. It strains credulity to believe that a reasonable officer, as he is approaching a suspect to arrest, is thinking to himself: "Are the facts here anything like the facts in York v. City of Las Cruces?" Thus, when the Supreme Court grounds its clearly established jurisprudence in the language of what a reasonable officer or a reasonable official would know, Kisela v. Hughes, 138 S. Ct. 1148, 1153 (2018), yet still requires a highly factually analogous case, it has either lost sight of reasonable officer's experience or it is using that language to mask an intent to create "an absolute shield for law enforcement officers," Kisela v. Hughes, 138 S. Ct. at 1162 (Sotomayor, J. dissenting). The Court concludes that the Supreme Court is doing the latter, crafting its recent qualified immunity jurisprudence to effectively eliminate § 1983 claims against state actors in their individual capacities by requiring an indistinguishable case and by encouraging courts to go straight to the clearly established prong. See Saenz v. Lovington Mun. Sch. Dist., 105 F. Supp. 3d 1271, 1297 n.4 (D.N.M. 2015)(Browning, J.).

The Court disagrees with the Supreme Court's approach. The most conservative, principled decision is to minimize the expansion of the judicially created clearly established prong, so that it does not eclipse the congressionally enacted § 1983 remedy. As the Cato Institute noted in a recent amicus brief, "qualified immunity has increasingly diverged from the statutory and historical framework on which it is supposed to be based." Brief of the Cato Institute as Amicus Curiae Supporting Petitioners at 2, White v. Pauly, 137 S. Ct. 548 (2017)(No. 17-1078)("Cato Brief"). "The text of 42 U.S.C. § 1983 . . . makes no mention of immunity, and the common law of 1871 did not include any across-the-board defense for all public officials." Cato Brief at 2. "With limited exceptions, the baseline assumption at the founding and throughout the nineteenth century was that public officials were strictly liable for unconstitutional misconduct. Judges and scholars alike have thus increasingly arrived at the conclusion that the contemporary doctrine of qualified immunity is unmoored from any lawful justification . . . ." Cato Brief at 2. See generally William Baude, Is Qualified Immunity Unlawful?, 106 Cal. L. Rev. 45 (2018)(arguing that the Supreme Court's justifications for qualified immunity are incorrect). Further, as the Honorable Clarence Thomas, Associate Justice for the Supreme Court of the United States, has argued, the Supreme Court's qualified immunity analysis "is no longer grounded in the common-law backdrop against which Congress enacted [§ 1983], we are no longer engaged in 'interpret[ing] the intent of Congress in enacting' the Act." Ziglar v. Abbasi, 137 S. Ct. 1843, 1871 (2017)(Thomas, J., concurring)(second alteration in Ziglar v. Abbasi)(quoting Malley v. Briggs, 475 U.S. 335, 342 (1986)). "Our qualified immunity precedents instead represent precisely the sort of 'freewheeling policy choice[s]' that we have previously disclaimed the power to make." Ziglar v. Abbasi, 137 S. Ct. at 1871 (Thomas, J., concurring)(alteration in Ziglar v. Abbasi)(quoting Rehberg v. Paulk, 556 U.S. 356, 363 (2012)). The judiciary should be true to § 1983 as Congress wrote it.

Moreover, in a day when police shootings and excessive force cases are in the news, there should be a remedy when there is a constitutional violation, and jury trials are the most democratic expression of what police action is reasonable and what action is excessive. If the citizens of New Mexico decide that state actors used excessive force or were deliberately indifferent, the verdict should stand, and not be set aside because the parties could not find an indistinguishable Tenth Circuit or Supreme Court decision. Finally, to always decide the clearly established prong first

## RELEVANT LAW REGARDING LIABILITY FOR CONSTITUTIONAL VIOLATIONS UNDER 42 U.S.C. § 1983

Section 1983 of Title 42 of the United States Code provides:

> Every person who under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable. For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.

42 U.S.C. § 1983. "To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." West v. Atkins, 487 U.S.

---

and then to always say that the law is not clearly established could be stunting the development of constitutional law. See Aaron L. Nielson & Christopher J. Walker, The New Qualified Immunity, 89 S. Cal. L. Rev. 1, 6 (2015). And while the Tenth Circuit -- with the exception of now-Justice Gorsuch, see Shannon M. Grammel, Justice Gorsuch on Qualified Immunity, Stan. L. Rev. Online (2017) -- seems to be in agreement with the Court, see, e.g., Casey v. City of Fed. Heights, 509 F.3d at 1286, the Supreme Court's per curiam reversals appear to have the Tenth Circuit stepping lightly around qualified immunity's clearly established prong, see, e.g., Perry v. Durborow, 892 F.3d 1116, 1123-27 (10th Cir. 2018); Aldaba II, 844 F.3d at 874; Rife v. Jefferson, 742 F. App'x 377, 381-88 (10th Cir. 2018)(unpublished); Malone v. Bd. of Cty. Comm'rs for Cty. of Dona Ana, 707 F. App'x at 555-56; Brown v. City of Colo. Springs, 709 F. App'x 906, 915 (10th Cir. 2017)(unpublished), and willing to reverse district court decisions should the district court conclude that the law is clearly established, but see Matthews v. Bergdorf, 889 F.3d 1136, 1149-50 (10th Cir. 2018)(holding that a child caseworker was not entitled to qualified immunity, because a caseworker would know that "child abuse and neglect allegations might give rise to constitutional liability under the special relationship exception"); McCoy v. Meyers, 887 F.3d 1034, 1052-53 (10th Cir. 2018)(concluding that there was clearly established law even though the three decisions invoked to satisfy that prong were not "factually identical to this case," because those cases "nevertheless made it clear that the use of force on effectively subdued individuals violates the Fourth Amendment").

42, 48 (1988).  Individual, non-supervisory defendants may be liable if they knew or reasonably should have known that their conduct would lead to the deprivation of a plaintiff's constitutional rights by others, and an unforeseeable intervening act has not terminated their liability.  See Martinez v. Carson, 697 F.3d at 1255 ("The requisite causal connection is satisfied if [Defendants] set in motion a series of events that [Defendants] knew or reasonably should have known would cause others to deprive [Plaintiffs] of [their] constitutional rights."  (alterations in Martinez v. Carson)(internal quotation marks omitted)(quoting Trask v. Franco, 446 F.3d at 1046)).  The Supreme Court has made clear that there is no respondeat superior liability under 42 U.S.C. § 1983.  See Ashcroft v. Iqbal, 556 U.S. 662, 676 (2009)("Because vicarious liability is inapplicable to *Bivens* and § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution.");  Bd. of Cty. Comm'rs of Bryan Cty. v. Brown, 520 U.S. 397, 403 (1997)(stating that "a municipality may not be held liable under § 1983 solely because it employs a tortfeasor").  "An entity cannot be held liable solely on the basis of the existence of an employer-employee relationship with an alleged tortfeasor."  Garcia v. Casaus, No. CIV 11-0011 JB/RHS, 2011 WL 7444745, at *25 (D.N.M. Dec. 8, 2011)(Browning, J.)(citing Monell v. Dep't of Soc. Servs., 436 U.S. 658, 689 (1978)).  Supervisors can be held liable only for their own unconstitutional or illegal policies, and not for the employees' tortious acts.  See Barney v. Pulsipher, 143 F.3d 1299, 1307-08 (10th Cir. 1998)(Seymour, C.J.).

    **1.**    **Color of State Law.**

"Under Section 1983, liability attaches only to conduct occurring 'under color of law.'" Gallagher v. Neil Young Freedom Concert, 49 F.3d 1442, 1447 (10th Cir. 1995).  The under-color-of-state-law requirement is a "'jurisdictional requisite for a § 1983 action,' which . . . furthers the

fundamental goals of 'preserv[ing] an area of individual freedom by limiting the reach of federal law . . . [and] avoid[ing] imposing on the State, its agencies or officials, responsibility for conduct for which they cannot fairly be blamed.'" Jojola v. Chavez, 55 F.3d 488, 492 (10th Cir. 1995)(alterations in Jojola v. Chavez)(first quoting Polk Cty. v. Dodson, 454 U.S. 312, 315 (1981); and then quoting Gallagher v. Neil Young Freedom Concert, 49 F.3d at 1447). "The traditional definition of acting under color of state law requires that the defendant in a § 1983 action have exercised power 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'" West v. Atkins, 487 U.S. at 49 (quoting United States v. Classic, 313 U.S. 299, 326 (1941)). "The authority with which the defendant is allegedly 'clothed' may be either actual or apparent." Jojola v. Chavez, 55 F.3d at 493. Accordingly, at a base level, to conclude that an action was taken under color of state law, the court must determine that "'the conduct allegedly causing the deprivation of a federal right' [is] 'fairly attributable to the State.'" Gallagher v. Neil Young Freedom Concert, 49 F.3d at 1447 (quoting Lugar v. Edmondson Oil Co., 457 U.S. 922, 937 (1982)).

The Tenth Circuit has directed that, while "'state employment is generally sufficient to render the defendant a state actor . . . [,]' at the same time, it is 'well settled that an otherwise private tort is not committed under color of law simply because the tortfeasor is an employee of the state.'" Jojola v. Chavez, 55 F.3d at 493 (first quoting Lugar v. Edmondson Oil Co., 457 U.S. at 935-36 n.18; and then quoting Mark v. Borough of Hatboro, 51 F.3d 1137, 1150 (3d Cir. 1995)). Thus, "before conduct may be fairly attributed to the state because it constitutes action 'under color of state law,' there must be 'a real nexus' between the employee's use or misuse of their authority as a public employee, and the violation allegedly committed by the defendant." Jojola v. Chavez,

55 F.3d at 493. What constitutes the required real nexus, however, is not completely clear. As the Tenth Circuit has stated, whether there is a real nexus in a particular case depends on the circumstances:

> The under color of law determination rarely depends on a single, easily identifiable fact, such as the officer's attire, the location of the act, or whether or not the officer acts in accordance with his or her duty. Instead one must examine "the nature and circumstances of the officer's conduct and the relationship of that conduct to the performance of his official duties."

David v. City & Cty. of Denver, 101 F.3d 1344, 1353 (10th Cir. 1996)(citations omitted)(quoting Martinez v. Colon, 54 F.3d 980, 986 (1st Cir. 1995)).

## 2. Individual Liability.

Government actors may be liable for the constitutional violations that another committed, if the actors "set in motion a series of events that the defendant[s] knew or reasonably should have known would cause others to deprive the plaintiff of [his] constitutional rights," thus establishing the "requisite causal connection" between the government actor's conduct and a plaintiff's constitutional deprivations. Trask v. Franco, 446 F.3d at 1046 (internal quotation marks omitted)(quoting Snell v. Tunnell, 920 F.2d 673, 700 (10th Cir. 1990)). The Tenth Circuit has explained that § 1983 liability "should be read against the background of tort liability that makes a man responsible for the natural consequences of his actions." Martinez v. Carson, 697 F.3d at 1255 (internal quotation marks omitted)(quoting Monroe v. Pape, 365 U.S. 167, 187 (1961), overruled in part by Monell v. Dep't of Soc. Servs., 436 U.S. at 663). "Thus, Defendants are liable for the harm proximately caused by their conduct." Martinez v. Carson, 697 F.3d at 1255 (citing Trask v. Franco, 446 F.3d at 1046). As the Court has previously concluded, "a plaintiff who establishes liability for deprivations of constitutional rights actionable under 42 U.S.C. § 1983 is

entitled to recover compensatory damages for all injuries suffered as a consequence of those deprivations. The recovery should be guided by common-law tort principles -- including principles of causation . . . ." Train v. City of Albuquerque, 629 F. Supp. 2d 1243, 1251 (D.N.M. 2009)(Browning, J.).[12]

The Tenth Circuit has found liability for those defendants who proximately caused an injury alleged under § 1983 and stated that the fact that the "conduct of other people may have concurrently caused the harm does not change the outcome as to [the defendant]," so long as there was not a superseding, intervening cause of a plaintiff's harm. Lippoldt v. Cole, 468 F.3d 1204, 1220 (10th Cir. 2006).

> Even if a factfinder concludes that the residential search was unlawful, the officers only "would be liable for the harm 'proximately' or 'legally' caused by their tortious conduct." *Bodine v. Warwick*, 72 F.3d 393, 400 (3d Cir. 1995). "They would not, however, necessarily be liable for all of the harm caused in the 'philosophic' or but-for sense by the illegal entry." *Id.* In civil rights cases, a superseding cause, as we traditionally understand it in tort law, relieves a defendant of liability. *See, e.g.*, *Warner v. Orange County Dep't of Prob.*, 115 F.3d 1068, 1071 (2d Cir. 1997); *Springer v. Seaman*, 821 F.2d 871, 877 (1st Cir. 1987), *abrogated on other grounds by Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701 . . . (1989).

Trask v. Franco, 446 F.3d at 1046. Thus, in the context of a claim under the Fourth Amendment, the Tenth Circuit has held that government actors "may be held liable if the further unlawful detention and arrest would not have occurred but for their conduct and if there were no

---

[12]The Court clarified in Herrera v. Santa Fe Public Schools, 41 F. Supp. 3d 1188 (D.N.M. 2014)(Browning, J.), that common-law causation standards do not necessarily hold in the municipal-liability context, and, in fact, "the causation standard for municipal liability cases is unclear in the Tenth Circuit." 41 F. Supp. 3d at 1273 (citing Schneider v. City of Grand Junction Police Dep't, 717 F.3d 760, 769-71. The Court applied a traditional proximate-cause analysis, and left open the possibility that there might be some greater, undefined causation requirement. See 41 F. Supp. 3d at 1281.

unforeseeable intervening acts superseding their liability." Martinez v. Carson, 697 F.3d at 1255. The Tenth Circuit gave an example of a superseding-intervening cause, quoting the Honorable Samuel J. Alito, then-United States Circuit Judge for the United States Court of Appeals for the Third Circuit:

> "Suppose that three police officers go to a suspect's house to execute an arrest warrant and that they improperly enter without knocking and announcing their presence. Once inside, they encounter the suspect, identify themselves, show him the warrant, and tell him that they are placing him under arrest. The suspect, however, breaks away, shoots and kills two of the officers, and is preparing to shoot the third officer when that officer disarms the suspect and in the process injures him. Is the third officer necessarily liable for the harm caused to the suspect on the theory that the illegal entry without knocking and announcing rendered any subsequent use of force unlawful? The obvious answer is "no." The suspect's conduct would constitute a "superseding" cause, *see Restatement (Second) of Torts* § 442 (1965), that would limit the officer's liability. *See id.* § 440."

Trask v. Franco, 446 F.3d at 1046 (quoting Bodine v. Warwick, 72 F.3d at 400). Additionally, "[f]oreseeable intervening forces are within the scope of the original risk, and . . . will not supersede the defendant's responsibility." Trask v. Franco, 446 F.3d at 1047 (internal quotation marks omitted)(quoting William Lloyd Prosser et al., Prosser and Keeton on Torts § 44, at 303-04 (5th ed.1984)).

> [I]f "the reasonable foreseeability of [an intervening act's occurrence] is a factor in determining whether the intervening act relieves the actor from liability for his antecedent [wrongful act], and under the undisputed facts there is room for reasonable difference of opinion as to whether such act was [wrongful] or foreseeable, the question should be left for the jury."

Trask v. Franco, 446 F.3d at 1047 (second, third, and fourth alterations added by Trask v. Franco)(quoting Restatement (Second) of Torts § 453 cmt. b).

3. **Supervisory Liability.**

The Tenth Circuit has held that supervisors are not liable under 42 U.S.C. § 1983 unless there is "an affirmative link . . . between the constitutional deprivation and either the supervisor's personal participation, . . . exercise of control or direction, or . . . failure to supervise." Gallagher v. Shelton, 587 F.3d 1063, 1069 (10th Cir. 2009)(internal quotation marks omitted)(quoting Green v. Branson, 108 F.3d 1296, 1302 (10th Cir. 1997)).  Because supervisors can be held liable only for their own constitutional or illegal policies, and not for the torts that their employees commit, supervisory liability requires a showing that such policies were a "'deliberate' or 'conscious' choice." Barney v. Pulsipher, 143 F.3d at 1307 (quoting City of Canton v. Harris, 489 U.S. 378, 389 (1989)).  Accord Bd. of Cty. Comm'rs of Bryan Cty. v. Brown, 520 U.S. at 404 ("[I]t is not enough for a § 1983 plaintiff merely to identify conduct properly attributable to the municipality. The plaintiff must also demonstrate that, through its *deliberate* conduct, the municipality was the 'moving force' behind the injury alleged."  (emphasis in original)).

The Tenth Circuit has recognized that Ashcroft v. Iqbal limited, but did not eliminate, "supervisory liability for government officials based on an employee's or subordinate's constitutional violations." Garcia v. Casaus, 2011 WL 7444745, at *25 (citing Dodds v. Richardson, 614 F.3d 1185 (10th Cir. 2010)).  The language that may have altered the landscape for supervisory liability in Ashcroft v. Iqbal is as follows: "Because vicarious liability is inapplicable to *Bivens* and § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." Ashcroft v. Iqbal, 556 U.S. at 676.  The Tenth Circuit in Dodds v. Richardson held:

> Whatever else can be said about *Iqbal*, and certainly much can be said, we conclude the following basis of § 1983 liability survived it and ultimately resolves this case: § 1983 allows a plaintiff to impose liability upon a defendant-supervisor who creates, promulgates, implements, or in some other way possesses responsibility for the continued operation of a policy the enforcement (by the defendant-supervisor or her subordinates) of which "subjects, or causes to be subjected" that plaintiff "to the deprivation of any rights . . . secured by the Constitution . . . ."

614 F.3d at 1199 (quoting 42 U.S.C. § 1983).  The Tenth Circuit noted that <u>Ashcroft v. Iqbal</u> "does not purport to overrule existing Supreme Court precedent," but stated that "*Iqbal* may very well have abrogated § 1983 supervisory liability as we previously understood it in this circuit in ways we do not need to address to resolve this case."  <u>Dodds v. Richardson</u>, 614 F.3d at 1200.  It concluded that <u>Ashcroft v. Iqbal</u> did not alter "the Supreme Court's previously enunciated § 1983 causation and personal involvement analysis."  <u>Dodds v. Richardson</u>, 614 F.3d at 1200.  The Tenth Circuit, based on this conclusion, set forth a test for supervisory liability under § 1983 after <u>Ashcroft v. Iqbal</u>:

> A plaintiff may . . . succeed in a § 1983 suit against a defendant-supervisor by demonstrating: (1) the defendant promulgated, created, implemented or possessed responsibility for the continued operation of a policy that (2) caused the complained of constitutional harm, and (3) acted with the state of mind required to establish the alleged constitutional deprivation.

<u>Dodds v. Richardson</u>, 614 F.3d at 1199 (citing <u>Summum v. City of Ogden</u>, 297 F.3d 995, 1000 (10th Cir. 2002)).  The Tenth Circuit noted, however: "We do not mean to imply that these are distinct analytical prongs, never to be intertwined."  <u>Dodds v. Richardson</u>, 614 F.3d at 1199 n.8.  Relying on the Supreme Court's opinion in <u>Board of County Commissioners of Bryan County v. Brown</u>, the Tenth Circuit reasoned that two of the prongs often, if not always, are sufficient proof that the third prong has been met also:

"Where a plaintiff claims that a particular municipal action itself violates federal law, or directs an employee to do so, resolving these issues of fault and causation is straightforward. Section 1983 itself contains no state-of-mind requirement independent of that necessary to state a violation of the underlying federal right. In any § 1983 suit, however, the plaintiff must establish the state of mind required to prove the underlying violation. Accordingly, proof that a municipality's legislative body or authorized decisionmaker has intentionally deprived a plaintiff of a federally protected right necessarily establishes that the municipality acted culpably. Similarly, the conclusion that the action taken or directed by the municipality or its authorized decisionmaker itself violates federal law will also determine that the municipal action was the moving force behind the injury of which the plaintiff complains."

Dodds v. Richardson, 614 F.3d at 1199-1200 n.8 (internal quotation marks and citations omitted)(quoting Bd. of Cty. Comm'rs of Bryan Cty. v. Brown, 520 U.S. at 404-05). The Tenth Circuit noted: "We think the same logic applies when the plaintiff sues a defendant-supervisor who promulgated, created, implemented or possessed responsibility for the continued operation of a policy that itself violates federal law." Dodds v. Richardson, 614 F.3d at 1200 n.8. Thus, the Tenth Circuit reduced the test to what is essentially a two-part test for supervisor liability, requiring the plaintiff to prove "an 'affirmative' link . . . between the unconstitutional acts by their subordinates and their 'adoption of any plan or policy . . . -- express or otherwise -- showing their authorization or approval of such misconduct.'" Dodds v. Richardson, 614 F.3d at 1200-01 (quoting Rizzo v. Goode, 423 U.S. 362, 371 (1976)).

### LAW REGARDING STATE ACTION AND CIVIL-RIGHTS CLAIMS

The Supreme Court has stated that it is a

judicial obligation . . . to not only "'preserv[e] an area of individual freedom by limiting the reach of federal law' and avoi[d] the imposition of responsibility on a State for conduct it could not control," [Nat'l Collegiate Athletic Ass'n v.] Tarkanian, [488 U.S. 179, 191 (2001)](quoting Lugar, supra, at 936-937 . . .), but also to assure that constitutional standards are invoked "when it can be said that the

State is *responsible* for the specific conduct of which the plaintiff complains," *Blum* [v. Yartesky, 457 U.S. 991, 1004 (1982)](emphasis in original).

Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n, 531 U.S. 288, 295 (2001)(first two alterations in Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n). Most rights under the Constitution secure protection only against infringement through state action. See, e.g., Flagg Bros., Inc. v. Brooks, 436 U.S. 149, 156 (1978)("[M]ost rights secured by the Constitution are protected only against infringement by governments."). Under some circumstances, however, private parties' conduct may be deemed to be state action when "the conduct allegedly causing the deprivation of a federal right may be fairly attributable to the State." Lugar v. Edmondson Oil Co., 457 U.S. at 937. Whether the conduct may in fact be "fairly attributed" to the state requires a two-part inquiry. Lugar v. Edmondson Oil Co., 457 U.S. at 937. "First, the deprivation must be caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by the state or by a person for whom the State is responsible." Lugar v. Edmondson Oil Co., 457 U.S. at 937. "Second, the party charged with the deprivation must be a person who may fairly be said to be a state actor." Lugar v. Edmondson Oil Co., 457 U.S. at 937. See West v. Atkins, 487 U.S. at 48 (explaining that, to state a claim under § 1983, the plaintiff must show: (i) a deprivation of a right that the federal Constitution or federal laws secure; and (ii) that a person acting under color of state law caused the deprivation).

The Supreme Court in Lugar v. Edmondson Oil Co. explained that the two prongs merge when the claim is "directed against a party whose official character is such as to lend the weight of the State to his decisions," whereas they remain distinct when analyzing private parties' conduct. 457 U.S. at 937. The first prong of Lugar v. Edmondson Oil Co.'s test -- that the

deprivation of a right is attributable to the state -- is satisfied when "the authority of state officials . . . put the weight of the State behind their private decision." 457 U.S. at 940. The second prong, identification of a defendant as a state actor, is met where the defendant "is a state official, because he has acted together with or has obtained significant aid from state officials, or because his conduct is otherwise chargeable to the State." 457 U.S. at 937. The Supreme Court applied these prongs and determined that the plaintiff's allegation that private unlawful conduct deprived him of his property without due process failed to state a claim under § 1983. See 457 U.S. at 940. The Supreme Court also held that the plaintiff's claim, which alleged that the private parties had invoked a state statute maliciously or without valid grounds, did not give rise to state action. See 457 U.S. at 940. Instead, that claim amounted to nothing more than the private misuse or abuse of a state statute. See 457 U.S. at 940-41.

For a private individual to act under color of state law, the deprivation of a federal right "must be caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by the state or by a person for whom the State is responsible," and the defendant accused of a constitutional deprivation "must be a person who may fairly be said to be a state actor[,] . . . because he is a state official, because he has acted together with or has obtained significant aid from state officials, or because his conduct is otherwise chargeable to the State." Lugar v. Edmondson Oil Co., 457 U.S. at 937.

> Congress did not, in using the term "under the color of state law," intend to subject private citizens, acting as private citizens, to a federal lawsuit whenever they seek to initiate a prosecution or seek a remedy involving the judicial system. To hold otherwise would significantly disregard one purpose of the state action requirement, which is to "preserve[] an area of individual freedom by limiting the reach of federal law and federal judicial power." *Lugar*, 457 U.S. at 936 . . . . Instead, in enacting § 1983, Congress intended to provide a federal cause of action

primarily when the actions of private individuals are undertaken with state authority.  *See id.* at 934.  Thus, absent more, causing the state, or an arm of the state, to initiate a prosecution or serve process is insufficient to give rise to state action.

How v. City of Baxter Springs, 217 F. App'x 787, 793 (10th Cir. 2007)(unpublished).

1.       **Whether There Is State Action by Private Actors is a Legal Determination.**

The Tenth Circuit has described the determination of state action as "particularly fact-sensitive, so the circumstances must be 'examined in their totality.'"  Marcus v. McCollum, 394 F.3d 813, 819 (10th Cir. 2004)(quoting Howerton v. Gabica, 708 F.2d 380, 384 (9th Cir. 1983)).  According to the Tenth Circuit, "[t]he Supreme Court has counseled us that the state action inquiry, although a legal determination to be made by the court, requires the 'sifting [of] facts and weighing [of] circumstances.'"  Phelps v. Wichita Eagle-Beacon, 886 F.2d 1262, 1271 (10th Cir. 1989)(footnote omitted)(quoting Burton v. Wilmington Parking Auth., 365 U.S. 715, 722 (1961)).  In Gilmore v. City of Montgomery, 417 U.S. 556 (1974), the Supreme Court said that, although it was the Supreme Court's role to determine whether the use of zoos, museums, parks, and other recreational facilities by private school groups and private non-school organizations "involves government so directly in the actions of those users as to warrant court intervention on constitutional grounds," the factual record before the Supreme Court "[did] not contain sufficient facts upon which to predicate legal judgments of this kind."  417 U.S. at 570.

On the other hand, leaving the determination of state action to the jury has shown to be ill-advised.  The cases in which the acts of private entities have been held to constitute state action or to be under color of law, and cases in which they have not, tend to be distinguished "by fine shadings in the sometimes complex interrelationships that develop between the state and private

bodies." Adams v. Vandemark, 787 F.2d 588, 1986 WL 16606, at *2 (6th Cir. 1986)(per curiam)(unpublished table opinion). In Adams v. Vandemark, the United States Court of Appeals for the Sixth Circuit reviewed a jury instruction on state action from the United States District Court for the Eastern District of Michigan. 1986 WL 16606, at *1. The Sixth Circuit, in a per curium opinion, found that the few words that were given to the jury on when to find state action "gave the jury little to guide it in making its determination on this crucial element of the claim for relief." 1986 WL 16606, at *2. The Sixth Circuit noted that the application of the symbiotic-relationship test and the joint-relationship test are "very difficult and complex question[s]," and, "[t]o the extent a jury is to decide upon the proper factual predicates for this essentially legal determination, it must be given instructions that are clear, precise and informative as to the factors involved and the factual issues to be determined." 1986 WL 16606, at *2. The Sixth Circuit found that the defendants were entitled to a new trial, because the jury was given no direction that could have enabled it to make the necessary underlying factual determination regarding state action. 1986 WL 16606, at *2-3. The Court on multiple occasions has ruled on dispositive motions that required a determination as a matter of law whether a private party was a state actor. See, e.g., Herrera v. Santa Fe Pub. Sch., 41 F. Supp. 3d 1027, 1176-77 (D.N.M. 2014)(Browning, J.)(holding that private company providing security for school prom was a state actor); Archuleta v. City of Roswell, 898 F. Supp. 2d 1240, 1250-52 (D.N.M. 2012)(Browning, J.)(holding that private attorney was not a state actor engaged in a conspiracy against his client with prosecutors).

       2.       **The Tests for Determining State Action by a Private Party.**

The Supreme Court has articulated four different tests for courts to use in determining whether conduct by an otherwise private party is state action: (i) the public-function test; (ii) the

nexus test; (iii) the symbiotic-relationship test; and (iv) the joint-action test. See Johnson v. Rodrigues (Orozco), 293 F.3d 1196, 1202-03 (10th Cir. 2002)(reviewing the various tests); Gallagher v. Neil Young Freedom Concert, 49 F.3d at 1447 (noting that "[a]pplication of the state action doctrine has been characterized as 'one of the more slippery and troublesome areas of civil rights litigation'" (quoting Int'l Soc. For Krishna Consciousness v. Air Can., 727 F.2d 253, 255 (2d Cir. 1984))).

### a.      The Public-Function Test.

Under the public-function test, a court determines whether a private party has exercised "powers traditionally exclusively reserved to the State." Jackson v. Metro. Edison Co., 419 U.S. 345, 352 (1974). The public-function test is difficult to satisfy, because, while many functions may be traditionally governmental, few are "exclusively" governmental functions, as the test requires. Gallagher v. Neil Young Freedom Concert, 49 F.3d at 1456. The courts have found exclusive government functions to include holding elections, performing necessary municipal functions, and running nursing facilities. See Johnson v. Rodrigues (Orozco), 293 F.3d at 1203.

### b.      The Nexus Test.

Under the nexus test, state action is present if the state has ordered the private conduct, or "exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the State." Blum v. Yaretsky, 457 U.S. at 993. A court determines under the nexus test whether there is a sufficiently close nexus between the state and the challenged conduct, such that the conduct "may be fairly treated as that of the state itself." Jackson v. Metro. Edison Co., 419 U.S. at 351. "Private use of state-sanctioned private remedies or procedures does not rise to the level of state action. . . . But when private parties make

use of state procedures with the overt, significant assistance of state officials, state action may be found." <u>Tulsa Prof'l Collection Servs., Inc. v. Pope</u>, 485 U.S. 478, 485-86 (1988)(citations omitted).

### c.  The Symbiotic-Relationship Test.

Under the symbiotic-relationship test, state action is present if the state "has so far insinuated itself into a position of interdependence" with a private party that "it must be recognized as a joint participant in the challenged activity." <u>Burton v. Wilmington Parking Auth.</u>, 365 U.S. at 725. "[E]xtensive state regulation, receipt of substantial state funds, and the performance of important public functions do not necessarily establish the kind of symbiotic relationship between the [state] and a private [party] that is required for state action." <u>Gallagher v. Neil Young Freedom Concert</u>, 49 F.3d at 1451.

> The applicable decisions clearly establish no bright-line rule for determining whether a symbiotic relationship exists between a government agency and a private entity. Questions as to how far the state has insinuated itself into the operations of a particular private entity and when, if ever, the operations of a private entity become indispensable to the state are matters of degree.

<u>Gallagher v. Neil Young Freedom Concert</u>, 49 F.3d at 1452.

### d.  The Joint-Action Test.

State action exists under the joint-action test if the private party is a "willful participant in joint action with the State or its agents." <u>Dennis v. Sparks</u>, 449 U.S. 24, 27 (1980). Courts look to "whether state officials and private parties have acted in concert in effecting a particular deprivation of constitutional rights." <u>Gallagher v. Neil Young Freedom Concert</u>, 49 F.3d at 1453. "[I]f there is a 'substantial degree of cooperative action' between state and private officials, or if there is 'overt and significant state participation,' in carrying out the deprivation of the plaintiff's

constitutional rights, state action is present." Gallagher v. Neil Young Freedom Concert, 49 F.3d at 1454 (citations omitted)(first quoting Collins v. Womancare, 878 F.2d 1145, 1154 (9th Cir. 1989); and then quoting Hoai v. Vo, 935 F.2d 308, 313 (D.C. Cir. 1991)). Joint participation can also take the form of a conspiracy between public and private actors; in such cases, the plaintiff must show that the "public and private actors share a common, unconstitutional goal." Sigmon v. CommunityCare HMO, Inc., 234 F.3d 1121, 1126 (10th Cir. 2000)(quoting Anaya v. Crossroads Managed Care Sys., Inc., 195 F.3d 584, 596 (10th Cir. 1999)). Even a conspiracy claim requires a sufficient level of state involvement to constitute joint participation in the unconstitutional actions. See Soldal v. Cook Cty., 506 U.S. 56, 60 n.6 (1992). The Tenth Circuit has previously dismissed constitutional claims against a private individual where the plaintiff did not give specific facts showing a conspiracy evidencing state action. See Martinez v. Winner, 771 F.2d 424, 445 (10th Cir. 1985)("Beyond the bare conclusory allegation that [the defendant], a private citizen, conspired with the other defendants to deprive plaintiff of his constitutional and civil rights, no facts are stated indicating that [the defendant] did anything . . . .").

In Gallagher v. Neil Young Freedom Concert, the Tenth Circuit, in an opinion that the Honorable Robert H. Henry, then-United States Circuit Judge for the Tenth Circuit, authored, surveyed several instances in which courts have found action "under color of state law" where governmental and private parties have acted together in joint-action:

> We have applied the joint action test in several cases involving allegations that private citizens acted in concert with police officers in making arrests. In both *Carey v. Continental Airlines Inc.*, 823 F.2d 1402 (10th Cir. 1987), and *Lee v. Town of Estes Park*, 820 F.2d 1112 (10th Cir. 1987), we held that citizens who made complaints to police officers that resulted in arrests were not state actors. We found nothing in the record in either case from which we could infer that the allegedly unconstitutional arrests "resulted from any concerted action, whether conspiracy,

prearranged plan, customary procedure, or policy that substituted the judgment of a private party for that of the police or allowed a private party to exercise state power." *Carey*, 823 F.2d at 1404. In both cases, the record indicated that the police officers had made an independent decision to make the challenged arrest. In contrast, in *Lusby v. T.G. & Y. Stores, Inc.*, 749 F.2d 1423, 1429 (10th Cir. 1984), *cert. denied*, 474 U.S. 818 . . . (1985), we concluded that a store security guard who reported a suspected shoplifter to the police was a state actor. We noted that the officer that made the arrest did not make an independent investigation but relied on the judgment of the security guard.

      In *Coleman v. Turpen*, 697 F.2d 1341 (10th Cir. 1982)(per curiam), we applied the joint action test by focusing on the manner in which the alleged constitutional deprivation was carried out. There, the plaintiff challenged the seizure and sale of his property and named as defendants not only state officials but also the wrecking company that towed his truck and subsequently sold it. We found the company to be a state actor because it had "jointly participated in seizing the truck by towing it away" and because the company's sale of the plaintiff's property was "an integral part of the deprivation." *Id.* at 1345.

49 F.3d at 1454-55. The Tenth Circuit noted that, "[j]ust as with the other tests for state action, the mere acquiescence of a state official in the actions of a private party is not sufficient." Gallagher v. Neil Young Freedom Concert, 49 F.3d at 1453. The Tenth Circuit found that the joint-action test can be satisfied where police are involved in cooperative action with a private party when "the police have substantially assisted in the allegedly wrongful conduct." Gallagher v. Neil Young Freedom Concert, 49 F.3d at 1455. Joint participation typically arises when the authorities agree to facilitate through affirmative action a private party's unconstitutional acts. See Soldal v. Cook Cty., 506 U.S. at 60 n.4.

**3.**      **The Influence of Police Involvement on Transforming Private Action into State Action.**

The Tenth Circuit has concluded that police involvement does not necessarily convert a defendant's abuse of state law into conduct attributable to the state for purposes of § 1983 liability. See Yanaki v. Iomed, Inc., 415 F.3d 1204, 1210 (10th Cir. 2005)(citing Winterland Concessions

Co. v. Trela, 735 F.2d 257, 262 (7th Cir. 1984); Taylor v. Gilmartin, 686 F.2d 1346, 1348-49, 1355 n.3 (10th Cir. 1982); Torres v. First State Bank of Sierra Cty., 588 F.2d 1322, 1327 (10th Cir. 1978)).  In Yanaki v. Iomed, Inc., the plaintiffs argued that the police acting in concert with the defendants in the search of the plaintiffs' residence converted the defendants' actions into conduct attributable to the state for the purposes of § 1983 liability.  See 415 F.3d at 1209-10.  The Tenth Circuit held that the plaintiffs "fail[ed] to satisfy the first part of the [Lugar v. Edmondson Oil Co.] color of law test because the conduct that Plaintiffs complain deprived them of their constitutional rights was caused by and [could] only be attributed to the private Defendants."  415 F.3d at 1210. The Tenth Circuit, therefore, found it unnecessary to address whether the private defendants were state actors.  See 415 F.3d at 1210.  Additionally, merely following a procedure established by state law does not transform a private party's activity into state action.  See Scott v. Hern, 216 F.3d 897, 906-07 (10th Cir. 2000); Kirksey v. Theilig, 351 F. Supp. 727, 733 (D. Colo. 1972)(Arraj, C.J.)(holding that self-help repossession of an automobile by a private party is not action under color of state law).

### LAW REGARDING FOURTH AMENDMENT SEIZURES

For purposes of analyzing Fourth Amendment seizures, the Tenth Circuit has divided interactions between police and citizens into three categories: (i) consensual encounters; (ii) investigative stops; and (iii) arrests.  See Oliver v. Woods, 209 F.3d 1179, 1186 (10th Cir. 2000). See also Dorato v. Smith, 108 F. Supp. 3d. 1064, 1118 (D.N.M. 2015)(Browning, J.)(noting that investigative stops are seizures); United States v. Young, 347 F. Supp. 3d 747, 770 (D.N.M. 2018)(Browning, J.)(describing an arrest as a seizure).  "A police officer may seize someone either by physical force or a show of authority."  United States v. Roberson, 864 F.3d 1118, 1121 (10th

Cir. 2017)(citing <u>United States v. Salazar</u>, 609 F.3d 1059, 1064 (10th Cir. 2010)). "[W]hen an officer does not apply physical force to restrain a subject, a Fourth Amendment seizure occurs only if (a) the officer shows his authority; and (b) the citizen 'submit[s] to the assertion of authority.'" <u>United States v. Salazar</u>, 609 F.3d at 1064 (alteration in <u>United States v. Salazar</u>)(quoting <u>California v. Hodari D.</u>, 499 U.S. 621, 625-26 (1991)). "[T]he test for existence of a show of authority is an objective one: not whether the citizen perceived that he was being ordered to restrict his movement, but whether the officer's words and actions would have conveyed that to a reasonable person." <u>United States v. Salazar</u>, 609 F.3d at 1064 (internal quotation marks omitted)(quoting <u>California v. Hodari D.</u>, 499 U.S. at 628). "If a reasonable person would feel free to terminate the encounter, then he or she has not been seized." <u>United States v. Drayton</u>, 536 U.S. 194, 201 (2002)). <u>See</u> <u>California v. Hodari D.</u>, 499 U.S. at 627-28 ("[A] person has been seized within the meaning of the Fourth Amendment only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." (alteration in <u>California v. Hodari D.</u>)(internal quotation marks omitted)(quoting <u>United States v. Mendenhall</u>, 446 U.S. 544, 554 (1980))). The standard for submission is also objective, <u>see</u> <u>United States v. Salazar</u>, 609 F.3d at 1064 (citing <u>United States v. Cardoza</u>, 129 F.3d 6, 14 n.4 (1st Cir. 1997)), but "[s]ubmission 'requires, at minimum, that a suspect manifest compliance with police orders,'" <u>United States v. Roberson</u>, 864 F.3d at 1122 (quoting <u>United States v. Mosley</u>, 743 F.3d 1317, 1326 (10th Cir. 2014)).

     1.     **Consensual Encounters.**

     A consensual encounter occurs when a police officer approaches a person to ask questions under circumstances where a reasonable person would feel free to refuse to answer and to end the

encounter.  See Oliver v. Woods, 209 F.3d at 1186.  For example, officers generally may "go to a person's home to interview him," United States v. Daoust, 916 F.2d 757, 758 (1st Cir. 1990), because "[i]t is not improper for a police officer to call at a particular house and seek admission for the purpose of investigating a complaint or conducting other official business," 1 Wayne LaFave, Search and Seizure: A Treatise on the Fourth Amendment § 2.3(b), at 475 (3d ed. 1996).

## 2.    Investigative Stops.

In United States v. King, the Tenth Circuit noted: "*Terry* was the first case to recognize that 'the Fourth Amendment governs "seizures" of the person . . . [other than] arrests' and created a 'narrowly drawn' exception to the probable cause requirement for lesser government intrusions into an individual's liberty." United States v. King, 990 F.2d 1552, 1557 (10th Cir. 1993)(internal citations omitted)(quoting Terry v. Ohio, 392 U.S. 1, 16, 27).  The Tenth Circuit has recognized that, in Terry v. Ohio, the Supreme Court identified two police actions: (i) an investigative detention -- a "stop"; and (ii) a protective search -- a "frisk." United States v. King, 990 F.2d at 1557 (citations omitted). The Tenth Circuit explained:

> *Terry* has come to stand for two distinct propositions -- an investigative detention ("stop") in which a police officer, for the purpose of investigation, may briefly detain a person on less than probable cause, and a protective search ("frisk") which permits an officer, in the course of an investigative detention, to conduct a limited search for weapons for his or her own protection.

United States v. King, 990 F.2d at 1557 (citations omitted).  When evaluating any of these actions, a court asks whether the action was reasonable under the Fourth Amendment.  See United States v. Wilson, 96 F. App'x 640, 643 (10th Cir. 2004)(unpublished); United States v. King, 990 F.2d at 1557.

### a.     **Investigative Detentions and Reasonable Suspicion.**

A police-citizen encounter that is not consensual may be a constitutional investigative detention. See Dorato v. Smith, 108 F. Supp. 3d at 1118. An investigative detention occurs when an officer stops and briefly detains a person "in order to determine his identity or to maintain the status quo momentarily while obtaining more information." Oliver v. Woods, 209 F.3d at 1186 (internal quotation marks omitted)(quoting Adams v. Williams, 407 U.S. 143, 146 (1972)). Such brief investigative detentions must meet two distinct requirements to be "reasonable" under the Fourth Amendment. Dorato v. Smith, 108 F. Supp. 3d at 1118. First, the officer "must have a particularized and objective basis for suspecting the particular person stopped of criminal activity." Oliver v. Woods, 209 F.3d at 1186 (internal quotation marks omitted)(quoting United States v. Cortez, 449 U.S. 411, 417-18 (1981)). Second, the investigative detention that follows the stop must be "reasonably related in scope to the circumstances which justified" the stop in the first place, Terry v. Ohio, 392 U.S. at 20, because the Fourth Amendment imposes "limitations on both the length of the detention and the manner in which it is carried out," United States v. Holt, 264 F.3d 1215, 1229 (10th Cir. 2001)(per curiam), overruled on other grounds by Muehler v. Mena, 544 U.S. 93 (2005).

"For reasonable suspicion to exist, an officer 'need not rule out the possibility of innocent conduct;' he or she simply must possess 'some minimal level of objective justification' for making the stop." United States v. Winder, 557 F.3d 1129, 1134 (10th Cir. 2009)(quoting United States v. Vercher, 358 F.3d 1257, 1261 (10th Cir. 2004)). Information "falling 'considerably short' of a preponderance standard" will meet the standard for reasonable suspicion. United States v. Winder, 557 F.3d at 1134 (quoting United States v. Arvizu, 534 U.S. 266, 274 (2002)). See Illinois v.

Wardlow, 528 U.S. 119, 123 (2000)(noting that "'reasonable suspicion' is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence").

In United States v. Johnson, 364 F.3d 1185 (10th Cir. 2004)(Tymkovich, J.), the Tenth Circuit held that an officer had reasonable suspicion to continue questioning and to frisk a suspect after: (i) the officer had responded to a call from a citizen who gave his telephone number, and gave a detailed and accurate description of possible criminal activity and of the suspect; (ii) the contact occurred in Albuquerque's highest-crime area; and (iii) the suspect displayed nervous behavior. See 364 F.3d at 1194. The Tenth Circuit noted that the officer's experience and training allowed him to make inferences, based on a combination of the surrounding circumstances, that criminal activity was afoot. See 364 F.3d at 1194 ("His suspicions were particularized to [the suspect], and were based on how his training and experience taught him to interpret a number of objectively reasonable details."). While many of the factors that the Tenth Circuit considered would not, without more, have given rise to reasonable suspicion, the combination of circumstances was sufficient. See 364 F.3d at 1193 (noting that the district court had erred, because "[a]ll of these factors, mitigating and aggravating, should have been analyzed as part of the totality of the circumstances faced by [the officer] at the inception of the detention").

In United States v. Ceballos, 355 F. App'x 226 (10th Cir. 2009)(unpublished), the police officer observed a young girl walking down the street at night. See 355 F. App'x at 227-28. A truck pulled alongside the girl, the driver of the truck and the girl spoke briefly, then the truck drove ahead, and the girl continued on her walk. See 355 F. App'x at 228. Rather than leave, however, the truck drove ahead and parked with its lights off at a dark spot on the road by which

the girl would have to walk.  See 355 F. App'x at 228.  The officer spoke to the girl, who seemed

unconcerned and told him that the man in the truck had asked only if she needed a ride; she had

refused.  See 355 F. App'x at 228.  Not investigating any particular crime or suspected crime, and

admittedly acting on a "hunch," the officer turned on his emergency lights and pulled behind the

truck.  355 F. App'x at 229.  Upon talking to the truck's driver, Ceballos, the officer discovered

that Ceballos' breath smelled of alcohol, that he did not have a driver's license, and that he had a

gun and other items in his vehicle.  See 355 F. App'x at 227-29.  The Tenth Circuit concluded that

the facts available to the officer would have led a reasonable officer to conclude that reasonable

suspicion existed and that the officer's "subjective characterization of his actions is irrelevant."

355 F. App'x at 229.  The Tenth Circuit explained, in an opinion that the Honorable Michael R.

Murphy, now-Senior United States Circuit Judge for the Tenth Circuit, wrote and the Honorable

Mary Beck Briscoe, United States Circuit Judge for the Tenth Circuit, and the Honorable Robert

H. McWilliams, late-United States Circuit Judge for the Tenth Circuit, joined:

> A review of the totality of the circumstances shows Gallegos was not acting
> on an unparticularized hunch; during his testimony he articulated specific facts that
> caused him to suspect Ceballos intended to assault or abduct the teenage pedestrian.
> Specifically, at the time Gallegos initiated the traffic stop, he had observed Ceballos
> slow his vehicle as he passed a teenage girl walking alone late at night.  He then
> observed Ceballos alter his route by making a U-turn and following the girl down
> a narrow, nearly deserted residential street.  Ceballos pulled alongside the girl, who
> he did not know, and asked her if she wanted a ride.  She refused, telling him she
> lived up the street.  Ceballos then drove further down the road, pulled into a
> driveway as if to turn around and return to the main road, but instead backed out
> and drove a few feet further east, in the same direction the girl was walking.  He
> parked in a dark location and turned off his lights.
>
> . . . .
>
> We agree with the Government that Officer Gallegos had reasonable
> suspicion to stop and detain Ceballos.  Ceballos showed an interest in a teenage girl

he did not know, to the point that he changed his route to follow her down a dark street, offered her a ride, and then parked where the girl would be required to walk past him as she continued to her home. The facts found by the district court, viewed in totality, amply support the constitutionality of the investigative detention.

355 F. App'x at 229. The Tenth Circuit did not require the officer to identify the particular crime of which the officer had reasonable suspicion or even to acknowledge having reasonable suspicion. See 355 F. App'x at 229. The Tenth Circuit was content to find that a reasonable officer would have reasonable suspicion that "Ceballos intended to assault or abduct the teenage pedestrian." 355 F. App'x at 229. The Tenth Circuit demanded only that an officer have facts from which a reasonable officer could form a reasonable suspicion that criminal conduct was occurring or was about to occur. See 355 F. App'x at 229.

In United States v. Aragones, 483 F. App'x 415 (10th Cir. 2012)(unpublished), the Tenth Circuit found reasonable suspicion based upon an officer's knowledge of the defendant's

(1) gang tattoo; (2) presence in a high crime area; (3) abrupt move away from the officer as soon as [the defendant] saw [the officer]; (4) glancing about in a manner consistent with an attempt to find a route to flee; and, (5) approach to [a private] home's back door without conversing with the residents visible inside.

483 F. App'x at 417. At the district court level, in ruling on the motion to suppress, the Honorable Martha A. Vázquez, United States District Court Judge for the District of New Mexico, had concluded that, because the defendant's conduct in standing outside a private residence and looking in was "consistent with the most benign of conduct, including a visit to a friend's house or calling upon a neighbor for assistance," the officer did not have reasonable suspicion at the time of the stop and should have waited longer to rule out innocent conduct. 483 F. App'x at 418 (internal quotation marks omitted)(quoting United States v. Aragones, No. 10 CR 2453 MV, 2011 WL 13174481, at *9 (D.N.M. June 10, 2011)(Vázquez, J.)). The Tenth Circuit disagreed,

however, stating: "The problem is that conduct giving rise to reasonable suspicion sufficient to support an investigative detention can be -- and often is -- consistent with innocent behavior." 483 F. App'x at 418. The Tenth Circuit noted that, moreover, the defendant's conduct was not necessarily innocent, because an Albuquerque public "ordinance prohibits '[e]ntering upon any private property and looking into any occupied dwelling without the consent of the occupant or owner of the dwelling.'" 483 F. App'x at 417 (alteration in United States v. Aragones)(quoting Albuquerque, N.M., Ordinance § 12-2-21(B)). The Tenth Circuit, thus, reversed Judge Vázquez' decision, disagreeing with her conclusion that the officer lacked reasonable suspicion of unlawful activity, and concluded that "a reasonable officer could have suspected that [the defendant] wasn't a welcome guest and did not have consent to look into the home." 483 F. App'x at 417.

### b. Frisks.

A "frisk" is "a protective search . . . which permits an officer, in the course of an investigative detention, to conduct a limited search for weapons for his or her own protection." United States v. King, 990 F.2d at 1557 (citing Adams v. Williams, 407 U.S. at 147-48). An officer may "stop and frisk" an individual under the Fourth Amendment if a reasonably prudent person "in the circumstances would be warranted in the belief that his safety or that of others was in danger." Terry v. Ohio, 392 U.S. at 27. "The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." Terry v. Ohio, 392 U.S. at 27. A frisk "must . . . be confined in scope to an intrusion reasonably designed to discover guns, knives, clubs, or other hidden instruments for the assault of the police officer." Terry v. Ohio, 392

U.S. at 29. In evaluating the validity of the stop-and-frisk, the totality of the circumstances must be considered. See Florida v. Bostick, 501 U.S. 429, 436 (1991).

### c. Traffic Stops.

"A traffic stop is a seizure within the meaning of the Fourth Amendment . . . ." United States v. Holt, 264 F.3d at 1220 (internal quotation marks omitted)(quoting United States v. Hunnicutt, 135 F.3d 1345, 1348 (10th Cir. 1998)). "For the duration of a traffic stop, . . . a police officer effectively seizes everyone in the vehicle, the driver and all passengers." United States v. White, 584 F.3d 935, 945 (10th Cir. 2009)(internal quotation marks omitted)(quoting Arizona v. Johnson, 555 U.S. 323, 327 (2009)). "This seizure implicates a passenger's Fourth Amendment interests to the same degree as the driver's." United States v. Wilson, 96 F. App'x at 643 (citing United States v. Erwin, 875 F.2d 268, 270 (10th Cir. 1989)). "Therefore, both the driver and passenger have standing to challenge the constitutionality of the initial stop." United States v. White, 584 F.3d at 945. See United States v. Wilson, 96 F. App'x at 643 ("Wilson does not assert any such interest in the truck or its contents[;] [n]evertheless, Wilson may, as he does here, 'contest the lawfulness of his own detention and seek to suppress evidence found in the vehicle as the fruit of the illegal detention.'" (quoting United States v. Nava-Ramirez, 210 F.3d 1128, 1131 (10th Cir. 2000); and citing United States v. Gama-Bastidas, 142 F.3d 1233, 1239 (10th Cir. 1998); United States v. Shareef, 100 F.3d 1491, 1500 (10th Cir. 1996))). The Tenth Circuit "reject[s] any notion that a vehicular stop detains for Fourth Amendment purposes *only* the driver simply because the passenger may be free to depart." United States v. Erwin, 875 F.2d at 270 (emphasis in original).

The Terry v. Ohio framework applies whether the traffic stop is based on probable cause or reasonable suspicion. See United States v. Holt, 264 F.3d at 1230. "[B]ecause 'the ultimate

touchstone of the Fourth Amendment is reasonableness,'" <u>Kentucky v. King</u>, 563 U.S. 452, 459

(2011)(quoting <u>Brigham City v. Stuart</u>, 547 U.S. 398, 403 (2006)), courts

> assess the reasonableness of a routine traffic stop under the principles laid out for investigative detentions in *Terry v. Ohio*, 392 U.S. 1 . . . (1968), considering "whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place."

United States v. Wilson, 96 F. App'x at 643 (quoting <u>United States v. Holt</u>, 264 F.3d at 1220). A

court must examine "both the length of the detention and the manner in which it is carried out,"

<u>United States v. Holt</u>, 264 F.3d at 1230, "keeping in mind that an officer may extend the duration

and scope of the initial detention based on 'an objectively reasonable and articulable suspicion that

illegal activity has occurred or is occurring,'" <u>United States v. Wilson</u>, 96 F. App'x at 643 (quoting

<u>United States v. Caro</u>, 248 F.3d 1240, 1244 (10th Cir. 2001)). "When the stop is extended based

on reasonable suspicion, the further detention must, like the original traffic stop, 'be temporary,

lasting no longer than necessary to effectuate the purpose of the [further detention], and the scope

of the [further] detention must be carefully tailored to its underlying justification.'" <u>United States

v. Wilson</u>, 96 F. App'x at 644 (alterations in <u>United States v. Wilson</u>)(quoting <u>United States v.

Wood</u>, 106 F.3d 942, 945 (10th Cir. 1997)). "A traffic stop is justified at its inception if an officer

has . . . reasonable articulable suspicion that a particular motorist has violated any of the

traffic . . . regulations of the jurisdiction." <u>United States v. Winder</u>, 557 F.3d at 1134.

### 3. Arrests.

An arrest is a seizure that is "characterized by highly intrusive or lengthy search or

detention," <u>Oliver v. Woods</u>, 209 F.3d at 1186 (internal quotation marks omitted)(quoting <u>United

States v. Cooper</u>, 733 F.2d 1360, 1363 (10th Cir. 1984)); a police-citizen encounter that goes

beyond the limits of a stop under Terry v. Ohio is an arrest.  See United States v. Perdue, 8 F.3d 1455, 1462 (10th Cir. 1993)("An encounter between police and an individual which goes beyond the limits of a *Terry* stop, however, may be constitutionally justified only by probable cause or consent.").  The general rule is that "the use of firearms, handcuffs, and other forceful techniques" is sufficiently intrusive to signal that a person has been placed under arrest.[13]  United States v. Melendez-Garcia, 28 F.3d 1046, 1052 (10th Cir. 1994).  See Florida v. Royer, 460 U.S. 491, 499 (1983).

"Inasmuch as an arrest exceeds an investigative stop's limited scope or duration, it must be supported by probable cause."  United States v. Rodriguez, 836 F. Supp. 2d 1258, 1288 (D.N.M. 2011)(Browning, J.).  See Wilson v. Jara, 866 F. Supp. 2d 1270, 1292 (D.N.M. 2011)(Browning, J.)("Probable cause must support an arrest, 'characterized by highly intrusive or lengthy search or detention.'" (quoting Oliver v. Woods, 209 F.3d at 1185)), aff'd, 512 F. App'x 841 (10th Cir. 2013).  "Probable cause to arrest exists only when the 'facts and circumstances within the officers' knowledge, and of which they have reasonably trustworthy information, are sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed.'"  United States v. Valenzuela, 365 F.3d 892, 896 (10th Cir.

---

[13]The use of handcuffs, however, does not always elevate a detention into an arrest.  See United States v. Albert, 579 F.3d 1188, 1194 (10th Cir. 2009)("[W]e have approved the use of handcuffs in the context of a *Terry* stop."), abrogated on other grounds by United States v. Stewart, 473 F.3d 1265 (10th Cir. 2007); Pierre-Louis v. Schake, No. CIV 12-0527 JB/RHS, 2014 WL 1954783, at *44-49 (D.N.M. April 30, 2014)(Browning, J.)(concluding that the defendant police officer acted reasonably in handcuffing the plaintiff, whom he suspected had recently assaulted a person on the side of the road, by threatening him with a gun); United States v. Reyes-Vencomo, 866 F. Supp. 2d 1304, 1330 (D.N.M. 2012)(Browning J.)("The use of handcuffs . . . does not always elevate a detention into an arrest.").

2004)(quoting United States v. Edwards, 632 F.3d 633, 639 (10th Cir. 2001); and citing Draper v. United States, 358 U.S. 307, 313 (1959)).  Although "[p]robable cause does not require facts sufficient for a finding of guilt . . . , it does require 'more than mere suspicion.'"  United States v. Morris, 247 F.3d 1080, 1088 (10th Cir. 2001)(quoting United States v. Vazquez-Pulido, 155 F.3d 1213, 1216 (10th Cir. 1998)).  The Supreme Court has made the following distinction between reasonable suspicion, which is sufficient for an investigatory stop under Terry v. Ohio, and probable cause, which is required before an arrest can be made:

> Reasonable suspicion is a less demanding standard than probable cause not only in the sense that reasonable suspicion can be established with information that is different in quantity or content than that required to establish probable cause, but also in the sense that reasonable suspicion can arise from information that is less reliable than that required to show probable cause.

Alabama v. White, 496 U.S. 325, 330 (1990).

Probable cause is measured against an objective standard.  See Beck v. Ohio, 379 U.S. 89, 96 (1964).  "The subjective belief of an individual officer as to whether there was probable cause for making an arrest is not dispositive."  United States v. Valenzuela, 365 F.3d at 89 (citing Florida v. Royer, 460 U.S. at 507; United States. v. Treto-Haro, 287 F.3d 1000, 1006 (10th Cir. 2002)).  Thus, the primary consideration is "whether a reasonable officer would have believed that probable cause existed to arrest the defendant based on the 'information possessed by the [arresting] offic[er].'"  Olsen v. Layton Hills Mall, 312 F.3d 1304, 1312 (10th Cir. 2002)(alterations in Olsen v. Layton Hills Mall)(quoting Romero v. Fay, 45 F.3d 1472, 1476 (10th Cir. 1995)).

### a.        When a Detention Becomes an Arrest.

The Tenth Circuit has held that a police-citizen encounter which goes beyond an investigative stop's limits is an arrest that probable cause or consent must support to be valid.  See

United States v. Perdue, 8 F.3d at 1462 ("An encounter between police and an individual which goes beyond the limits of a *Terry* stop, however, may be constitutionally justified only by probable cause or consent."). "*Terry* stops must be limited in scope to the justification for the stop . . . [and] the intrusiveness of a search or seizure will be upheld if it was reasonable under the totality of the circumstances." United States v. Perdue, 8 F.3d at 1462. "The government has the burden of demonstrating 'that the seizure it seeks to justify on the basis of a reasonable suspicion was sufficiently limited in scope and duration to satisfy the conditions of an investigative seizure.'" United States v. Perdue, 8 F.3d at 1462 (quoting Florida v. Royer, 460 U.S. at 500).

This Court has also engaged in the balancing act of deciding when a detention becomes an arrest. In United States v. Perea, 374 F. Supp. 2d 961 (D.N.M. 2005)(Browning, J.), aff'd sub nom. United States v. Burciaga-Burciaga, 147 F. App'x 725 (10th Cir. 2005)(unpublished), the Court had to determine whether the police transformed the investigative detention into an arrest by drawing their weapons on the suspect, handcuffing him, and placing him in the back of a police car. See United States v. Perea, 374 F. Supp. 2d at 976. In that case, the Court determined that such measures were appropriate and did not elevate the investigative detention to the level of an arrest. See 374 F. Supp. 2d at 976. The Court recognized that, "[i]n 'most scenarios,' when officers effectuate what would otherwise be considered a *Terry* stop by pointing guns at a suspect, that stop is elevated to an arrest, which requires probable cause." 374 F. Supp. 2d at 974. See United States v. Burciaga-Burciaga, 147 F. App'x at 730 (affirming the Court's determination in United States v. Perea that the officers had reasonable suspicion to believe that the suspect might be armed and dangerous, justifying the officers' use of firearms and not transforming the vehicle stop into a formal arrest requiring probable cause); United States v. Gama-Bastidas, 142 F.3d at

1240 ("[T]he use of firearms, handcuffs, and other forceful techniques are justified only by probable cause or when 'the circumstances reasonably warrant such measures.'" (quoting United States v. Perdue, 8 F.3d at 1462)).

There "exist[s], however, a limited set of circumstances in which officers may draw their guns at a suspect without transforming the stop into an arrest. 'The use of guns in connection with a stop is permissible where the police reasonably believe the weapons are necessary for their protection.'" United States v. Perea, 374 F. Supp. 2d at 974 (quoting United States v. Perdue, 8 F.3d at 1462). See United States v. Merkley, 988 F.2d 1062, 1064 (10th Cir. 1993)(upholding reasonableness of stop when officers detained the defendant at gunpoint and placed him in handcuffs where suspect had threatened to kill someone and was pounding interior of truck with his fists); United States v. Lechuga, 925 F.2d 1035, 1040-41 (7th Cir. 1991)(holding that the officer's "drawing his gun but keeping it pointed to the street" was not "unreasonably intrusive"); United States v. Alexander, 907 F.2d 269, 273 (2d Cir. 1990)(holding that the law enforcement officers did not convert the stop into an arrest by "unholstering their guns and frisking" the defendant when they suspected that the defendant had "just completed a narcotics purchase," there were a number of "innocent bystanders on the crowded city street," and stopping a vehicle "is especially hazardous and supports the need for added safeguards"). Similarly, there are circumstances in which a seizure is not an arrest merely because the subject of the detention is placed in handcuffs. See United States v. Merkley, 988 F.2d at 1064; United States v. Miller, 974 F.2d 953, 957 (8th Cir. 1992)("Numerous cases have held that a police officer's use of handcuffs can be a reasonable precaution during a *Terry* stop."); United States v. Hastamorir, 881 F.2d 1551, 1557 (11th Cir. 1989)("The handcuffing of Hastamorir constituted a *Terry* stop, and was a

reasonable action designed to provide for the safety of the agents."). United States v. Perea was one of those unique cases, because the police had reasonable cause to believe that the person whom they were detaining was the suspect whom they sought to arrest -- a man wanted for murder who, it was believed, might be armed and dangerous. See 374 F. Supp. 2d at 976. The Tenth Circuit affirmed the Court's determination that the stop was not an arrest:

> The officers' conduct during the felony stop was appropriate in relation to the perceived threat. The measures taken during a *Terry* stop must be "reasonably related in scope to the circumstances which justified the interference in the first place" and may not go beyond what is necessary for officer safety. *United States v. King*, 990 F.2d [at] 1563 . . . (quoting *Terry v. Ohio*, 392 U.S. 1, 20 . . . (1968)). The felony stop was justified by suspicion that someone in the Escalade might have a gun, or at least was dangerous. The officers displayed their weapons only as long as necessary to ensure that the vehicle and its occupants posed no threat. The officers put their guns away as soon as they handcuffed Mr. Burciaga, placed him in the back of a police car, and confirmed that no one else was in the car.

United States v. Burciaga-Burciaga, 147 F. App'x at 730.

> **b.** **Officers Have a Duty to Investigate Easily Accessible Evidence Before Making an Arrest.**

"[T]he Fourth Amendment requires officers to reasonably interview witnesses readily available at the scene, investigate basic evidence, or otherwise inquire if a crime has been committed at all before invoking the power of warrantless arrest and detention." Romero v. Fay, 45 F.3d at 1476-77. Police officers "may not ignore easily accessible evidence and thereby delegate their duty to investigate [to others]." Baptiste v. J.C. Penney Co., 147 F.3d 1252, 1259 (10th Cir. 1998). However, "[o]nce probable cause is established, an officer is not required to continue to investigate for exculpatory evidence before arresting a suspect." Garcia v. Casuas, 2011 WL 7444745, at *49 (citing Cortez v. McCauley, 478 F.3d 1108, 1121 n.18 (10th Cir. 2007)(en banc)).

In Romero v. Fay, the Tenth Circuit confronted the issue of when an officer must conduct further investigation before arresting an individual. In that case, law enforcement officers interviewed two individuals -- Stella Gutierrez and Manuel Duran -- who implicated the plaintiff in a murder. See 45 F.3d at 1474. Approximately four hours later, without conducting additional investigation or obtaining a warrant, an officer arrested the plaintiff for murder. See 45 F.3d at 1474. After he was taken into custody, the plaintiff told the officer that he was innocent and that he had an alibi. See 45 F.3d at 1474. The plaintiff stated that three individuals would establish that he was asleep at home when the murder occurred. See 45 F.3d at 1474. The officer refused the plaintiff's offer of names of alibi witnesses and said that the witnesses "were of little significance because they would lie to protect Plaintiff." 45 F.3d at 1474. The officer never interviewed the alibi witnesses. See 45 F.3d at 1474. The plaintiff was incarcerated for three months before the government dismissed the case and he was released. See 45 F.3d at 1474.

The plaintiff brought a 42 U.S.C. § 1983 action for, among other things, violations of his Fourth Amendment rights. See 45 F.3d at 1474. The plaintiff argued that, regardless whether the officers' interviews of Gutierrez and Duran established probable cause, under clearly established law, a reasonable officer would have investigated his alibi witnesses before arresting him. See 45 F.3d at 1476. The Tenth Circuit disagreed, in an opinion that the Honorable Bobby R. Baldock, now-Senior United States Circuit Judge for the Tenth Circuit, authored, and the Honorable Deanall Reece Tacha, former-United States Circuit Judge for the Tenth Circuit, and the Honorable Monroe G. McKay, Senior United States Circuit Judge for the Tenth Circuit joined. See 45 F.3d at 1476. The Tenth Circuit stated that the Fourth Amendment requires officers to only "reasonably interview witnesses readily available at the scene, investigate basic evidence, or otherwise inquire

if a crime has been committed at all before invoking the power of warrantless detention." 45 F.3d at 1476-77. The Tenth Circuit determined:

> Once [the defendant] concluded based on the facts and information known to him that probable cause existed to arrest Plaintiff for the murder of David Douglas, his failure to question Plaintiff's alibi witnesses prior to the arrest did not negate probable cause. Thus, [the defendant's] failure to investigate Plaintiff's alibi witnesses prior to arrest did not constitute a constitutional violation.

45 F.3d at 1478 (footnote omitted).

In Baptiste v. J.C. Penney Co., officers arrested the plaintiff for shoplifting after: (i) receiving reports from store security guards that they witnessed her shoplifting on store surveillance; and (ii) watching a video of the surveillance footage on which the security officers relied in reaching their conclusion -- which supported the plaintiff's story that she had not stolen anything. See 147 F.3d at 1254-55. The Tenth Circuit, in an opinion that Judge Murphy authored, and the Honorable Stephen Hale Anderson, Senior United States Circuit Judge for the Tenth Circuit, and the Honorable James Kenneth Logan, late-United States Circuit Judge for the Tenth Circuit joined, concluded that qualified immunity did not apply. See 147 F.3d at 1257-59. The Tenth Circuit asserted that the security guards' allegations were based solely on the plaintiff's conduct, "which was memorialized in its entirety on the videotape." 147 F.3d at 1257. The Tenth Circuit stated that the police officers "viewed the very same conduct on the videotape, which this court has concluded failed to establish probable cause." 147 F.3d at 1257. The Tenth Circuit held that, consequently, "[i]t was . . . not reasonable for the officers to rely on the security guards' allegations." 147 F.3d at 1257. The Tenth Circuit added that

> police officers may not ignore easily accessible evidence and thereby delegate their duty to investigate and make an independent probable cause determination based on that investigation. Here, [the defendants] did conduct some investigation by

viewing the videotape and questioning [the plaintiff].  They argue, however, that they should be allowed to rely on the statement of the guards for probable cause to arrest.  Because the officers knew that the allegations of the guards were based on observations of conduct captured and preserved on an available videotape, to credit this argument would allow a wholesale delegation of police officers' duty to investigate and make an independent probable cause determination.

147 F.3d at 1259 (citation omitted).

In Cortez v. McCauley, officers responded to a call from a nurse stating that a woman had brought her two-year-old daughter to the hospital asserting that the child had complained that her babysitter's boyfriend had molested her.  See 478 F.3d at 1113.  Without (i) interviewing the girl, her mother, the nurse, or the attending physician; (ii) inspecting the girl's clothing for signs of sexual assault; or (iii) waiting for the results of the child's medical examination, the officers arrested the boyfriend.  See 478 F.3d at 1113, 1117.  The Tenth Circuit, in an en banc opinion that the Honorable Paul Joseph Kelly Jr., now-Senior United States Circuit Judge for the Tenth Circuit, authored, explained that,

> whether we view it as a need for more pre-arrest investigation because of insufficient information, *see Valenzuela*, 365 F.3d at 902, or inadequate corroboration, what the officers had fell short of reasonably trustworthy information indicating that a crime had been committed by [the plaintiff].  *See BeVier v. Hucal*, 806 F.2d 123, 128 (7th Cir. 1986)("A police officer may not close her or his eyes to facts that would help clarify the circumstances of an arrest.  Reasonable avenues of investigation must be pursued especially when, as here, it is unclear whether a crime had even taken place.").  Based on the facts above, [the plaintiff] was arrested without probable cause.

478 F.3d at 1116 (footnote omitted).  The Tenth Circuit further held that

> it was established law that "the probable cause standard of the Fourth Amendment requires officers to reasonably interview witnesses readily available at the scene, investigate basic evidence, or otherwise inquire if a crime has been committed at all before invoking the power of warrantless arrest and detention."  *Romero*, 45 F.3d at 1476-77 (footnote omitted); *see also Baptiste v. J.C. Penney, Co.*, 147 F.3d . . . [at] 1259 . . . ("[P]olice officers may not ignore easily accessible evidence and

thereby delegate their duty to investigate and make an independent probable cause determination based on that investigation."). In the present case, witnesses were readily available for interviews, physical evidence was available, and a medical diagnosis was forthcoming. Defendants, however, . . . conducted no investigation. Instead, the Defendants relied on the flimsiest of information conveyed by a telephone call.

478 F.3d at 1117-18. The Tenth Circuit concluded, therefore, that qualified immunity did not

apply. See 478 F.3d at 1118-22.

In Garcia v. Casuas, a detective with the City of Rio Rancho, New Mexico -- Monica Casuas -- arrested the plaintiff, Mitchell Garcia, for sexual penetration of a minor. See 2011 WL 7444745, at *8. The plaintiff was ultimately exonerated, and subsequently filed a § 1983 claim against the arresting officer and Rio Rancho for, among other things, unlawfully arresting him in violation of his Fourth Amendment rights. See 2011 WL 7444745, at *12. The Court concluded that the officer had probable cause to arrest the plaintiff based on information gleaned from other officers' interviews of the plaintiff, the victim -- K.J., the victim's mother -- Audrey Odom, and a witness at the scene on the night of the incident -- Jennifer Katz. See 2011 WL 7444745, at *43-46. Garcia argued that, by failing to re-interview Odom and Katz, and instead choosing to rely on the other officers' interviews of them, Casuas "fail[ed] to interview readily accessible witnesses." 2011 WL 7444745, at *15. Garcia contended that, moreover, Casuas should have known that failing to personally interview him, Odom, Katz, K.J., and Katz' neighbors before arresting him violated his constitutional rights. See 2011 WL 7444745, at *15. Garcia argued that, had Casuas interviewed him before arresting him, she would have discovered Katz' and Odom's motivations to lie. See 2011 WL 7444745, at *15.

Finding that the defendant's failure to conduct further investigation before arresting the plaintiff did not constitute a Fourth Amendment violation, the Court explained:

> Although Garcia cites Romero v. Fay and cases from several other circuits for the general proposition that officers must interview witnesses at the scene, Garcia points to no case law which would establish that, after the officers at the scene have interviewed witnesses, the Constitution requires the investigating detective to interview those witnesses again. . . . Here, the responding police officers . . . interviewed every adult alleged to be involved in the incident and briefly spoke with K.J. . . . Garcia also states that, if Casuas had investigated further, she would have known that there was no semen on the bedding, and she would have discovered Katz' and Odom's motivation if she spoke to him. The Tenth Circuit's discussion of probable cause in Romero v. Fay also undercuts Garcia's assertion that Casuas was required to do more after [K.J.'s interview] solidified the existence of probable cause. In Romero v. Fay, the Tenth Circuit held:
>
> > Plaintiff contends that regardless of whether the statements by Duran and Guiterrez supplied probable cause for Defendant Fay to arrest Plaintiff, under clearly established law a reasonable police officer would have investigated his alibi witnesses before arresting him, and the exculpatory information possessed by them would have negated the probable cause to arrest. We disagree.
>
> 45 F.3d at 1466. In Baptiste v. J.C. Penney Co., the Tenth Circuit also recognized that "officers are not required to conduct full investigations before making an arrest." 147 F.3d at 1257 n.8. . . . These cases establish that Casuas was not required to speak to [Katz' neighbors], because they did not appear to be material witnesses. Garcia has made no allegations and presented no facts suggesting that the neighbors were ever around K.J. Garcia has also not presented any facts demonstrating that [the neighbors] have shed light on the motivations of Katz or Odom. Garcia only speculates that Casuas *might* have found something. An officer is not required to exhaust every possible lead to satisfy the Fourth Amendment. In Romero v. Fay, the Tenth Circuit held:
>
> > Once Defendant Fay concluded based on the facts and information known to him that probable cause existed to arrest Plaintiff for the murder of David Douglas, his failure to question Plaintiff's alibi witnesses prior to the arrest did not negate probable cause. Thus, Defendant Fay's failure to investigation Plaintiff's alibi witnesses prior to arrest did not constitute a constitutional violation.

45 F.3d at 1478. . . . Furthermore, Garcia's other statements belie the fact that, if Casuas had interviewed him before his arrest, he would have explained that Katz and Odom were biased or trying to frame him. When [another officer] interviewed Garcia on the night of the incident, he asked Garcia whether Katz and Odom had a reason to beat him up, and informed him that he was being accused of choking K.J. Garcia responded that Katz and Odom had no reason to beat him up, and denied hurting K.J., never mentioning that Katz and Odom might have beat him up or encouraged K.J. to accuse him because they were romantically interested in him. During his interrogation after his arrest, Garcia never mentioned that Katz and Odom might have improper motives. The cases that Garcia cites establish only that the police may not ignore available material witnesses. Here, [the other officer] spoke with Garcia; Garcia denied doing wrong and never related that he may have been framed. Garcia presents no cases, and the Court could find none, suggesting that Casuas was required to repeat the steps other officers had already taken and re-interview all witnesses. . . . Finally, waiting for the laboratory results would not have substantially altered the probable-cause determination, because, while the New Mexico Department of Public Safety Forensic Laboratory found no semen, it does not have the capabilities to "detect the presence of urine in or on a substance."

Once probable cause is established, an officer is not required to continue to investigate for exculpatory evidence before arresting a suspect. See Cortez v. McCauley, 478 F.3d at 1121 n.18 (citing Baker v. McCollan, 443 U.S. 137, 145-46 (1979)). The Court has already determined that Casuas had probable cause to arrest Garcia and that there was a substantial basis for the issuance of the arrest warrant after the safe-house interview. Casuas was not required to investigate further after that determination.

Garcia v. Casuas, 2011 WL 7444745, at *47-49 (emphasis in original)(alterations added)(citations to the record omitted).

## LAW REGARDING EXCESSIVE FORCE

An excessive force claim "must . . . be judged by reference to the specific constitutional standard which governs that right, rather than to some generalized 'excessive force' standard." Graham v. Connor, 490 U.S. at 394. The Supreme Court has long held that all claims of excessive force in the context of an arrest or detention should be analyzed under the Fourth Amendment's reasonableness standard. See Graham v. Connor, 490 U.S. at 395 ("[A]ll claims that law

enforcement officers have used excessive force -- deadly or not -- in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard . . . ." (emphasis omitted)).  The Supreme Court recognizes that "police officers are often forced to make split-second judgments -- in circumstances that are tense, uncertain, and rapidly evolving -- about the amount of force that is necessary in a particular situation."  Graham v. Connor, 490 U.S. at 397.  Consequently, "the reasonableness of the officer's belief as to the appropriate level of force should be judged from that on-scene perspective."  Saucier v. Katz, 533 U.S. at 205.

1.      **Relevant Factors in Determining Whether Officers' Actions Were Objectively Reasonable.**

Graham v. Connor provides three factors that a court must consider in determining whether an officer's actions were objectively reasonable: "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight."  Graham v. Connor, 490 U.S. at 396 (citing Tennessee v. Garner, 471 U.S. at 8-9).  See Weigel v. Broad, 544 F.3d 1143, 1151-52 (10th Cir. 2008).

A court assesses "objective reasonableness based on 'whether the totality of the circumstances justified the use of force,' and [must] 'pay careful attention to the facts and circumstances of the particular case.'"  Estate of Larsen ex. rel Sturdivan v. Murr, 511 F.3d at 1260 (quoting Sevier v. City of Lawrence, 60 F.3d 695, 699 (10th Cir. 1995)).  "The excessive force inquiry evaluates the force used in a given arrest or detention against the force reasonably necessary to effect a lawful arrest or detention under the circumstances of the case."  Cortez v.

McCauley, 478 F.3d at 1126. "If the plaintiff can prove that the officers used greater force than would have been reasonably necessary to effect a lawful arrest, he is entitled to damages resulting from that excessive force." Cortez v. McCauley, 478 F.3d at 1127. Additionally, "[t]he 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Graham v. Connor, 490 U.S. at 396 (citing Terry v. Ohio, 392 U.S. at 20-22).

Caselaw need not establish that the exact police procedure at issue is unreasonable for a district court to conclude that it violates the Fourth Amendment. In Weigel v. Broad, two police officers accidentally caused the death of a suspect by using excessive force in arresting and handcuffing him. See 544 F.3d at 1148-49, 1155. The suspect was non-cooperative, disobeying the officers' commands and attempting to flee. See 544 F.3d at 1148. To gain control of the suspect, one officer tackled him and wrestled him to the ground. See 544 F.3d at 1148. The suspect vigorously resisted, repeatedly attempting to take the officers' weapons and evade handcuffing. See 544 F.3d at 1148. The officer put the suspect in a choke hold, handcuffed him, laid across his legs, and applied weight to his upper torso. See 544 F.3d at 11048. After several minutes, the suspect went into full cardiac arrest and died. See 544 F.3d at 1149.

The Tenth Circuit held that the district court should not have granted summary judgment for the officers on qualified immunity grounds. It reasoned that whether the officers' actions were reasonable was a jury question, because there was evidence that a reasonable officer would have known that: (i) the pressure created a risk of asphyxiation; and (ii) the pressure was unnecessary to restrain the suspect. See 544 F.3d at 1152-53. Accordingly, a reasonable jury could have concluded that an objectively reasonable officer would not have continued to apply force. See 544

F.3d at 1149-52. "If true, this constitutes an unreasonable use of force under the Fourth Amendment." 544 F.3d at 1153 (citing Gutierrez v. City of San Antonio, 139 F.3d 441, 449 (5th Cir. 1998)(concluding that a "material dispute of fact exists as to whether Gutierrez posed a threat of death or serious bodily injury to the officers or to others")).

Similarly, the Tenth Circuit has made clear that, although officers may use force to apprehend a suspect, the level of force they use must be necessary to accomplish their objectives. See Buck v. City of Albuquerque, 549 F.3d 1269, 1289-90 (10th Cir. 2008). Accordingly, officers may use more force to apprehend a fleeing felon than they may use to arrest a submissive misdemeanant. See Casey v. City of Fed. Heights, 509 F.3d at 1282. In Buck v. City of Albuquerque, the Tenth Circuit concluded that, when a suspect was charged with only a misdemeanor and was not fleeing, a reasonable jury could find that the officer's acts of grabbing the suspect, dragging him, pushing him face down onto the pavement, and kneeing him in the back were unreasonable. See 549 F.3d at 1290.

The Court has written several times on excessive force. In Smith v. Kenny, 678 F. Supp. 2d 1124 (D.N.M. 2009)(Browning, J.), the Court concluded that police officers did not use excessive force when they handcuffed two suspects. See F. Supp. 2d at 1165-66. It reasoned that mere "temporary redness and tenderness" to the suspects' wrists, without more evidence of force, "is the kind of de minimis physical injury that does not support an excessive use of force claim." 678 F. Supp. 2d at 1165. In Martin v. City of Albuquerque, 147 F. Supp. 3d 1298 (D.N.M. 2015)(Browning, J.), the Court declined to grant a police officer's summary judgment motion on an excessive force claim. See 174 F. Supp. 3d at 1330-33. It determined that there was a factual issue whether the police officer struck a drunk driver in the groin or the thigh -- a strike to the thigh

might be reasonable, but the groin would be unreasonable.  See 147 F. Supp. 3d at 1330-31.  The Court also determined that a reasonable jury could conclude that the thigh strike would be unreasonable given that the drunk driver cooperated, albeit belatedly, to the officer's commands. See 147 F. Supp. 3d at 1331-32.  In so holding, the Court emphasized that the excessive force was all the more apparent, because the police officer "did not inform Martin that he was under arrest before pushing him up against the truck" and executing the thigh or groin strike.  147 F. Supp. 3d at 1332.  Finally, the Court determined that "a reasonable jury might find that Padilla's action of pushing Martin face-first into the ground was also unnecessary," because, by the time the officer pushed the man to the ground, the man's "hands were already covering his groin and he was bent over in pain."  147 F. Supp. 3d at 1333.

### 2.    Least -- or Less -- Forceful Alternatives in Excessive-Force Cases.

"To avoid a 'Monday morning quarterback' approach, the Fourth Amendment does not require the use of the least, or even a less, forceful or intrusive alternative to effect custody, so long as the use of force is reasonable under Graham v. Connor."  James v. Chavez, 830 F. Supp. 2d 1208, 1236 (D.N.M. 2011)(Browning, J.).  The Fourth Amendment requires only that the defendant officers choose a "reasonable" method to end the threat that the plaintiff poses to the officers in a force situation, regardless of the availability of less intrusive alternatives.  Graham v. Connor, 490 U.S. at 397.

In Michigan Department of State Police v. Sitz, 496 U.S. 444, 450-51 (1990), the Supreme Court examined a case addressing the constitutionality of highway sobriety checkpoints and stated that Brown v. Texas, 443 U.S. 47 (1979),

was not meant to transfer from politically accountable officials to the courts the decision as to which among reasonable alternative law enforcement techniques should be employed to deal with a serious public danger. Experts in police science might disagree over which of several methods of apprehending drunken drivers is preferable as an ideal. But for purposes of Fourth Amendment analysis, the choice among such reasonable alternatives remains with government officials who have a unique understanding of, and a responsibility for, limited public resources, including a finite number of police officers.

Mich. Dep't of State Police v. Sitz, 496 U.S. at 453-54. See Illinois v. Lafayette, 462 U.S. 640, 647 (1983)("The reasonableness of any particular government activity does not necessarily or invariably turn on the existence of alternative 'less intrusive' means."). To avoid unrealistic second guessing, the Fourth Amendment does not require that an officer use the least-intrusive alternative available to protect himself or others so long as the method chosen is reasonable.

In United States v. Sokolow, 490 U.S. 1 (1989), the Supreme Court examined the stop under Terry v. Ohio, of a suspected drug courier in an airport. See 490 U.S. at 3. The Supreme Court rejected Sokolow's contention that the arresting officers were "obligated to use the least intrusive means available to verify or dispel their suspicions that he was smuggling narcotics." 490 U.S. at 10. Instead, the Supreme Court held: "The reasonableness of the officer's decision to stop a suspect does not turn on the availability of less intrusive investigatory techniques. Such a rule would unduly hamper the police's ability to make swift, on-the-spot decisions . . . and it would require courts to 'indulge in unrealistic second-guessing.'" United States v. Sokolow, 490 U.S. at 11 (quoting United States v. Montoya de Hernandez, 473 U.S. 531, 542 (1985)). Similarly, in United States v. Sharpe, 470 U.S. 675 (1985), the Supreme Court stated:

A creative judge engaged in *post hoc* evaluation of police conduct can almost always imagine some alternative means by which the objectives of police might have been accomplished. But "[t]he fact that the protection of the public might, in

the abstract, have been accomplished by 'less intrusive' means does not, by itself, render the search unreasonable."

470 U.S. at 686-87 (alteration in United States v. Sharpe)(quoting Cady v. Dombrowski, 413 U.S. 433, 447 (1973)).

In United States v. Melendez-Garcia, the Tenth Circuit stated: "We must avoid 'unrealistic second-guessing' of police officers' decisions in this regard and thus do not require them to use the least intrusive means in the course of a detention, only a reasonable ones." 28 F.3d at 1052 (quoting United States v. King, 990 F.2d at 1562-63). See Medina v. Cram, 252 F.3d 1124, 1133 (10th Cir. 2001)(Tacha, C.J.)(stating that "the reasonableness standard does not require that officers use alternative less intrusive means" (internal quotation marks omitted)); Dickerson v. McClellan, 101 F.3d 1151, 1160 (6th Cir. 1996)("[T]he Fourth Amendment does not require officers to use the best technique available as long as their method is reasonable under the circumstances."); Schulz v. Long, 44 F.3d 643, 649 (8th Cir. 1995)("[T]he Fourth Amendment inquiry focuses not on what the most prudent course of action may have been or whether there were other alternatives available, but instead whether the seizure actually effectuated falls within the range of conduct which is objectively 'reasonable' under the Fourth Amendment."); Scott v. Henrich, 39 F.3d 912, 915 (9th Cir. 1994)("Requiring officers to find and choose the least intrusive alternative would require them to exercise superhuman judgment. . . . Officers thus need not avail themselves of the least intrusive means of responding to an exigent situation; they need only act within that range of conduct we identify as reasonable."); Menuel v. City of Atlanta, 25 F.3d 990, 996-97 (11th Cir. 1994)("[T]he Fourth Amendment does not require officers to use the least intrusive or even less intrusive alternatives in search and seizure cases. The only test is whether

what the police officers actually did was reasonable."); <u>Plakas v. Drinski</u>, 19 F.3d 1143, 1149 (7th Cir. 1994)("We do not believe the Fourth Amendment requires the use of the least or even a less deadly alternative so long as the use of force is reasonable under <u>Garner v. Tennessee</u> [sic] and <u>Graham v. Connor</u>.").

## NEW MEXICO LAW REGARDING THE TORTS OF ASSAULT AND BATTERY

New Mexico courts have stated that "the elements of civil and criminal assault and battery are essentially identical." <u>State v. Ortega</u>, 1992-NMCA-003, ¶ 12, 827 P.2d 152, 155. A person is liable for the intentional tort of simple battery when the person intentionally causes bodily contact to the plaintiff in a way not justified by the plaintiff's apparent wishes or by a privilege, and the contact is harmful or offensive to the plaintiff. <u>See</u> 1 Dan B. Dobbs, <u>The Law of Torts</u> § 28, at 52-53 (2000)("The defendant is subject to liability for a simple battery when he intentionally causes bodily contact to the plaintiff in a way not justified by the plaintiff's apparent wishes or by a privilege, and the contact is in fact harmful or against the plaintiff's will." (citing Restatement (Second) of Torts § 13)).

> Under New Mexico law, wherein the <u>Restatement of Torts</u> reigns, one commits a battery when "(a) he acts intending to cause a harmful or offensive contact with the person of the other or a third person, or an imminent apprehension of such a contact, and (b) an offensive contact with the person of the other directly or indirectly results."

<u>Sisneros v. Fisher</u>, 685 F. Supp. 2d 1188, 1220-21 (D.N.M. 2010)(Browning, J.)(quoting <u>Desmare v. New Mexico</u>, No. CIV 07-0199 JB/RHS, 2007 WL 5231690, at *4 (D.N.M. Aug. 14, 2007)(Browning, J.)). <u>See</u> Restatement (Second) of Torts § 18 ("An actor is subject to liability to another for battery if (a) he acts intending to cause a harmful or offensive contact with the person of the other or a third person, or an imminent apprehension of such a contact, and (b) an offensive

contact . . . results.").[14]  Accord State v. Ortega, 1992-NMCA-003, ¶ 10, 827 P.2d at 155 (noting

that the "elements of civil and criminal assault and battery are essentially identical," and comparing

"[t]he elements of [N.M. Stat. Ann.] Section 30-22-24(A)" with Restatement (Second) of Torts

§ 18).[15]  "An 'officer can be held liable for assault and battery if he uses excessive force.'"

Adegbuji v. Middlesex Cty., No. CIV A 03CV-1757 PGS, 2006 WL 2806289, at *12 (D.N.J. Sept.

---

[14]The Court often looks to the New Mexico Civil Uniform Jury Instructions for guidance on New Mexico state law.  See, e.g., Coffey v. United States, 906 F. Supp. 2d 1114, 1186 n.33 (D.N.M. 2012)(Browning, J.)("The Supreme Court of New Mexico's adoption of uniform jury instructions proposed by standing committees of the Court establishes a presumption that the instructions are correct statements of law."  (citing State v. Wilson, 1994-NMSC-009, ¶ 5, 867 P.2d 1175, 1178).  The Civil Uniform Jury Instruction for the intentional torts of assault and battery, however, states that the Committee concluded that the New Mexico law regarding the torts was not clearly developed to warrant an instruction.  See Civ. U.J.I. 13-1624 N.M.R.A., Committee Commentary (noting that the Committee "spent much time over a period of several months studying the matter of intentional torts," but ultimately "concluded that there was insufficient New Mexico law on assault and battery to guide the committee on this subject and that too much reliance had been placed upon the law of other jurisdictions on assault and battery to include such instructions in this work").

The Court has carefully searched New Mexico state caselaw on the intentional torts of assault and battery, and, in addition, considered the reference to Restatement (Second) of Torts § 18 in State v. Ortega.  The Court notes that the Court of Appeals of New Mexico, in Yount v. Johnson, 1996-NMCA-046, 915 P.2d 341, cites to W. Page Keeton et al., Prosser and Keeton on the Law of Torts (5th ed. 1984) and the Restatement (Second) of Torts for the proposition that "[c]onsent is a defense for intentional torts like assault and battery."  Yount v. Johnson, 1996-NMCA-046, ¶ 17, 915 P.2d at 346.  The Court has previously noted that "New Mexico courts often look to the law as stated in the Restatement (Second) of Torts."  Coffey v. United States, 906 F. Supp. 2d at 1169 n.31 (citing Montanez v. Cass, 1975-NMCA-142, ¶ 46, 546 P.2d 1189, 1195 ("It has long been the policy of our courts to follow in the footsteps of the Restatement of Torts, 2d."), rev'd in part on other grounds sub nom. N.M. Elec. Serv. Co. v. Montanez, 1976-NSMC-028, 551 P.2d 634).  The Court thus follows the New Mexico courts' guidance, relying on Dobbs, supra, the West Group's successor treatise to Prosser and Keeton on the Law of Torts, discussing the Restatement (Second) of Torts' definition of battery, for the elements of the intentional tort of battery.

[15]The Court notes that the Supreme Court of New Mexico agrees with State v. Ortega's construction of New Mexico's battery statute, as provided in State v. Padilla, 1997-NMSC-022, ¶ 7, 937 P.2d 492, 494.

28, 2006)(Sheridan, J.)(quoting <u>Mantz v. Chain</u>, 239 F. Supp. 2d 486, 498 (D.N.J. 2002)(Brotman, J.)).

As to the intent required to commit a battery, Professor Dobbs notes that the Restatement (Second) of Torts is "ambiguous" whether "the plaintiff shows intent by showing merely an intent to touch that turned out to be offensive or harmful or whether she must show that the harm or offense was intended." Dobbs, <u>supra</u>, § 30, at 58. It is clear, however that "an intent to touch in a way the defendant understands is not consented to is sufficient. So is an actual intent to harm." Dobbs, <u>supra</u>, § 30, at 58. For the contact required, Professor Dobbs notes that, because the intentional tort of battery rose out of the common-law action of trespass, harm is not required. <u>Accord</u> <u>Selmeczki v. New Mexico Dep't of Corr.</u>, 2006-NMCA-024, ¶ 29, 129 P.3d 158, 167 ("It is black-letter law that causing an offensive touching, even indirectly to another's clothing and not resulting in injury, is the tort of battery."). Rather, "[t]he gist of battery is that the plaintiff has been touched, intentionally, in a way that she has not even apparently consented to and that is not justified by some generally recognized privilege." Dobbs, <u>supra</u>, § 29, at 55. Thus, for purposes of battery, a harmful touching is sufficient, but not necessary. <u>Cf.</u> <u>Garety v. Demers</u>, 1978-NSMC-097, ¶ 55, 589 P.2d 180, 191 (in the context of whether medical malpractice is distinct from the tort of battery, the Supreme Court of New Mexico noted: "As to causation in a battery action, the tort of battery is the wrongful touching of the [plaintiff's] body which by itself gives the patient a claim for substantial damages").

In <u>Selmeczki v. New Mexico Department of Corrections</u>, the Court of Appeals of New Mexico held that a disgruntled corrections department officer committed the tort of battery when the officer hit visitors to his office with a stack of coins. <u>See</u> 2006-NMCA-024, ¶ 29, 129 P.3d at

167. The visitors' testimony was that the officer "rose up part way from a seated position behind a desk and forcefully slapped a stack of five to ten coins toward both visitors, which resulted in the coins striking them both on the legs." 2006-NMCA-024, ¶ 6, 129 P.3d at 1661. The officer's version was quite different; he "denied slapping or striking the coins at [the visitors] but claimed that he only 'nudged or dropped' them off the desk, a gesture he admitted was probably 'not prudent.' He denied any advance planning, claiming it was a 'spur of the moment' act." 2006-NMCA-024, ¶ 7, 129 P.3d at 161. The testimony elicited at trial was that "no injury or harm was likely from the coins being launched at [the visitors]." 2006-NMCA-024, ¶ 29, 129 P.3d at 167. The Court of Appeals of New Mexico concluded that, regardless whether the officer "did not 'meaningfully' commit a civil battery," he was liable, as "[i]t is black-letter law that causing an offensive touching, even indirectly to another's clothing and not resulting in injury, is the tort of battery." 2006-NMCA-024, ¶ 29, 129 P.3d at 167.

## NEW MEXICO LAW REGARDING FALSE ARREST AND FALSE IMPRISONMENT

"Under New Mexico law, '[f]alse imprisonment consists of intentionally confining or restraining another person without his consent and with knowledge that he has no lawful authority to do so.'" Romero v. Sanchez, 1995-NMSC-028, ¶ 13, 895 P.2d 212, 215 (alteration in Romero v. Sanchez)(quoting N.M. Stat. Ann. § 30-4-3). False arrest or unlawful detention occurs when the "facts available to [a] detaining officer would [not] warrant [a] person of reasonable caution to believe detention appropriate." Romero v. Sanchez, 1995-NMSC-028, ¶ 13, 895 P.2d at 215 (stating that "[u]nlawful detention has similar requirements" to false imprisonment (citing State v. Ryder, 1981-NMCA-017, ¶ 12, 649 P.2d 756, 758). While the Supreme Court of New Mexico appears to recognize them as separate torts, the Court of Appeals of New Mexico more recently

has found that "[a] false arrest is merely one way of committing false imprisonment." Santillo v. N.M. Dep't of Pub. Safety, 2007-NMCA-159, ¶ 12, 173 P.3d at 10 (citing 32 Am. Jur. 2d False Imprisonment § 3 (2007)). See Wallace v. Kato, 549 U.S. 384, 388 (2007)("False arrest and false imprisonment overlap; the former is a species of the latter."); Butler ex rel. Butler v. Rio Rancho Pub. Sch. Bd. of Educ., 245 F. Supp. 2d 1203, 1211 (D.N.M. 2002)(Mechem, J.)("The torts of false arrest and false imprisonment are similar."); Dobbs, supra, § 36, at 67 ("False arrest is a term that describes the setting for false imprisonment when it is committed by an officer or by one who claims the power to make an arrest.").

New Mexico state courts have not stated when a plaintiff's causes of action for false arrest and for false imprisonment accrue. These courts, however, often look to the law as stated in the Restatement (Second) of Torts. See Montanez v. Cass, 1975-NMCA-142, ¶ 46, 546 P.2d 1189, 1195 ("It has long been the policy of our courts to follow in the footsteps of the Restatement of Torts, 2d."), rev'd in part on other grounds sub nom. N.M. Elec. Serv. Co. v. Montanez, 1976-NSMC-028, 551 P.2d 634. In Schmitz v. Smentowski, 1990-NMSC-002, 785 P.2d 726, the Supreme Court of New Mexico stated: "We have also been very willing to adopt the view of the Restatement of Torts to assist our development of new tort areas." 1990-NMSC-002, ¶ 49, 785 P.2d at 736. The Supreme Court of New Mexico explained:

> Accordingly, New Mexico has recognized as tortious inducing a breach of contract, adopting the view promulgated in Restatement of Torts § 766 (1939). *Wolf v. Perry*, 65 N.M. 457, 461, 339 P.2d 679, 681 (1959)(requiring that "one who, without justification or privilege to do so, induces a third person not to perform a contract with another, is liable to the other for the harm caused thereby"); *see also Williams v. Ashcraft*, 72 N.M. 120, 381 P.2d 55 (1963)(recognizing the tort of wrongful interference with another's business relations). We have adopted the cause of action of intentional interference with prospective contractual relations, relying on the tort as articulated in Restatement (Second) of Torts § 766(B) (1977).

> *M & M Rental Tools, Inc. v. Milchem, Inc.*, 94 N.M. 449, 452-54, 612 P.2d 241, 244-46 (Ct. App. 1980)(one who, with "bad motive," intentionally interferes with another's prospective contractual relations, is subject to liability); *Anderson v. Dairyland Ins. Co.*, 97 N.M. 155, 158-59, 637 P.2d 837, 840-41 (1981). These torts reflect the underlying theory of prima facie tort as applied to contractual relations -- the underlying malicious motive of a defendant's actions, done without justification, makes an otherwise lawful act, competition, tortious.
>
> New Mexico has also recognized the tort of intentional infliction of emotional distress, relying on Restatement (Second) of Torts § 46 (1965), *Mantz v. Follingstad*, 84 N.M. 473, 479-80, 505 P.2d 68, 74-75 (Ct. App. 1972); *Ramirez v. Armstrong*, 100 N.M. 538, 673 P.2d 822 (1983), and we have recognized that the intentional and wrongful deprivation of the right to vote or hold public office creates tort liability. *Valdez v. Gonzalez*, 50 N.M. 281, 176 P.2d 173 (1946).

Schmitz v. Smentowski, 1990-NMSC-002, ¶¶ 50-51, 785 P.2d at 736. See Baldonado v. El Paso Nat. Gas Co., 2008-NMSC-005, ¶ 26, 176 P.3d 277, 294 (adopting the elements of intentional infliction of emotional distress from Restatement (Second) of Torts § 46); Berlangieri v. Running Elk Corp., 2003-NMSC-024, ¶ 18, 76 P.3d 1098, 1104 ("The rule [for acceptance of risk] followed by the courts of this state thus far tracks the rule followed in a majority of other courts, as well as the Restatement (Second) of Torts § 496B (1965)."). The Supreme Court of New Mexico, however, has also stated that "the Restatement is merely persuasive authority entitled to great weight that is not binding on this Court." Gabaldon v. Erisa Mortg. Co., 1999-NMSC-039, ¶ 27, 990 P.2d 197, 203. See Blake v. Pub. Serv. Co, 2004-NMCA-002, ¶ 26, 82 P.3d 960, 967 (noting that New Mexico courts have not adopted Restatement (Second) of Torts § 324A, Liability to Third Person for Negligent Performance of Undertaking, declining to decide whether to do so).

## ANALYSIS

The Court concludes that Dollar and Soto are entitled to qualified immunity on Count I through III -- the federal, Fourth Amendment claims. The Court further concludes that Dollar and

Soto are entitled to summary judgment on Counts VIII and IX -- the state claims. With no remaining claims against them, the Court terminates Dollar and Soto as Defendants in this matter.

## I.       DOLLAR AND SOTO ARE ENTITLED TO QUALIFIED IMMUNITY ON COUNTS I, II, AND III.

Dollar and Soto assert that they are entitled to qualified immunity, warranting the dismissal of Favela's claims against them. See Motion at 24. Qualified immunity shields government officials from liability where "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Pearson v. Callahan, 555 U.S. at 231 (quoting Harlow v. Fitzgerald, 457 U.S. at 818). When a defendant asserts qualified immunity, the plaintiff must show: (i) that the defendant's actions violated his or her constitutional or statutory rights; and (ii) that the right was clearly established at the time of the alleged misconduct. See Riggins v. Goodman, 572 F.3d at 1107 (citing Pearson v. Callahan, 555 U.S. at 232, 236). "Failure on either qualified immunity element is fatal to the plaintiff's cause." Kerns v. Bader, 663 F.3d at 1180. The facts do not support that Dollar or Soto violated Favela's constitutional rights, and, in any case, the law on those rights is unsettled. Dollar and Soto are thus entitled to qualified immunity.

The Court will follow the process that Saucier v. Katz outlined, first determining whether the Defendants' actions violated the Constitution and then, assuming any rights were violated, determining whether they were clearly established. See Saucier v. Katz, 533 U.S. at 201. Although the Court recognizes that this approach is no longer mandatory, it believes it will be "beneficial" under the circumstances. Pearson v. Callahan, 555 U.S. at 236. Specifically, there "would be little if any conservation of judicial resources" here by only addressing the clearly established prong,

Pearson v. Callahan, 555 U.S. at 236, because it would be "difficult to decide whether a right is clearly established without deciding precisely what the existing constitutional right happens to be," Pearson v. Callahan, 555 U.S. at 236 (internal quotation marks omitted)(quoting Lyons v. Xenia, 417 F.3d 565, 581 (6th Cir. 2005)(Sutton, J., concurring)). In this case, it is difficult to decide precisely what law is or is not clearly established unless the Court determines, as best it can, whether there is even a constitutional right at issue, what it is, what its scope is, and whether -- under the facts and circumstances here -- it was violated. It is, in short, this is an appropriate case to "avoid avoidance," Camreta v. Greene, 563 U.S. at 705, because the exercise of determining whether Dollar and Soto violated Favela's constitutional rights will help the Court determine whether the law was clearly established. The Court will thus address whether any constitutional violations occurred before discussing whether the law was clearly established.

A. **THE COURT WILL DISCUSS COUNT I, WHICH ALLEGES THAT DOLLAR AND SOTO DID NOT HAVE PROBABLE CAUSE TO ARREST FAVELA AND THAT FAVELA'S ARREST THEREFORE AMOUNTED TO AN UNLAWFUL SEIZURE.**

In Count I of his Complaint, Favela asserts that Dollar and Soto lacked probable cause to arrest Favela, and did not obtain a warrant to search him when they brought him to Memorial Medical for medical clearance and detention. See Complaint ¶¶ 63-74, at 9-10. Favela asserts that these actions violated Favela's Fourth Amendment rights to be free of unreasonable seizures. See Complaint ¶¶ 63-74, at 9-10. Favela concedes that probable cause existed to conduct the traffic stop. See Response at 1-2. Favela further notes that he agrees with Dollar and Soto's arguments that support dismissal of the Complaint's Count I. See Response at 1-2. Favela therefore concedes that dismissal of Count I against Dollar and Soto is appropriate. See Response at 1-2. The Court

nevertheless will provide analysis why Dollar and Soto are entitled to qualified immunity on Count I. As a threshold matter, however, the Court notes Soto was not present until after Dollar had arrested Favela and had no say in the stop or arrest, so he cannot be liable for any constitutional violations that occurred and is thus entitled to qualified immunity on this claim. See Trask v. Franco, 446 F.3d at 1046 (allowing liability only where the officer personally participated in , supervised, or caused a constitutional deprivation). The Court's analysis regarding Count I will therefore focus only on Dollar.

### 1. Dollar Did Not Violate Favela's Constitutional Rights.

The traffic stop detention has three distinct periods in which Dollar could have violated Favela's Fourth Amendment rights: (i) the initial traffic stop; (ii) the pat-down search; and (iii) the arrest. The Court will examine each point in turn regarding Dollar's conduct. See United States v. Lyons, 510 F.3d 1225, 1236 (10th Cir. 2007)(stating that a lawful traffic stop must be "justified at its inception" and reasonable in scope based on circumstances justifying it in the first place). Whether an officer has reasonable suspicion to continue detention during a traffic stop is judged based on "the 'totality of the circumstances' to see whether the officer had a 'particularized and objective basis for suspecting wrongdoing.'" United States v. Williams, 403 F.3d 1203, 1207 (10th Cir. 2005)(qutoing United States v. Arvizu, 534 U.S. 266, 173 (2002)).

### a. The Traffic Stop Was Constitutional.

An officer may stop a vehicle with "an objectively reasonable articulable suspicion that a traffic violation has occurred or is occurring." United States v. Soto, 988 F.2d 1548, 1554 (10th Cir. 1993). "[P]robable cause is not required." United States v. Soto, 988 F.2d at 1554. Probable cause for a traffic stop may be provided by the officer's credible visible estimate of speed. See

United States v. Ludwig, 641 F.3d 1243, 1247 (10th Cir. 2011)(Gorsuch, J.). See also United States v. Sowards, 690 F.3d 583, 591 (4th Cir. 2012)(noting an officer's probable cause determination may be supported "where an officer estimates that a vehicle is traveling in significant excess of the legal speed limit"). Here, the undisputed facts show that Dollar observed Favela run a red light at what Dollar believed to be approximately ninety miles per hour on a road with a thirty-five-mile-per-hour speed limit. The facts also show that Dollar pursued Favela for about nine blocks, pacing him at seventy-five miles per hour. While Dollar's initial estimation of Favela's speed may not be reliable, because he did not use a radar gun to verify and had been on the force for only about two years at the time, that Favela ran a red light provided cause for Dollar to give chase.[16] See Whren v. United States, 517 U.S. 806, 810 (1996)("As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred."). It is also not particularly important that Dollar determine at what exact speed Favela was traveling, for it was obvious that it was significantly faster than the posted speed limit and that he had ran a stop light. Cf. United States v. Sowards, 690 F.3d at 591; United States v. Ludwig, 641 F.3d at 1248. These observations thus provided Dollar with probable cause to effectuate the traffic stop. As probable cause supports Dollar's traffic stop, there was not a violation of Favela's Fourth Amendment rights.

---

[16]Las Cruces Municipal Code of Ordinances § 27-12-5-3 provides that "[t]he driver of any vehicle shall obey the instructions of any official traffic-control device applicable thereto." New Mexico state law also requires that "[t]he driver of any vehicle shall obey the instructions of any official traffic-control device applicable thereto . . . unless otherwise directed by a traffic or police officer, subject to the exceptions granted the driver of an authorized emergency vehicle . . . ." N.M. Stat. Ann. § 66-7-104.

### b.     The Pat-Down Search Was Constitutional.

An officer may conduct a pat-down search of a person's outer clothing if the officer has reasonable suspicion to believe that person is armed and dangerous. See United States v. Dennison, 410 F.3d 1203, 1211 (10th Cir. 2005). Indeed, the "reasonable suspicion required to justify a pat-down search represents a 'minimum level of objective justification.'" United States v. Rice, 483 F.3d 1079, 1083 (10th Cir. 2007)(Tymkovich, J.)(quoting United States v. Alcaraz-Arellano, 441 F.3d 1252, 1260 (10th Cir. 2006)). A court determines whether an officer had reasonable suspicion in conducting a pat-down search "based on the totality of the circumstances, taking into account an officer's reasonable inferences based on training, experience, and common sense." United States v. Rice, 483 F.3d at 1083. Officer safety is the primary justification for allowing an officer to conduct a pat-down search. See United States v. Rice, 483 F.3d at 1083. Here, undisputed facts show that Dollar's pat-down search of Favela was not only warranted, but necessary for Dollar's safety. Dollar paced Favela -- with sirens engaged on his police unit -- for nine blocks while Favela was driving significantly over the posted speed limit. As Favela eventually slowed his motorcycle to a stop, he positioned his motorcycle in a manner that was directly facing Dollar. Favela did not immediately dismount his motorcycle nor cut off the power to his engine. In fact, Favela shut off his motorcycle's engine only after Dollar had exited his police unit with his sidearm drawn and after Dollar had commanded Favela to turn off his engine. These facts show Favela's evasive nature was suspicious, and could indicate that Favela was dangerous and prepared to confront Dollar. Nevertheless, Dollar had articulable reasonable suspicion when he saw a handgun protruding from underneath Favela's jacket. This fact alone is enough to show that Dollar had reasonable suspicion to pat-down Favela. Favela's actions coupled

with the handgun seen on his person met the minimum level of justification needed for Dollar to conduct his pat-down search of Favela. See United States v. Rice 483 F.3d at 1083. Dollar's pat-down search of did not violate Favela's Fourth Amendment rights, because Dollar's reasonable suspicion that Favela was armed and dangerous justified the pat-search.

c.    **The Arrest Was Constitutional.**

Finally, an officer may arrest a person in public without a warrant if the officer has probable cause to believe that person has violated the law. See United States v. Valenzuela, 365 F.3d at 896-97. See also Atwater v. City of Lago Vista, 532 U.S. 318, 354 (2001)("If an officer has probable cause that an individual has committed even a very minor criminal offense in his presence, he may, without violating the Fourth Amendment, arrest the offender."). Probable cause to arrest a person "exists only when the 'facts and circumstances within the officers' knowledge, and of which they have reasonably trustworthy information, are sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed.'" United States v. Valenzuela, 365 F.3d at 896 (quoting United States v. Edwards, 632 F.3d at 639). In the present case, it is undisputed that Dollar witnessed Favela blow through a red light at a speed at least two times the posted speed limit. This observation alone gave Dollar probable cause to arrest Favela for reckless driving.[17]    Additionally, Dollar noted that Favela would also be under arrest

---

[17]Section 27-12-12-5 of the Las Cruces Municipal Code of Ordinances ("the Code") provides that Las Cruces police officers may make an arrest for reckless driving without a warrant. Section 27-12-6-12.3 of the Code defines "reckless driving" as driving "any vehicle carelessly and heedlessly in willful or wanton disregard of the rights or safety of others and without due caution and circumspection and at a speed or in a manner so as to endanger or be likely to endanger any person or property." This definition matches New Mexico state law's definition of reckless driving, which states that a "person who drives any vehicle carelessly and heedlessly in willful or wanton disregard of the rights or safety of others and without due caution and circumspection and

for concealing a firearm without a permit. Dollar had probable cause to arrest Favela without a warrant because of his reckless driving and possession of a firearm. Accordingly, the Court concludes that Dollar did not violate Favela's Fourth Amendment rights at the traffic stop.

> **2.** **Even If Soto Violated Favela's Constitutional Rights, These Rights Were Not Clearly Established at the Time of Favela's Traffic Stop and Arrest.**

Even if the Court could, on the record before it, conclude, as a matter of law, that Dollar violated Favela's constitutional rights, the Court concludes that the law was not clearly established such that a reasonable officer in Dollar's position would have recognized the unlawfulness of his actions regarding Favela's arrest. Qualified immunity provides broad protection for government officials where "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Pearson v. Callahan, 555 U.S. at 231 (internal quotation marks omitted)(quoting Harlow v. Fitzgerald, 457 U.S. at 818). The Supreme Court requires district courts "not to define clearly established law at a high level of generality" and requires that they focus on "whether the violative nature of particular conduct is clearly established." Ashcroft v. al-Kidd, 563 U.S. at 742 (emphasis added). "A government official's conduct violates clearly established law when, at the time of the challenged conduct, '[t]he "contours of [a] right [are] sufficiently clear' that every 'reasonable official would have understood that what he is doing violates that right.'" Ashcroft v. al-Kidd, 563 U.S. at 741 (emphasis added)(alterations in Ashcroft v. al-Kidd)(quoting Anderson v. Creighton, 483 U.S. at 640). It operates to protect officials from the law's "sometimes 'hazy border'" and shields officers with

---

at a speed or in a manner so as to endanger or be likely to endanger any person or property is guilty of reckless driving." N.M. Stat. Ann. § 66-8-113.

"reasonable, but mistaken beliefs." Saucier v. Katz, 533 U.S. at 205 (quoting Priester v. City of Riviera Beach, 208 F.3d at 926-27). "Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." Currier v. Doran, 242 F.3d at 923.

As the Tenth Circuit has emphasized, although "a case on point isn't required if the impropriety of the defendant's conduct is clear from existing case law," the law is not clearly established where "a distinction *might* make a constitutional difference." Kerns v. Bader, 663 F.3d at 1186-87 (emphasis in Kerns v. Bader). In Kerns v. Bader, dealing with the search of a home, the Tenth Circuit explained that the relevant question "wasn't whether we all have some general privacy interest in our home," but "whether it was beyond debate in 2005 that the officers' entry and search lacked legal justification." Kerns v. Bader, 663 F.3d at 1183.

Favela has not directed the Court to any analogous case which could support a finding that Dollar's actions at the time of the traffic stop violated any clearly established rights. To the contrary, Favela agrees with Dollar that no clearly established law would suggest that Dollar violated Favela's rights. See Response at 1-2. Indeed, the only caselaw on this issue to which the parties point is in Dollar and Soto's Motion. Dollar and Soto point the Court to two cases that bear little similarity to the case at hand. Those cases are United States v. King, and Novitsky v. City of Aurora, 491 F.3d 1244 (10th Cir. 2007). The Court will analyze these cases even though Favela has conceded the efficacy of the cases in the context of Dollar's probable cause to arrest Favela.

In United States v. King, the Tenth Circuit considered an appeal from the district court's determination that the officer who seized the defendants lacked a reasonable suspicion to do so,

and thus violated the Fourth Amendment.  990 F.2d at 1555.  The officer had arrived at the scene of an accident and noticed "a car with heavily tinted windows" whose "driver was honking his horn incessantly."  990 F.2d at 1555.  As the officer approached the vehicle to advise the driver of the hazardous conditions and to stop honking, the driver, King, "partially rolled down his window," allowing the officer to observe "a nine millimeter pistol, with a clip inside the weapon, on the driver's seat, partially tucked under King's right thigh."  990 F.2d at 1555.  In response, the officer "drew her service revolver, pointed it at King, and ordered him to place his hands on the steering wheel, threatening to shoot him if he did not comply," which she did "out of the concern for the safety of herself and the bystanders, despite the fact that King had not made any threatening gesture or sudden movement."  990 F.2d at 1555.  Another officer arrived and "ordered King to exit the vehicle while keeping his hands in view, and King complied."  990 F.2d at 1555.  The officers then handcuffed King.  See 990 F.2d at 1555.

The Tenth Circuit conducted a de novo review of whether the officer's conduct was reasonable, noting that the district court had analyzed the case as if the officer conducted an investigative detention, whereas the United States asserted that the officer's "seizure of Defendants can be justified by her concern for the safety of herself and the bystanders due to her observation of the pistol within Defendants' immediate reach."  United States v. King, 990 F.2d at 1558.  See id. at 1556.  The Tenth Circuit rejected both the district court's and the United States' approaches, because the officer did not approach the car with an investigative purpose, and the United States' "argument would effectively eliminate Fourth Amendment protections for lawfully armed persons."  990 F.2d at 1559.  The Tenth Circuit acknowledged that an "officer may have occasion to seize a person, as the Supreme Court has defined the term for Fourth Amendment purposes, in

order to ensure the safety of the public and/or the individual, regardless of any suspected criminal activity." 990 F.2d at 1560. The Tenth Circuit determined that the officer was "exercising her 'community caretaking function' when she approached Defendants' car" with a "specific, articulable basis" to believe King "might cause a second accident," because of his incessant honking. 990 F.2d at 1560-61. Accordingly, the Tenth Circuit concluded that the officer "had a reasonable and articulable basis to briefly detain King in order to advise him to cease honking his horn." 990 F.2d at 1561. The Tenth Circuit stated that the officer's "observation of an apparently loaded pistol within Defendants' immediate reach would justify her separation of defendants from the pistol in order to ensure her own safety during the encounter," and that "[t]he governmental interest in the safety of police officers outweighs the individual's Fourth Amendment interest when an officer has an objective basis to believe that the person being lawfully detained is armed and dangerous." 990 F.2d at 1561. The Tenth Circuit concluded that the officer's ordering King to the ground and handcuffing him after separating him from the pistol, and thus removing any "threat to the safety of any of the officers or bystanders," "was not 'reasonably related in scope to the circumstances which justified the inference in the first place' and went far beyond what was necessary to protect her safety." 990 F.2d at 1562-63 (quoting Terry v. Ohio, 392 U.S. at 20).

In Novitsky v. City of Aurora, the Tenth Circuit reviewed an encounter in which officers received a call about "an unconscious man in the front seat of a vehicle located in a YMCA parking lot." 491 F.3d at 1248. When the officers arrived on scene, they "observed a man's legs hanging out of the open front passenger door of a parked vehicle" and, when they approached, "noticed another man, later identified as Mr. Novitsky, who appeared to be sleeping or passed out in the vehicle's back seat." 491 F.3d at 1248 (internal quotation marks and citation omitted). The

officers awoke "Novitsky by knocking on the window and directed him to get out of the vehicle"; the car smelled of alcohol, but the officers did not know whether Novitsky was intoxicated. 491 F.3d at 1249. As Novitsky "reached up with his right hand to grab onto the door and help himself out," the officer grabbed his "hand in a 'twist lock.'"[18] 491 F.3d at 1249. The officer turned Novitsky around to perform a pat down, immediately observed a handgun in Novitsky's pants pocket, and "removed a loaded Smith & Wesson .44 caliber pistol from Mr. Novitsky's pocket." 491 F.3d at 1249. They then handcuffed Novitsky. See 491 F.3d at 1249.

Novitsky asserted that the officer's use of a twist lock to pull him from the vehicle violated the Fourth Amendment. See 491 F.3d at 1253. The Tenth Circuit first determined that Novitsky's detention was justified at the inception, because the officers were reasonably exercising their community caretaking function by responding to the call. 491 F.3d at 1253-54. The Tenth Circuit also determined that, in the circumstances, a reasonable officer would believe Novitsky was intoxicated, so the officer was "justified in having some concern for his safety when he first encountered Mr. Novitsky." 491 F.3d at 1254. See id. at 1255. The Tenth Circuit concluded that a reasonable jury, however, could "conclude . . . that Officer Wortham's application of the twist lock for officer safety purposes was unreasonable under the Fourth Amendment." 491 F.3d at 1255. As to whether the right was clearly established, the Tenth Circuit turned to United States v. King at Novitsky's urging, and determined that it would not "have given a reasonable officer 'fair warning' that using a twist lock to remove Mr. Novitsky from the vehicle was unreasonable." 491 F.3d at 1256. The Tenth Circuit nonetheless concluded that Novitsky "failed to establish that

---

[18]The officer described the "twist lock" technique as "an officer grabbing an individual by the hand and twisting to tighten up the arm." 491 F.3d at 1249.

Officer Wortham violated clearly established law in using the twist lock to remove him from the vehicle," because he notes no "cases that would have given Officer Wortham the requisite warning." 491 F.3d at 1256-57.

These two cases are not directly on point and the facts differ from those here. First, Dollar was not exercising his community caretaking function when he initially stopped Favela, but was stopping him with probable cause that he violated traffic laws. Thus, criminal activity formed the basis for the initial stop in this case, unlike in United States v. King or Novitsky v. City of Aurora. Similar to these cases, however, in the course of carrying out the detention, Dollar noticed a handgun on Favela's person, and acted to remove it to ensure his safety. Unlike in Novitsky v. City of Aurora, Dollar did not apply any physical force onto Favela until after the gun was secured. That the Tenth Circuit awarded qualified immunity in Novitsky v. City of Aurora bears no applicability here, because that determination was based on the lack of a case on point and that the officer believed Novitsky to be intoxicated. See 491 F.3d at 1257. Although Dollar was pointing his gun at Favela as he waited for Favela to comply with his orders, he did not threaten to shoot Favela, but to taser Favela, unlike in United States v. King. Further, although Dollar then placed Favela in handcuffs after securing the handgun, similar to United States v. King, this action was not done for officer safety, but because Dollar believed Favela violated the law. Accordingly, these cases are unhelpful to the Court's determination, but the Court nevertheless concludes that Dollar did not violate clearly established law in stopping, patting down, and arresting Favela.

**B.     THE COURT WILL DISCUSS COUNT II, WHICH ALLEGES THAT THE USE OF THE CATHETER WAS AN UNREASONABLE SEARCH.**

In Count II, Favela alleges Dollar, Soto, and the Memorial Medical Defendants violated Favela's Fourth Amendment rights by forcibly inserting a straight catheter without a valid arrest or law enforcement authority.  See Complaint ¶¶ 75-78, at 10. Favela avers that Soto set in motion a series of events which culminated in Favela's catheterization.  See Complaint ¶ 75, at 10; Response at 9; Tr. at 22:18-22 (Coronado).  Favela predominately supports this argument with two cases from the Tenth Circuit: Martinez v. Carson and Trask v. Franco.  The Court concludes that the facts of Martinez v. Carson and Trask v. Franco are distinguishable from this case's facts, and the Court therefore determines those cases to be inapposite for Favela's argument.  Soto is entitled to qualified immunity on Count II, because he did not violate Favela's constitutional rights, and, even assuming he violated a constitutional right, no clearly established right existed at the time of catheterization.  The Court concludes that Dollar is entitled to qualified immunity on Count II, because Dollar was not at the hospital at the time of the catheterization and nothing in the facts before the Court indicate that Dollar had any say in Favela's catheterization. See Trask v. Franco, 446 F.3d at 1046; Snell v. Tunnell, 920 F.2d at 700 (noting liability under 42 U.S.C § 1983 must have a causal connection between a defendant and alleged constitutional violation).  Any causal connection between Dollar arresting Favela and Favela's subsequent hospitalization terminated when Favela refused to answer the emergency personnel's questions at the scene of his arrest, which spurred their transporting him to Memorial Medical.  See Trask v. Franco, 446 F.3d at 1046; Restatement (Second) of Torts § 442 (1965).  Further, Favela conceded at the hearing that all

claims against Dollar can be dismissed.  See Tr. at 9:11-16 (Court, Coronado).  The Court's analysis will therefore proceed regarding Soto's conduct only.

### 1.    Soto Did Not Violate Favela's Constitutional Rights.

The Court concludes that Soto did not violate Favela's constitutional rights.  First, the use of the catheter, as a matter of excessive force, was not unreasonable given the necessity for medical clearance and Favela's refusal to participate in less-intrusive medical procedures.  Second, even if the catheterization is excessive force, Memorial Medical staff, not Soto, applied that force and, Soto was not the proximate cause of the application of that force.

### a.    The Use of the Catheter Does Not Constitute Excessive Force.

Count II of Favela's Complaint sets forth that his catheterization amounted to excessive force.  An excessive force claim "must . . . be judged by reference to the specific constitutional standard which governs that right, rather than to some generalized 'excessive force' standard." Graham v. Connor, 490 U.S. at 394.  The Supreme Court has long held that all claims of excessive force in the context of an arrest or detention should be analyzed under the Fourth Amendment's reasonableness standard.  See Graham v. Connor, 490 U.S. at 395.  The Supreme Court recognizes that "police officers are often forced to make split-second judgments -- in circumstances that are tense, uncertain, and rapidly evolving -- about the amount of force that is necessary in a particular situation." Graham v. Connor, 490 U.S. at 397.  Consequently, "the reasonableness of the officer's belief as to the appropriate level of force should be judged from that on-scene perspective." Saucier v. Katz, 533 U.S. at 205.

A court assesses "objective reasonableness based on 'whether the totality of the circumstances justified the use of force,' and [must] 'pay careful attention to the facts and

circumstances of the particular case.'" <u>Estate of Larsen ex. rel Sturdivan v. Murr</u>, 511 F.3d at 1260 (quoting <u>Sevier v. City of Lawrence</u>, 60 F.3d at 699). "[T]he excessive force inquiry evaluates the force used in a given arrest or detention against the force reasonably necessary to effect a lawful arrest or detention under the circumstances of the case." <u>Cortez v. McCauley</u>, 478 F.3d at 1126. "If the plaintiff can prove that the officers used greater force than would have been reasonably necessary to effect a lawful arrest, he is entitled to damages resulting from that excessive force." <u>Cortez v. McCauley</u>, 478 F.3d at 1127. Additionally, "[t]he 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." <u>Graham v. Connor</u>, 490 U.S. at 396. "To avoid a 'Monday morning quarterback' approach, the Fourth Amendment does not require the use of the least, or even a less, forceful or intrusive alternative to effect custody, so long as the use of force is reasonable under <u>Graham v. Connor</u>." <u>James v. Chavez</u>, 830 F. Supp. 2d at 1236. The Fourth Amendment requires only that the defendant officers choose a "reasonable" method to end the threat that the plaintiff poses to the officers in a force situation, regardless of the availability of less intrusive alternatives. <u>Graham v. Connor</u>, 490 U.S. at 397.

The reasonableness of the catheter in this case is largely attributable to Favela's medical condition and actions. In analyzing the use of the catheter, the Court must pay careful attention to the facts and circumstances surrounding the use of the catheter. <u>See</u> <u>Estate of Larsen ex. rel Sturdivan v. Murr</u>, 511 F.3d at 1260. Favela's catheterization resulted from his lawful arrest -- an arrest which the parties do not dispute that probable cause supported, and which the Court concluded that probable cause supported in the previous subsection. <u>See</u> Motion at 10 (setting forth this contention); Response at 1-2 (not disputing this contention). The necessity to medically

clear Favela was because of Favela's condition at the time of that lawful arrest. Favela's repeated loss of consciousness and complaints of feeling too hot created the necessity that Favela be medically cleared. These incidents at the time of Favela's arrest warranted a medical examination to ensure Favela's immediate health. Favela's transportation to Memorial Medical, and subsequent catheterization, were not therefore actions that Soto took for purposes of criminal investigation, but, rather, the catheterization was a medical procedure performed to ensure Favela's health. Indeed, at the time that Favela was transported to the hospital, Soto was intending to take Favela to jail. See Motion ¶ 38, at 8 (setting forth that the decision not to take Favela to jail was made after Favela was at Memorial Medical); Response at 2 (not disputing this fact). It was apparent at the time to Soto that Favela would need to be cleared medically before going to jail.

Favela was not immediately subjected to the use of a catheter, and the use of the catheter was performed only as a last resort. While an excessive force analysis does not contemplate a determination what would have been the least-intrusive means, see James v. Chavez, 830 F. Supp. 2d 1236, Favela's uncooperative nature indicated that the only means for obtaining a urine sample was forced extraction via catheter. It is of no small importance that Favela refused less intrusive and less extensive medical procedures on two occasions. First, Favela refused to answer emergency personnel's questions at the scene of his arrest. Indeed, had Favela answered those questions, he would not have gone to Memorial Medical let alone been subjected to catheterization. Favela's refusal to answer emergency personnel's questions at the scene of his arrest was the cause of Favela's transportation to Memorial Medical. Second, Favela refused to voluntarily provide a urine sample. Providing a urine sample would have required minimal effort on Favela's part and would have spared Favela of having urine forcibly extracted. Additionally, Favela's uncooperative

nature with Memorial Medical staff and emergency personnel suggested that catheterization was the only reasonable avenue for obtaining a urine sample -- a urine sample that was necessary to clear Favela medically. The use of the catheter on Favela therefore was reasonable. Favela's repeated loss of consciousness at the time of his arrest, need for medical attention, refusal to comply with less intrusive medical procedures, and uncooperative nature with emergency personnel and Memorial Medical staff are all factors the Court must consider. Those factors taken together point to the reasonableness of the use of the catheter in this case.

### b. Even if the Use of the Catheter Could be Deemed Excessive Force, Soto Could Not Be Liable for that Excessive Force.

Even if the use of the catheter is excessive force, nothing in the facts before the Court indicate that Soto was involved in any meaningful way in the application of that force. Memorial Medical staff and not Soto performed the physical administration of the catheterization. The extent of Soto's physical involvement in the case was removing handcuffs from Favela so Memorial Medical staff could place Favela in soft restraints. See Response ¶ 14, at 4 (setting forth this fact); Reply ¶ 7, at 2 (admitting this fact). Nevertheless, Favela asserts that Soto is proximately liable for any alleged excessive force, because Soto "set into motion a chain of events that he knew would lead to the deprivation of Favela's constitutional rights." Response at 5. See id. at 5-7. In support of this argument, Favela cites Martinez v. Carson and Trask v. Franco. See Response at 7-8. This case's facts are distinguishable from both Martinez v. Carson and Trask v. Franco.

In Martinez v. Carson, defendant officers were patrolling a high-crime neighborhood at night in an unmarked police unit. See 697 F.3d at 1253-54. The defendant officers observed the plaintiffs and a third man standing outside of an apartment complex. See 697 F.3d at 1253. The

third man ran from the police, while the plaintiffs remained.  See 697 F.3d at 1254.  While officers gave chase to the fleeing man, the defendant officers -- who were later determined to be acting without reasonable suspicion -- forced the plaintiffs to the ground, handcuffed them, and took them into custody.  See 697 F.3d at 1253, 1255.  The defendant officers then transferred the plaintiffs into the custody of another law enforcement agency's officers, and those officers unlawfully detained one plaintiff for five hours, and the other plaintiff for twelve hours.  See 697 F.3d at 1253.  The Martinez v. Carson plaintiffs brought, among other things, a claim under 42 U.S.C. § 1983 against the defendant officers, alleging the defendant officers were the proximate cause of the violation of the plaintiffs' constitutional rights.  See 697 F.3d at 1253.  The Tenth Circuit outlined that an officer can be "liable if further unlawful detention and arrest would not have occurred but for their conduct and if there were no unforeseeable intervening acts superseding their liability." 697 F.3d at 1255 (citing Trask v. Franco, 446 F.3d at 1046-47).  The Tenth Circuit concluded that the defendant officers could be found to be the proximate cause of at least some of the plaintiffs' extended detention.  See 697 F.3d at 1255.  The Tenth Circuit reasoned that the defendant officers did not have the reasonable suspicion necessary to handcuff and detain the plaintiffs.  See 697 F.3d at 1255.  The court further reasoned that this initial illegal stop was the but-for cause of the plaintiffs' detention.  See 697 F.3d at 1255-56.  Last, the Tenth Circuit noted that the defendant officers could have concluded through reasonable inferences that their illegal detention of the plaintiffs would lead to prolonged detention and, thus, the other officers' actions were not an unforeseeable intervening act which superseded the defendant officers' liability.  See 697 F.3d at 1255-56.

In Trask v. Franco, probation officers visited the home of Carly Bliss under the mistaken belief that Bliss was still on probation, even though she had been discharged a month earlier. See 446 F.3d at 1040. Dale Trask, Bliss' boyfriend, would not answer the probation officers' knocks, and as a result, the probation officers called police officers to the scene. See 446 F.3d at 1040. After the police officers knocked on the door, Trask answered wearing knives in sheaths on his belt. See 446 F.3d at 1040. Additionally, Trask lied to police, stating that Bliss was not in the house, when she was in fact hiding under a bed at Trask's direction. See 446 F.3d at 1040. This deception resulted in Trask's arrest for obstructing an officer. See 446 F.3d at 1040. Trask and Bliss sued the probation officers under 42 U.S.C. § 1983 alleging that they were the "'but for' and proximate causes of" Trask's unlawful arrest and alleged injuries, because they had come to Bliss' residence under the mistaken belief Bliss was still on probation. 446 F.3d at 1046. See id. at 1040-41. The Tenth Circuit began its analysis by stating that no evidence supported the idea that the probation officers supervised Trask's arrest. See 446 F.3d at 1046. The Tenth Circuit noted:

> The absence of supervision, though, does not end our analysis. "Anyone who 'causes' any citizen to be subjected to a constitutional deprivation is also liable." *Johnson v. Duffy*, 588 F.2d 740, 743 (9th Cir. 1978). "The requisite causal connection is satisfied if the defendant[s] set in motion a series of events that the defendant[s] knew or reasonably should have known would cause others to deprive the plaintiff of [his] constitutional rights." *Snell v. Tunnell*, 920 F.2d 673, 700 (10th Cir. 1990)(quoting *Conner v. Reinhard*, 847 F.2d 384, 397 (7th Cir. 1988)).

446 F.3d at 1046 (alterations in Trask v. Franco). The Tenth Circuit in Trask v. Franco further explained that the probation officers could be liable only for harm that their conduct proximately or legally caused. See 446 F.3d at 1046. The probation officers would not "'necessarily be liable for all of the harm caused in the "philosophic" or but-for sense by the illegal entry[,]' . . . [because] in civil rights cases, a superseding cause, as we traditionally understand it in tort law, relieves a

defendant of liability." Trask v. Franco 446 F.3d at 1046 (quoting Bodine v. Warwick, 72 F.3d at 400). The Tenth Circuit reasoned that Trask's false statement to police regarding Bliss' whereabouts, coupled with his appearance with knives, could be deemed superseding events that led to Trask's arrest. See 446 F.3d at 1246-47. Based on this reasoning, the Tenth Circuit remanded the case to the district court to determine whether the defendant probation officers could have foreseen Trask lying to police or Trask's appearance with knives when answering the door. See 446 F.3d at 1247.

This case distinguishes itself from Martinez v. Carson and Trask v. Franco in several key aspects. First, in both Martinez v. Carson and Trask v. Franco, the alleged constitutional violations were the outgrowths of unlawful detentions and arrests. In Martinez v. Carson, the defendant police officers did not have the requisite reasonable suspicion to detain the plaintiffs, see 697 F.3d at 1253, 1254, and, in Trask v. Franco, the defendant probation officers arrived at a residence with incorrect information that an individual was on probation, see 446 F.3d at 1039. Favela's allegations of constitutional violations in this case from a lawful arrest, which Favela has conceded probable cause supports. Second, Martinez v. Carson and Trask v. Franco are predicated on how one law enforcement agency could reasonably foresee how its actions would lead to another law enforcement agency's constitutional deprivations. In this case, LCPD police officers performed Favela's lawful arrest, and the police officers then deferred judgment to emergency personnel and then to medical staff at Memorial Medical. Nothing in the facts here indicate how Soto -- or any other LCPD officer -- could reasonably foresee medical staff forcibly extracting urine from Favela via a catheter. Memorial Medical staff had authority over Favela while Favela was at the hospital.

Soto, a police officer, could not have reasonably foreseen what medical actions Memorial Medical staff would undertake while Favela was under their authority.

Another distinguishing characteristic of this case is the various superseding events that alleviate any potential liability which could be attributed to Soto. In <u>Martinez v. Carson</u>, the defendant police officers in motion a series of events that they reasonably could have foreseen would lead to the deprivation of constitutional rights; there was no superseding event that broke that casual connection. <u>See</u> 697 F.3d at 1256-57. Likewise, in <u>Trask v. Franco</u>, the Tenth Circuit specifically remanded the case to the district court to determine whether Trask's actions that led to his arrest were superseding events which relieved the defendant probation officers of liability. <u>See</u> 446 F.3d at 1047. Presently, there are cognizable superseding events that broke any of Soto's potential liability: (i) Favela's immediate medical needs, (ii) Favela's uncooperative nature, and (iii) Memorial Medical, a third-party, made the decision to catheterize Favela, and nothing in the facts implicates that Soto had any say in that decision. <u>See</u> Restatement (Second) of Torts §442 (providing "important" considerations in determining a superseding cause).[19] <u>Accord</u> <u>Trask v.</u>

_____

[19]In determining if an intervening force constitutes a superseding cause, the Restatement (Second) of Torts counsels considering:

> (a) the fact that its intervention brings about harm different in kind from that which would otherwise have resulted from the actor's negligence;

> (b) the fact that its operation or the consequences thereof appear after the event to be extraordinary rather than normal in view of the circumstances existing at the time of its operation;

> (c) the fact that the intervening force is operating independently of any situation created by the actor's negligence, or, on the other hand, is or is not a normal result of such a situation;

Franco, 446 F.3d at 1046 (relying on the Restatement (Second) of Torts § 442 to interpret whether superseding causes cut off a law enforcement officer's liability). The Court does not view Favela's need for medical clearance as a foreseeable result of his lawful arrest. Indeed, Dollar was attempting to Mirandize Favela as Favela was passing out, which indicates the surprising and unforeseeable nature of Favela's medical issues. See Motion ¶¶ 22-23, at 6; Response at 2. Moreover, summoning of emergency personnel, let alone transportation to a hospital, is not a foreseeable consequence of Favela's arrest. Numerous arrests occur daily across this country without the need for emergency medical assistance. Regarding Favela's uncooperative nature, the Court does not believe that Soto could have reasonably foreseen that taking Favela to Memorial Medical would result in Favela not cooperating with medical professionals. Indeed, the more reasonable inference would be that an individual who had passed out multiple times and complained of overheating would cooperate with medical professionals. Last, Soto should not be held liable for the use of the catheter, because Memorial Medical staff, a third party, made the decision to catheterize Favela. Soto was not involved in that decision, and no fact provided reasonably indicates that Soto instructed Memorial Medical staff on what medical procedures to employ. Once Memorial Medical committed Favela, Soto did not have authority over Favela, and

---

(d) the fact that the operation of the intervening force is due to a third person's act or to his failure to act;

(e) the fact that the intervening force is due to an act of a third person which is wrongful toward the other and as such subjects the third person to liability to him;

(f) the degree of culpability of a wrongful act of a third person which sets the intervening force in motion.

Restatement (Second) of Torts § 442.

Soto certainly did not have authority over Favela at the time the decision was made to catheterize or at the time the procedure was implemented. Accordingly, the Court concludes that the catheterization is not a violation of Favela's constitutional rights and that even the catheterization was a violation, Soto did not proximately cause that violation. The Court therefore concludes that Soto did not violate Favela's constitutional rights as Count II alleges.

2.      **Even if the Catheter's Use Violated Favela's Rights, These Rights Were Not Clearly Established.**

Even if the Court concluded, as a matter of law, on the record before it that the use of the catheter somehow constituted a violation of Favela's rights by Soto, the Court concludes that the law was not clearly established such that reasonable officer in Soto's position would have recognized the unlawfulness of medical staff catheterizing Favela. Qualified immunity provides broad protection for government officials where "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Pearson v. Callahan, 555 U.S. at 231 (internal quotation marks omitted)(quoting Harlow v. Fitzgerald, 457 U.S. at 818). The Supreme Court requires courts "not to define clearly established law at a high level of generality[,]" and requires that they focus on "whether the violative nature of particular conduct is clearly established." Ashcroft v. al-Kidd, 563 U.S. at 742 (emphasis added)(requiring that the "'contours of [a] right [are] sufficiently clear' that every 'reasonable official would have understood that what he is doing violates that right.'" (emphasis added)(alterations in Ashcroft v. al-Kidd)(quoting Anderson v. Creighton, 483 U.S. at 640)). As the Tenth Circuit has emphasized, although "a case on point isn't required if the impropriety of the defendant's conduct is clear from

existing case law," the law is not clearly established where "a distinction *might* make a constitutional difference." Kerns v. Bader, 663 F.3d at 1186-87 (emphasis in original).

Favela has not pointed the Court to any meaningful Supreme Court or Tenth Circuit caselaw that would suggest use of a catheter to extract urine from an individual is a constitutional violation. The Court's own research has been equally unavailing to find guidance from the Supreme Court or Tenth Circuit on the matter. Indeed, this dearth of caselaw spans beyond the Tenth Circuit. The Court's research yielded a handful of cases from other district courts confronting this issue. See Powell v. City of Ocean City, Civil Action No. 14-4395, 2016 WL 5417189, at *8 (D.N.J. Sept. 28, 2016)(Rodriguez, J.)(concluding that, if a catheterization was performed in a medically accepted manner and exigency is established, "then given the absence of physical force used, catheterization standing alone is not sufficient grounds for an excessive force claim"); Cook v. Olathe Med. Ctr., Inc., 773 F. Supp. 2d 990, 1011-12 (D. Kan. 2011)(Vratil, J.)(noting that forced catheterization could be excessive force, because the catheterization was done for criminal investigation, and the police physically participated in the procedure); Hooper v. Pearson, No. 2:08-CV-871, 2010 WL 2990809, at *10-11 (D. Utah July 26, 2010)(Benson, J.)(concluding no excessive force in obtaining urine via a catheter, because the officers did not immediately resort to forced catheterization, but resorted to it only after attempting to have the plaintiff submit to a urine test). While none of these cases are of binding precedent to the Court's qualified immunity analysis, the Court notes that interpretations from other jurisdictions would suggest the catheterization in this case did not violate Favela's clearly established rights. The Court reaches this conclusion because Soto was not involved in the procedure, Soto did not order the catheterization, nothing indicates the procedure was performed

in a medically unacceptable manner, and the catheterization was performed for medical purposes and not for any criminal investigation. These observations are, of course, academic, because no binding caselaw establishes that the catheterization in this case violated Favela's clearly established rights. Without this showing of a clearly established right, Favela cannot proceed on Count II of his Complaint, and Soto is entitled to qualified immunity on Count II.

<strong>C. THE COURT WILL DISCUSS COUNT III WHICH ALLEGES THAT DOLLAR AND SOTO VIOLATED FAVELA'S RIGHTS BY NOT OBTAINING A WARRANT BEFORE THE CATHETERIZATION.</strong>

Favela alleges in Count III that Dollar and Soto violated his Fourth Amendment rights because they did not obtain a warrant before Favela's catheterization. See Complaint ¶¶ 81-86, at 11. Favela contends that the intrusive and invasive nature of the catheterization required that Dollar and Soto obtain a warrant before the procedure was performed. See Response at 9. Favela's argument does not persuade the Court. For the same reasons that the Court concludes qualified immunity applies for Dollar and Soto on Count II, the Court concludes that Dollar and Soto are entitled to qualified immunity on Count III as well. The Court notes that Memorial Medical collected the urine sample collected in this case, and it did so for medical purposes and not as part of a criminal investigation. The Court also notes that Dollar was neither present at Memorial Medical at the time of the decision to catheterize nor at the time of catheterization, and that Favela conceded at the hearing that all claims against Dollar can be dismissed. See Tr. at 9:11-16 (Court, Coronado). The Court therefore concludes that Dollar is entitled to qualified immunity on Count III, because nothing connects him to the alleged constitutional violation. See Snell v. Tunnell, 920 F.2d at 700 (noting liability under 42 U.S.C § 1983 must have a causal connection between a defendant and alleged constitutional violation). See also Trask v. Franco, 446 F.3d at 1046

(discussing superseding causes); Restatement (Second) of Torts § 442 (same). The Court's analysis on Count III will proceed regarding only Soto. The facts also show that Soto had no say in the decision to catheterize and was not physically involved in the process. The Court therefore concludes that Soto is entitled to qualified immunity on Count III.

1. **Soto Did Not Violate Favela's Constitutional Rights.**

Soto's actions without a warrant did not violate the Fourth Amendment. The Supreme Court has stated that "the Fourth Amendment's proper function is to constrain, not against all intrusions as such, but against intrusions which are not justified in their circumstances, or which are made in an improper manner." Schmerber v. California, 384 U.S. at 768. The Fourth Amendment's warrant requirement is subject to exceptions. See Kentucky v. King, 563 U.S. at 459. The warrantless search of the person must fall within a recognized exception to be reasonable -- the invasion of bodily integrity to collect evidence for a criminal investigation "implicates an individual's 'most personal and deep-rooted expectations of privacy.'" Missouri v. McNeely, 569 U.S. 141, 148 (2013)(quoting Winston v. Lee, 470 U.S. 753, 760 (1985)). One well-recognized exception to the warrant requirement is when the exigencies of the circumstances make it objectively reasonable under the Fourth Amendment. See Kentucky v. King, 563 U.S. at 460. Among other scenarios, "an exigency sufficient to justify a warrantless search" includes "law enforcement's need to provide emergency assistance to an occupant of a home." Missouri v. McNeely, 569 U.S. at 149 (citing Michigan v. Fisher, 558 U.S. 45, 47-48 (2009)(per curiam)). See Kentucky v. King, 563 U.S. at 460 (noting an officer may enter a home without a warrant to prevent injury). A warrantless search in the exigency context is "potentially reasonable because 'there is compelling need for official action and no time to secure a warrant.'" Missouri v. McNeely, 569

U.S. at 149 (quoting Michigan v. Tyler, 436 U.S. 499, 509 (1978)).  Determining whether an officer faces an emergency that justifies a warrantless search is analyzed by looking at the totality of the circumstances.  See Missouri v. McNeely, 569 U.S. at 149.

For example, the Supreme Court applied the totality-of-the-circumstances approach to the facts presented in Schmerber v. California.  See 384 U.S. at 768, 771.  Accord Missouri v. McNeely, 569 U.S. at 150 ("Our decision in Schmerber applied this totality of the circumstances approach.").  In Schmerber v. California, the petitioner was arrested at a hospital while receiving treatment for injuries suffered during an automobile accident.  See 348 U.S. at 758.  The officer in that case had probable cause to arrest the petitioner for driving an automobile while under the influence of alcohol.  See 384 U.S. at 768.

> The interests in human dignity and privacy which the Fourth Amendment protects forbid any such [bodily] intrusions on the mere chance that desired evidence might be obtained.  In the absence of a clear indication that in fact such evidence will be found, these fundamental human interests require law officers to suffer the risk that such evidence may disappear unless there is an immediate search.

384 U.S. at 769-70.

> Search warrants are ordinarily required for searches of dwellings, and absent an emergency, no less could be required where intrusions into the human body are concerned. . . . The importance of informed, detached and deliberate determinations of the issue whether or not to invade another's body in search of evidence of guilt is indisputable and great.

384 U.S. at 770.  The Supreme Court in Schmerber v. California concluded that the warrantless search was reasonable, because the officer reasonably believed an emergency existed, as delay in obtaining a warrant would allow the alcohol in petitioner's system to metabolize and thus destroy evidence.  See 384 U.S. at 771.  The warrantless search was also reasonable because medical personnel -- a physician -- drew the blood in a medical environment -- hospital -- "according to

accepted medical practices," and thus did not invoke the "risk of infection and pain." 384 U.S. at 771-72.

In the present case, there is no indication that Soto needed a warrant before Favela's catheterization could proceed. Indeed, Soto did not order or perform the procedure, but rather Memorial Medical staff performed the procedure while Favela was in their care. When Favela was transported to the hospital, his criminal detention essentially became a hospitalization, and the decision to catheterize was a medical call that Memorial Medical staff made. Favela has not alleged that Memorial Medical staff were acting under the color of state law and the Court concludes that Memorial Medical staff were not acting under the color of state law. Said another way, Favela has not shown Memorial Medical staff sought to obtain a urine sample at Soto's behest or recommendation. In some instances, a private party's conduct may be attributable to the state when there is an alleged violation of a constitutional right. See A.M. ex rel. Youngers v. N.M. Dep't of Heath, 108 F. Supp. 3d 963, 998 (D.N.M. 2015)(Browning, J.). Those instances, however, depend upon a showing that: (i) the private party exercised a traditionally, exclusively governmental function; (ii) the state coerced, significantly encouraged, or ordered the private conduct so that it must be deemed state conduct; (iii) the state "has so far insinuated itself into a position of interdependence" with the private party that "it must be recognized as a joint participant in the challenged activity," Burton v. Wilmington Parking Auth., 365 U.S. at 725; or (iv) the private party willfully participated in a joint action with the state or its agents. See A.M. v. N.M. Dep't of Heath, 108 F. Supp. 3d at 1000-01. While it can be fairly stated that Soto was a state actor at the time, medical decisions that Memorial Medical made cannot be considered state action under any of these tests: (i) providing medical care is not a traditional, exclusively government

function, see Johnson v. Rodrigues (Orozco), 293 F.3d at 1203 (listing exclusive government functions); (ii) the undisputed evidence shows that Soto did not coerce, significantly encourage, or order the catheterization; (iii) there is no assertion and no evidence of Soto or the LCPD "insinuat[ing] itself into a position of interdependence" with Memorial Medical such that the Court could conclude they participated jointly in the catheterization, Burton v. Wilmington Parking Auth., 365 U.S. at 725; and (iv) the undisputed evidence that Soto did not act in concert with Memorial Medical to catheterize Favela, but, rather, had no say in what medical care Favela received. There is nothing to show, therefore, that the alleged Fourth Amendment violation is attributable to Soto or that Memorial Medical is a state actor. See Snell v. Tunnell, 920 F.2d at 700; A.M. v. N.M. Dep't of Heath, 108 F. Supp. 3d at 1000-01.

Even if the catheterization could be attributed to Soto, a warrantless search and seizure is justified by the situation's exigency. The uncontroverted facts here show that Favela had passed out on several occasions while he was under arrest, was sweating profusely in a manner that indicated he was under the influence of drugs, and was complaining of how hot he was. These incidents and remarks led to Dollar's calling emergency personnel and eventually led to Favela's hospitalization. Thus, the undisputed facts show that Favela was taken to the hospital to ensure his medical safety. This medical need has support, because the medical procedures at the hospital were necessary for purposes of Favela's health, and were not implemented for or necessitated by a criminal investigation. Such medical necessity justified the warrantless catheterization of Favela and did not violate his Fourth Amendment rights. See Sullivan v. Bornemann, 384 F.3d 372, 373 (7th Cir. 2004)(finding no constitutional violation where officers brought plaintiff to an emergency room to obtain medical clearance for detention and where an emergency room doctor ordered

catheterization). Additionally, Soto did not physically participate in the catheterization process. In fact, Soto remained passively at the door of the hospital room at Memorial Medical while staff attempted to collect samples from Favela. The Court concludes that Dollar and Soto's failure to obtain a warrant before the catheterization did not violate Favela's constitutional rights. Dollar and Soto, therefore, did not violate Favela's constitutional rights as Count III alleges.

**2.      Even if Catheterizing Favela Without a Warrant Violates Favela's Rights, These Rights Were Not Clearly Established.**

Even if the Court concluded on the record before it that the lack of a warrant in this case violates Favela's rights, the Court concludes that the law was not clearly established such that reasonable officer in Soto's position would have recognized the need for a warrant before Memorial Medical could perform a medically necessary procedure. Qualified immunity provides broad protection for government officials where "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Pearson v. Callahan, 555 U.S. at 231 (internal quotation marks omitted)(quoting Harlow v. Fitzgerald, 457 U.S. at 818). The Supreme Court requires courts "not to define clearly established law at a high level of generality" and requires that they focus on "whether the violative nature of particular conduct is clearly established." Ashcroft v. al-Kidd, 563 U.S. at 742 (emphasis added). As the Tenth Circuit has emphasized, although "a case on point isn't required if the impropriety of the defendant's conduct is clear from existing case law," the law is not clearly established where "a distinction *might* make a constitutional difference." Kerns v. Bader, 663 F.3d at 1186-87 (emphasis in original).

Favela directs the Court to several cases to support his contention that the right was clearly established. See Response at 9-10. Specifically, Favela cites Missouri v. McNeely, Schmerber v. California, Yanez v. Romero, and Woods v. Brumlop. Favela misconstrues those cases and misapplies them to the case at hand. None of these cases propose, let alone establish, that a warrant must be obtained before medical personnel can perform a medically necessary procedure solely for the purposes of medical clearance. See Missouri v. McNeely, 569 U.S. at 145-46, 164 (concluding that an officer violated a man's right to be free from unreasonable search and seizure when the officer directed a laboratory technician to forcibly extract blood from the man for the purposes of collecting evidence in the course of a criminal investigation); Schmerber v. California, 384 U.S. at 771-72 (holding that a warrantless blood draw to collect evidence was constitutionally permissible based upon the exigencies of the situation); Yanez v. Romero, 619 F.2d at 853-56 (concluding that there were no constitutional violations when the police collected a defendant's urine sample for evidence by threatening to catheterize him); Woods v. Brumlop, 1962-NMSC-133, ¶¶ 1-30, 377 P.2d at 521-25 (containing no reference to the Fourth Amendment, searches, seizures, or warrants, and instead discussing a medical malpractice action). As none of these cases demonstrate a clearly established right for the relevant purposes of this case, Favela cannot proceed on Count III of his Complaint, and Soto is entitled to qualified immunity.

## II.     SOTO IS ENTITLED TO SUMMARY JUDGMENT ON COUNTS VIII AND IX.

Soto asserts that he is entitled to summary judgment on Counts VIII and IX, warranting the dismissal of Favela's claims against him. See Motion at 24. Favela does not include Dollar as a Defendant in either Count VIII or IX, and thus only Soto moves the Court for summary judgment on these Counts. Rule 56 of the Federal Rules of Civil Procedure governs summary judgment.

Rule 56(a) states: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The movant bears the initial burden of 'show[ing] that there is an absence of evidence to support the nonmoving party's case.'" Herrera v. Santa Fe Pub. Sch., 956 F. Supp. 2d at 1221 (alteration in Herrera v. Santa Fe Pub. Sch.)(quoting Bacchus Indus., Inc. v. Arvin Indus., Inc., 939 F.2d at 891). See Celotex Corp. v. Catrett, 477 U.S. at 323. "If the *moving* party will bear the burden of persuasion at trial, that party must support its motion with credible evidence -- using any of the materials specified in Rule 56(c) -- that would entitle it to a directed verdict if not controverted at trial." Celotex Corp. v. Catrett, 477 U.S. at 331 (Brennan, J., dissenting)(emphasis in original). Once the movant meets this burden, rule 56 requires the nonmoving party to designate specific facts showing that there is a genuine issue for trial. See Celotex Corp. v. Catrett, 477 U.S. at 324; Liberty Lobby, 477 U.S. at 256.

The Court will apply these standards to the summary judgment analysis in this case, noting that the parties essentially do not dispute any of the material facts in the Motion or Response. See Response at 2 (disputing only one of Dollar and Soto's thirty-nine proffered undisputed material facts set forth in the Motion); Reply ¶¶ 1-9, at 2 (not disputing the substantive content of any of Favela's twenty-four proffered undisputed material facts in the Response). The Court will therefore apply those undisputed material facts to determine if Soto is entitled to summary judgment on Counts VIII and IX. Soto has shown that there is no dispute as to material facts pertaining to Counts VIII and IX, and has further shown that he is entitled to summary judgment on Counts VIII and IX. The Court therefore grants Soto's motion for summary judgment on Counts VIII and IX, and terminates him as a Defendant on those counts.

## A. THE COURT WILL DISCUSS COUNT VIII, WHICH ALLEGES SOTO COMMITTED ASSAULT AND BATTERY.

In Count VIII of his Complaint, Favela alleges assault and battery against Soto based on Soto's conduct at Memorial Medical. See Complaint ¶¶ 110-12, at 15. Favela asserts that Soto is liable for assault and battery, because Soto failed to inform Memorial Medical staff that Favela was not going to jail immediately after the hospital. See Response at 10-11. For the same reasons that Soto is entitled to qualified immunity on Counts II and III, Soto is entitled to summary judgment on Count VIII.

Assault under New Mexico law consists of:

A. an attempt to commit battery upon the person of another;

B. any unlawful act, threat or menacing conduct which causes another person to reasonably believe that he is in danger of receiving an immediate battery; or

C. the use of insulting language toward another impugning his honor, delicacy or reputation.

N.M. Stat. Ann. § 30-3-1. As a threshold matter, the Court notes that Favela's allegations of assault implicate only subsection B of Section 30-3-1. Assault under New Mexico law requires an "act, threat, or menacing conduct which causes another person to reasonably believe that he is in danger of receiving an immediate battery." Fuerschbach v. Sw. Airlines Co., 439 F.3d 1197, 1208 (10th Cir. 2006)(internal quotation marks omitted)(quoting N.M. Stat. Ann. § 30-3-1(B)). New Mexico law provides that "[b]attery is the unlawful, intentional touching or application of force to the person of another, when done in a rude, insolent or angry manner." N.M. Stat. Ann. § 30-3-4. " Battery occurs when an individual 'acts intending to cause a harmful or offensive contact with the person of the other or a third person, or an imminent apprehension of such a

contact, and . . . an offensive contact with the person of the other directly or indirectly results."
Fuerschbach v. Sw. Airlines Co., 439 F.3d at 1208-09 (quoting State v. Ortega, 1992-NMCA-003,
¶ 10, 827 P.2d at 155).  For contact to be offensive, it must offend "a reasonable sense of personal
dignity."  Fuerschbach v. Sw. Airlines Co., 439 F.3d at 1209 (internal quotation marks
omitted)(quoting Restatement (Second) of Torts § 19).

By Favela's own concession, probable cause existed for Favela's traffic stop.  See
Response at 1-2.  It is therefore undisputed that probable cause supports Favela's arrest.  This
possession of probable cause necessarily means that Favela's arrest was a lawful arrest supported
by probable cause.  Favela's lawful arrest removes any potential for assault by Soto under New
Mexico law.  See N.M. Stat. Ann. § 30-3-1(B) (stating that assault must involve an unlawful act).
Further, it is undisputed that Favela was given multiple opportunities to voluntarily and naturally
provide a urine sample to Memorial Medical, and the Court has concluded that Soto had no part
in the catheterization.  Soto also did not threaten to catheterize Favela.  The catheterization was a
result of only Favela's uncooperative behavior.

As to the potential for battery, it is fair to say that the forced catheterization of an individual
can be considered offensive contact, but such offensive contact must be done unlawfully.  See
N.M. Stat. Ann. §30-3-4.  Favela's catheterization was incident to a lawful arrest, justified by
Favela's repeated loss of consciousness, performed in a medically reasonably fashion, and was
initiated as a last resort because of Favela's refusal to provide a urine sample.  Indeed, had Favela
provided the urine sample -- or answered medial personnel's questions at the scene of the traffic
stop -- he would not have been catheterized -- or transported to the hospital.  Thus, Favela's
catheterization was not performed in an offensive manner, but rather it was a medically justified

procedure to ensure Favela's health. Even assuming the catheterization could viewed as an offensive contact to Favela's person, that offensive contact is attributable to Memorial Medical and not to Soto. This case's facts show the extent of Soto's involvement in the catheterization process was the removal of Favela's handcuffs so he could be placed in soft restraints. This need for soft restraints was the result of Favela's uncooperative nature. The undisputed facts of this case do not indicate that Soto committed assault or battery upon Favela. Accordingly, Soto is entitled to summary judgment on Count VIII.

### B. THE COURT WILL DISCUSS COUNT IX, WHICH ALLEGES FALSE IMPRISONMENT AGAINST SOTO.

Finally, in Count IX, Favela alleges that Soto's actions constitute false imprisonment. The Court concludes that Soto is entitled to summary judgment on Count IX. The Court reaches this conclusion because probable cause supports Favela's arrest.

Consistent with the Fourth Amendment, an officer may make a warrantless arrest if "there is probable cause to believe that a criminal offense has been or is being committed." Devenpeck v. Alford, 543 U.S. 146, 152 (2004). New Mexico law informs that false imprisonment, which includes false arrest, "occurs when a person intentionally confines or restrains another person without consent and with knowledge that he has no lawful authority to do so." Santillo v. N.M. Dep't of Pub. Safety, 2007-NMCA-159, ¶ 12, 173 P.3d at 10 (emphasis added).[20] Indeed, if a

---

[20]The Court concludes that the Supreme Court of New Mexico would agree with this statement of law. The Court reaches this conclusion based on Ulibarri v. Maestas, 1964-NMSC-212, 395 P.2d 238, which states that Cave v. Cooley, 1944-NMSC-050, 152 P.2d 886, provides New Mexico law "concerning liability when acting in his official capacity." Ulibarri v. Maestas, 1964-NMSC-212, ¶ 4, 395 P.2d at 240. The Supreme Court of New Mexico, in Cave v. Cooley, had adopted language allowing for an officer to make a warrantless arrest for crimes committed in the officer's presence, where the officer has probable cause. See Cave v. Cooley, 1944-NMSC-

police officer has probable cause to arrest a person, that officer "cannot be held liable for false arrest or imprisonment, since probable cause provides him with the necessary authority to carry out the arrest." Santillo v. N.M. Dep't of Pub. Safety, 2007-NMCA-159, ¶ 12, 173 P.3d at 10.[21] See Romero v. Sanchez, 1995-NMSC-028, ¶ 13, 895 P.2d at 215 (finding an officer could not be liable for false imprisonment claim, because the officer "reasonably could have believed that detaining [the plaintiff] was necessary to preserve the peace and to further his investigation").

In this case, probable cause supports Favela's arrest. See Motion at 19-21 (asserting this contention); Response at 1-2 (conceding this contention). Thus, the probable cause that supports Favela's arrest is the same probable cause that defeats his claim for false imprisonment. It is neither alleged nor reasonably inferred from the facts that Soto or Dollar were not acting within their lawful authority at the time of Favela's arrest and transportation to Memorial Medical. The facts therefore support that Favela's arrest was lawful and validly executed. That the District Attorney's office stated that it would not bring charges immediately against Favela is of no bearing upon the false imprisonment claim. The probable cause to arrest Favela did not dissipate when the District Attorney made this decision. Moreover, upon learning this information, Soto informed Memorial Medical staff that Favela could be discharged as soon as Memorial Medical staff's treatment was complete. No law imposed a duty on Soto to require Memorial Medical to release

---

050, ¶ 8, 152 P.2d at 888. See also Ulibarri v. Maestas, 1964-NMSC-212, ¶ 4, 395 P.2d at 240. The Supreme Court also adopted language which provides that an officer will not be liable where he or she arrests somebody under circumstances allowing a reasonable person to believe that a crime has been committed in the officer's presence. See Cave v. Cooley, 1944-NMSC-050, ¶ 9, 152 P.2d at 888. See also Ulibarri v. Maestas, 1964-NMSC-212, ¶ 4, 395 P.2d at 240.

[21]For the same reasons described supra note 20, the Court concludes that the Supreme Court of New Mexico would agree with this statement of the law.

Favela from its care. There is also no indication that Favela could have secured Favela's discharge from Memorial Medical. It therefore cannot be said that Soto intentionally confined Favela knowing he had no lawful authority to do so. See Santillo v. N.M. Dep't of Pub. Safety, 2007-NMCA-159, ¶ 12, 173 P.3d at 10.

The Court therefore concludes that Soto and Dollar did not violate Favela's constitutional rights and are entitled to qualified immunity on the claims brought under 42 U.S.C. § 1983, and to summary judgment on the state law claims.

**IT IS ORDERED** that: (i) the requests in Defendants[] [Matthew Dollar and Manuel Soto's] Motion and Supporting Memorandum for Qualified Immunity and Summary Judgment, filed February 6 , 2018 (Doc. 30), are granted; and (ii) the Court terminates Matthew Dollar and Manuel Soto as Defendants in this action.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Jose R. Coronado
Law Offices of Jose R. Coronado
Las Cruces, New Mexico

*Attorney for the Plaintiff*

Damian L. Martínez
Haley R. Grant
Holt Mynatt Martínez P.C.
Las Cruces, New Mexico

 *Attorneys for Defendants City of Las Cruces ex rel. Las Cruces Police Department, Matthew Dollar, and Manuel Soto*

J. Scott Mann
Kathryn Brack Morrow
Kemp Smith LLP
El Paso, Texas

 *Attorneys for Defendants PHC-Las Cruces, Inc. d/b/a Memorial Medical Center, James Proctor, Jamie Pitts, Jose Reveles, and Cassandria Branch*