# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

RUBEN O. FAVELA,

       Plaintiff,

vs.                                      No. CIV 17-0568 JB\SMV

CITY OF LAS CRUCES ex rel. LAS CRUCES
POLICE DEPARTMENT; LAS CRUCES POLICE
OFFICERS MATTHEW DOLLAR and MANUEL
SOTO; PHC-LAS CRUCES, INC., a New Mexico
Corporation, d/b/a MEMORIAL MEDICAL
CENTER; DANIELLE WILHELM, M.D.; JAMES
PROCTOR, R.N.; JAMIE PITTS, R.N.;
JOSE REVELES, R.N.; CASSANDRIA
BRANCH, R.N., and JOHN DOE SECURITY
GUARDS 1 and 2,

       Defendants.

## <u>MEMORANDUM OPINION</u>[1]

**THIS MATTER** comes before the Court on the Defendants' Motion for Summary Judgment, filed September 13, 2019 (Doc. 84)("MSJ"). The Court held a hearing on November 1, 2019. <u>See</u> Clerk's Minutes, filed November 1, 2019 (Doc. 117). The primary issue is whether, given that the Court has dismissed all federal claims in this case, the Court should decline to exercise supplemental jurisdiction over the remaining state law claims. The Court concludes that it will not exercise supplemental jurisdiction, because: (i) Plaintiff Ruben O. Favela has agreed that summary judgment is appropriate for Counts II, III, IV, VIII, and IX against Defendant Jamie

---

[1]The Court previously entered an Order Granting In Part Defendants' Motion for Summary Judgment and Remanding Cause to State Court, filed January 6, 2019 (Doc. 120)("Remand Order"), granting the requests in the Defendants' Motion for Summary Judgment, filed September 13, 2019 (Doc. 84). In the Remand Order, the Court declines to exercise supplemental jurisdiction over remaining state law claims and remands the case. This Memorandum Opinion details the Court's rationale for the previous Remand Order.

Pitts, R.N., for Counts II, III, and IV against Defendants Memorial Medical Center, James Proctor, R.N., Jose Reveles, R.N., and Cassandria Branch, R.N., and for Counts VI and VII against Memorial Medical; (ii) all federal claims have been dismissed; (iii) the Court has dismissed all claims over which it has original jurisdiction; and (iv) New Mexico courts are better suited to resolve the remaining state-law claims. Accordingly, the Court remands the case.[2]

## FACTUAL BACKGROUND

The Court draws the factual background from the parties' undisputed material facts in the Defendants' Motion and Supporting Memorandum for Qualified Immunity and Summary Judgment, filed February 6, 2018 (Doc. 30)("Motion"); the Response to Defendants' Motion and Supporting Memorandum for Qualified Immunity and Summary Judgment, filed March 15, 2018 (Doc. 36)("Response"); and the Defendants' Reply in Support of Motion and Supporting Memorandum for Qualified Immunity and Summary Judgment, filed March 29, 2018 (Doc. 37)("Reply"). The facts of this case are essentially undisputed. See Response at 2 (disputing only one of Matthew Dollar and Manuel Soto's thirty-nine proffered material facts); Reply ¶¶ 1-9, at 2 (not disputing the substantive content of Favela's twenty-four proffered material facts).

On April 13, 2016, Dollar, a police officer with the Las Cruces Police Department, observed Favela riding his motorcycle at approximately ninety miles per hour through an intersection that had a posted speed limit of thirty-five miles per hour. See Motion ¶¶ 1-2, at 4 (setting forth this fact)(citing Affidavit of Matthew Dollar ¶¶ 3-7, at 1-2 (dated February 1, 2018), filed February 6, 2018 (Doc. 30-1)("Dollar Aff.")); Response at 2 (not disputing this fact). Upon seeing Favela, Dollar activated the emergency lights on his police car and pursued Favela for a

---

[2]The Court determines that Defendant Danielle Wilhelm, M.D. was never served, and, therefore, the Court dismisses without prejudice all claims against Dr. Wilhelm.

distance, pacing Favela at approximately seventy-five miles per hour.  See Motion ¶¶ 3-4, at 4 (setting forth this fact)(citing Dollar Aff. ¶¶ 8-9, at 2); Response at 2 (not disputing this fact). Favela eventually slowed after Dollar activated the sirens on his police car, but he did not stop for another nine blocks, at which point Favela made a sharp U-turn and stopped his motorcycle on a city sidewalk in a position directly in front of Dollar's police car.  See Motion ¶¶ 4-5, at 4 (setting forth this fact)(citing Dollar Aff. ¶¶ 9-10, at 2); Response at 2 (not disputing this fact).  Dollar informed dispatch of his location, requested additional officers, and parked his police car in front of Favela, who had not yet dismounted his motorcycle or shut off its power.  See Motion ¶¶ 6-8, at 4 (setting forth this fact)(citing Dollar Aff. ¶¶ 11-15, at 2); Response at 2 (not disputing this fact).  Dollar then exited his police car with his sidearm drawn and ordered Favela to cut the power to his motorcycle.  See Motion ¶ 8, at 4 (setting forth this fact)(citing Dollar Aff. ¶¶ 13-15, at 2); Response at 2 (not disputing this fact).  After starting his motorcycle engine, Favela complied, at which point Dollar holstered his sidearm.  See Motion ¶ 8, at 4 (setting forth this fact)(citing Dollar Aff. ¶¶ 13-15, at 2); Response at 2 (not disputing this fact).

After Favela had shut off the power to this motorcycle, Dollar activated his lapel footage. See Motion ¶ 9, at 5 (setting forth this fact)(citing Dollar Aff. ¶¶ 5,16, at 2; Matthew Dollar Lapel Video 1 at 00:35-00:40 (dated April 13, 2016), filed February 6, 2018 (Doc. 30-1)("Dollar Video 1")); Response at 2 (not disputing this fact).  As Favela dismounted his motorcycle, Dollar noticed what he believed to be a handgun protruding from underneath Favela's jacket.  See Motion ¶¶ 10, 15, at 5 (setting forth this fact)(citing Dollar Aff. ¶¶ 17, 22, at 2-3; Dollar Video 1 at 03:45-04:00, 01:30-01:35); Response at 2 (not disputing this fact).  Upon seeing the weapon, Dollar ordered Favela to turn around so Dollar could pat him down.  See Motion ¶ 11, at 5 (setting forth this fact)(citing Dollar Aff. ¶¶ 18 at 3; Dollar Video 1 at 00:35-00:40); Response at 2 (not disputing

this fact). Dollar eventually threatened to taser Favela before Dollar was able to pat down Favela. <u>See</u> Motion ¶¶ 11-13, at 5 (setting forth this fact)(citing Dollar Aff. ¶¶ 18-20, at 3; Dollar Video 1 at 00:30-00:45, 00:40-01:00); Response at 2 (not disputing this fact). Dollar then secured the handgun on Favela's person and placed Favela in handcuffs. <u>See</u> Motion ¶¶ 13-15, at 5 (setting forth this fact)(citing Dollar Aff. ¶¶ 20-22, at 3; Dollar Video 1 at 00:40-01:00, 01:15-01:20, 01:30-01:35); Response at 2 (not disputing this fact). During this time, Favela began sweating profusely in a manner that indicated to Dollar that Favela was under the influence of an intoxicating substance. <u>See</u> Motion ¶ 16, at 5 (setting forth this fact)(citing Dollar Aff. ¶ 23, at 3; Dollar Video 1 at 01:50-1:55); Response at 2 (not disputing this fact). Dollar then placed Favela in the back of his police car. <u>See</u> Motion ¶ 17, at 5 (setting forth this fact)(citing Dollar Video 1 at 01:50-01:55); Response at 2 (not disputing this fact).

Once in the back of Dollar's police car, Favela said that he was hot and felt that he may pass out. <u>See</u> Motion ¶ 19, at 6 (setting forth this fact)(citing Dollar Aff. ¶ 25, at 3; Dollar Video 1 at 03:30-05:10); Response at 2 (not disputing this fact). Favela repeatedly requested that Dollar take off Favela's jacket and neckband. <u>See</u> Motion ¶ 19, at 6 (setting forth this fact)(citing Dollar Aff. ¶ 25, at 3; Dollar Video 1 at 03:30-05:10); Response at 2 (not disputing this fact). After waiting for backup to arrive, Dollar removed Favela's neckband and opened the police car's door for Favela. <u>See</u> Motion ¶ 21, at 6 (setting forth this fact)(citing Dollar Aff. ¶ 26, at 3; Dollar Video 1 at 05:20-06:45); Response at 2 (not disputing this fact). Dollar then attempted to read Favela his <u>Miranda</u>[3] rights; Favela, however, passed out in the back of Dollar's police car as his <u>Miranda</u>

---

[3]<u>Miranda v. Arizona</u>, 384 U.S. 436 (1966), "requires that procedural safeguards be administered to a criminal suspect prior to 'custodial interrogation.'" <u>United States v. Perdue</u>, 8 F.3d 1455, 1463 (10th Cir. 1993)(quoting <u>Miranda v. Arizona</u>, 384 U.S. at 444). The Supreme

rights were read to him.  See Motion ¶¶ 22-23, at 6 (setting forth this fact)(citing Dollar Aff. ¶ 27-29, at 3; Dollar Video 1 at 07:10-07:45, 08:00-08:15); Response at 2 (not disputing this fact).  At this point, other officers at the scene contacted emergency services to tend to Favela.  See Motion ¶ 23, at 6 (setting forth this fact)(citing Dollar Aff. ¶¶ 28-29, at 3; Dollar Video 1 at 08:00-08:15); Response at 2 (not disputing this fact).  Officers removed Favela from the back of Dollar's police car and laid Favela on the sidewalk while waiting for emergency services.  See Motion ¶ 25, at 6 (setting forth this fact)(citing Dollar Aff. ¶ 30, at 4; Dollar Video 1 at 10:20-10:45); Response at 2 (not disputing this fact).  Favela faded in and out of consciousness while being moved from the police car to the sidewalk.  See Motion ¶ 25, at 6 (setting forth this fact)(citing Dollar Aff. ¶ 30, at 4; Dollar Video 1 at 10:20-10:45); Response at 2 (not disputing this fact).

While the officers were waiting for emergency personnel, Dollar requested that dispatch run a "Triple-I" check[4] on Favela to determine whether Favela had any warrants.  Motion ¶ 24,

---

Court of the United States of America provided the substance of the warning that must be given to a defendant to meet these procedural safeguard requirements:

> Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed.  The defendant may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly and intelligently.  If, however, he indicates in any manner and at any stage of the process that he wishes to consult with an attorney before speaking there can be no questioning.  Likewise, if the individual is alone and indicates in any manner that he does not wish to be interrogated, the police may not question him.

Miranda v. Arizona, 384 U.S. at 444-45.

[4]An Interstate Identification Index report, or "Triple-I report," provides law enforcement with information regarding an individual's criminal history and previous police encounters.  See Courtney v. Oklahoma, 722 F.3d 1216, 1221 (10th Cir. 2013).  The Court offers this information solely as background for the reader's edification, and not as the truth or as a fact material to the issues in this opinion.

at 6 (setting forth this fact)(citing Dollar Aff. ¶ 30, at 4; Dollar Video 1 at 13:10-13:50). See Response at 2 (not disputing this fact). While waiting for this information from dispatch, Dollar informed other officers at the scene that Favela would be under arrest regardless what dispatch informed, because Favela had concealed a firearm without a permit. See Motion ¶ 27, at 7 (setting forth this fact)(citing Dollar Aff. ¶ 31, at 4; Dollar Video 1 at 16:20-16:20); Response at 2 (not disputing this fact). Dispatch then informed Dollar that Favela had a previous felony conviction for shooting from a vehicle. See Motion ¶ 26, at 7 (setting forth this fact)(citing Dollar Aff. ¶¶ 30-32; Dollar Video 1 at 17:15-17:25; Response at 2 (not disputing this fact).

Once emergency services arrived on the scene, Favela was loaded into an ambulance. See Motion ¶¶ 28-29, at 7 (setting forth this fact)(citing Affidavit of Manuel Soto ¶¶ 6-8, at 1-2 (dated February 5, 2018), filed February 6, 2018 (Doc. 30-2)("Soto Aff."); Officer Manuel Soto Lapel Video 1 at 04:40-05:10, 13:30, 16:45-17:05 (dated April 13, 2016), filed February 6, 2018 (Doc. 30-2)("Soto Video 1"); Dollar Aff. ¶ 33, at 4; Officer Matthew Dollar Video 2 at 00:45-01:45 (dated April 13, 2016), filed February 6, 2018 (Doc. 30-1)("Dollar Video 2")); Response at 2 (not disputing this fact). At this point, Favela regained consciousness and began asking what happened. See Motion ¶ 29, at 7 (setting forth this fact)(citing Dollar Aff. ¶ 33, at 4; Dollar Video 2 at 00:45-01:45); Response at 2 (not disputing this fact). Dollar informed Favela that he was under arrest for concealing a firearm and that officers were further investigating Favela as a felon in possession of a firearm. See Motion ¶ 29, at 7 (setting forth this fact)(citing Dollar Aff. ¶ 33, at 4; Dollar Video 2 at 00:45-01:45); Response at 2 (not disputing this fact). Favela was further informed that he could either leave the ambulance if he answered the emergency personnel's questions or go to the hospital if he did not answer their questions. See Motion ¶ 30, at 7 (setting forth this fact)(citing Dollar Video 2 at 00:45-01:45); Response at 2 (not disputing

this fact).  Favela was instructed that he was going to jail regardless whether he answered emergency personnel's questions.  <u>See</u> Motion ¶ 30, at 7 (setting forth this fact)(citing Dollar Video 2 at 00:45-01:45); Response at 2 (not disputing this fact).  Favela refused to answer questions, and emergency personnel accordingly transported Favela to Memorial Medical Center ("Memorial Medical").  <u>See</u> Motion ¶ 31, at 7 (setting forth this fact)(citing Dollar Aff. ¶ 34, at 4); Response at 2 (not disputing this fact).  Dollar remained at the scene and Soto, an officer with the Las Cruces Police Department, followed Favela and emergency personnel to Memorial Medical.  <u>See</u> Motion ¶ 32, at 7 (setting forth this fact)(citing Dollar Aff. ¶ 34, at 4); Response at 2 (not disputing this fact).  Dollar no longer had any contact with Favela.  <u>See</u> Transcript of Hearing at 9:14-21 (taken July 2, 2018)(Court, Coronado, Martinez), filed October 31, 2018 (Doc. 52)("July 2 Tr.")(noting the fact's undisputed nature).

Staff at Memorial Medical informed Favela that they would need a blood test and a urine sample to clear him for transportation to the jail.  <u>See</u> Motion ¶ 35, at 8 (setting forth this fact)(citing Soto Aff. at ¶¶ 13-14, at 2; Officer Manuel Soto Lapel Video 2 at 00:45-01:00, 01:15-01:25 (dated April 13, 2016), filed February 6, 2018 (Doc. 30-2)("Soto Video 2")); Response at 2 (not disputing this fact).  Favela also was informed that his failure to give a urine sample would result in staff catheterizing Favela to collect the urine.  <u>See</u> Motion ¶ 35, at 8 (setting forth this fact)(citing Soto Aff. at ¶¶ 13-14, at 2; Soto Video 2 at 00:45-01:00, 01:15-01:25); Response at 2 (not disputing this fact).  Soto was standing in the doorway of the hospital room while Memorial Medical staff attempted to collect urine samples from Favela.  <u>See</u> Response ¶ 15, at 4 (setting forth this fact)(citing Soto Video 2); Reply ¶ 6, at 2 (admitting this fact).  Favela was handcuffed to a floor mattress with Soto's police-issued handcuffs.  <u>See</u> Response ¶ 2, at 2 (setting forth this fact)(citing Soto Video 2); Reply ¶ 1, at 2 (admitting this fact).  Favela was provided with water

so he could provide a urine sample. See Response ¶ 10, at 3 (setting forth this fact)(citing Transcript of Officer Manuel Soto's April 13, 2016 Lapel Video at 4:1-2, filed March 3, 2018 (Doc. 36-1)("Tr. of Soto Lapel")); Reply ¶ 3, at 2 (admitting this fact). Favela became agitated, began screaming and crying, and had to be restrained by seven male nurses. See Response ¶ 13, at 3 (setting forth this fact)(citing Tr. of Soto Lapel at 7:16-25, 8:1-25; Soto Video 2); Reply ¶ 4, at 2 (admitting this fact). At this point, Soto entered the hospital room and removed Favela's handcuffs, and Memorial Medical staff placed Favela in soft restraints. See Response ¶ 14, at 4 (setting forth this fact)(citing Tr. of Soto Lapel at 8:5-13; Soto Video 2); Reply ¶ 7, at 2 (not disputing this fact). While Favela was placed in soft restraints, Soto received an incoming call on his cellular telephone. See Response ¶ 16, at 4 (setting forth this fact)(citing Tr. of Soto Lapel at 9:12); Reply ¶ 4, at 2 (not disputing this fact). This call informed Soto that the District Attorney was not going to charge Favela with felony possession of a deadly weapon, because the District Attorney was waiting on a report regarding Favela's felony status. See Motion ¶ 38, at 8 (setting forth this fact)(citing Soto Aff. ¶¶ 18-19, at 2-3; Soto Video 2 at 06:55-07:45); Response at 2 (not disputing this fact). After receiving this information, Soto remained in the room with Favela while Memorial Medical staff attempted to collect a urine sample from Favela. See Response ¶ 23, at 4-5 (setting forth this fact)(citing Tr. of Soto Lapel at 12:1-25; Soto Video 2); Reply ¶ 8, at 2 (admitting this fact). Favela was not willing to provide a urine sample, so Memorial Medical staff subsequently used a straight catheter on Favel to obtain a urine sample. See July 2 Tr. at 9:2-8 (Coronado)(stating a catheterization of Favela occurred at Memorial Medical); id. at 11:19-25 (Martinez)(noting the undisputed nature of this fact).[5] As Favela was not yet charged, Favela was

---

[5]The Court derives support for this fact from the hearing held on July 2, 2018, because neither the Motion nor the Response sets forth as undisputed fact that Favela was catheterized. It

then released from the hospital of his own recognizance.  See Motion ¶ 38, at 8 (setting forth this

fact)(citing Soto Aff. at ¶¶ 18-19, at 2-3; Soto Video 2 at 06:55-07:45); Response at 2 (not

disputing this fact).

## PROCEDURAL BACKGROUND

Favela filed his Complaint in New Mexico state court on May 2, 2017.  See Complaint to

Recover Damages for Deprivation of Civil Rights and Personal Injury at 1, filed May 18, 2017

(Doc. 1-1)("Complaint").  He brings nine counts against the Defendants.  See Complaint

¶¶ 63-107, at 9-15.  In Count I, Favela alleges Defendants City of Las Cruces, Dollar, and Soto

violated his rights under the Fourth Amendment of the Constitution of the United States of

America by detaining him for an unreasonable amount of time without probable cause, constituting

a constructive arrest, and bringing him to Memorial Medical to conduct a search of his body

without a warrant.  See Complaint ¶¶ 63-69, 72, at 9-10.  In Count II, Favela alleges that Dollar,

Soto, and the Memorial Medical Defendants -- Memorial Medical, and Defendants Dr. Danielle

Wilhelm, Jamie Pitts, R.N., James Proctor, R.N., Jose Reveles, R.N., and Cassandria Branch, R.N.

-- violated Favela's rights under the Fourth Amendment to the Constitution by forcibly inserting a

straight catheter[6] without a valid arrest or law enforcement authority.  See Complaint ¶¶ 75-78,

---

is apparent, however, from the Motion, Response, Reply, and the July 2, 2018, hearing that the
parties do not dispute that Favela was catheterized.  The Court finds no basis to determine that
Favela was not catheterized and will accept Favela's catheterization as an undisputed fact despite
the parties' failure to provide support.  See Fed. R. Civ. P. 56(e)(2); N.M. Consol. Constr, LLC v.
City Council of the City of Santa Fe, 97 F. Supp. 3d 1287, 1292 n.6 (D.N.M.
2015)(Browning, J.)(accepting a fact as undisputed pursuant to Rule 56(e)(2), because it was not
disputed, and the Court had no independent reason to doubt its accuracy).

[6]A straight catheter "is a soft, thin tube used to pass urine from the body."  What is a
Straight Catheter?, Home Care Delivered®, https://www.hcd.com/urology/straight-catheter/ (last
visited December 31, 2019).  The straight catheter, usually made of PVC plastic, is "inserted
through the urethra and into the bladder."  What is a Straight Catheter?, supra.  Straight catheters

at 10. In Count III, Favela alleges Dollar, Soto, and the Memorial Medical Defendants violated his Fourth Amendment rights by extracting his urine without probable cause or a warrant. See Complaint ¶¶ 81-84, at 11. Favela alleges in Count IV that the Memorial Medical Defendants breached their duty to conform to professional standards by forcibly obtaining Favela's urine sample without consent or probable cause via straight catheterization. See Complaint ¶¶ 87-89, at 11-12. In Count V, Favela alleges that Memorial Medical and Dr. Wilhelm, M.D., failed to obtain his informed consent to treatment, as the law requires, or that they should have known it was given "under duress and/or revoked by Plaintiff prior to treatment," Complaint ¶ 95, at 13, and thus "failed to comport with professional standards," Complaint ¶ 96, at 13. See id. ¶¶ 93-96, at 13. In Count VI, Favela alleges that, if Dr. Wilhelm is not Memorial Medical's employee, Memorial Medical was negligent in selecting Dr. Wilhelm as a staff physician and granting her staff privileges, or, alternatively, that Memorial Medical was negligent in failing to supervise Dr. Wilhelm and determining whether she possessed the care and skill an emergency room doctor requires. See Complaint ¶¶ 99-100, at 13-14. In Count VII, Favela alleges that Memorial Medical and Dr. Wilhelm are "engaging in commerce by providing services," that the New Mexico Unfair Practices Act, N.M. Stat. Ann. §§ 57-12-1 to-26 ("NMUPA"), binds them, and that they violated the NMUPA by "engaging in unconscionable trade practices" when they billed Favela for a medical service he refused and did not request. Complaint ¶¶ 101-04, at 14. In Count VIII, Favela alleges that Soto, Memorial Medical, Dr. Wilhelm, and Memorial Medical personnel acted in concert to commit assault and battery against Favela by physically inserting a straight catheter into him to extract urine. See Complaint ¶¶ 108-11, at 15. Finally, Favela alleges in Count IX that

---

do not attach to a collection bag, and consist of the PVC tubing attached to a funnel, which is used to direct the urine into a waste receptacle. See What is a Straight Catheter?, supra.

Soto, Memorial Medical, Dr. Wilhelm, and Memorial Medical personnel intentionally and unlawfully confined him in room 18 of Memorial Medical without his consent or a valid arrest, constituting false imprisonment.  See Complaint ¶¶ 113-16, at 15.

On May 30, 2017, Favela stipulated to the dismissal of the City of Las Cruces ex rel. Las Cruces Police Department.  See Stipulation of Dismissal as to Defendant City of Las Cruces Ex Rel. Las Cruces Police Department Without Prejudice at 1, filed May 30, 2017 (Doc. 3).  On September 21, 2019, the Court held that Dollar and Soto are entitled to qualified immunity on the federal claims, and dismissed all federal claims against them.  See Order at 1-5, filed September 21, 2018 (Doc. 47).  The Court explained its reasoning in its Memorandum Opinion, 398 F. Supp. 3d 858 (D.N.M. June 27, 2019)(Browning, J.)(Doc. 73)("June 27 MO").  In the June 27 MO, the Court held that Soto is entitled to summary judgment on two state law claims -- Count VIII for assault and battery, and Count IX for false imprisonment.  See June 27 MO at 118, 398 F. Supp. 3d at 942.  In Count VIII, Favela alleges that Soto, as well as Memorial Medical, Dr. Wilhelm, Proctor, Pitts, Reveles, and Branch, committed assault and battery by "intentionally and physically penetrat[ing], or caus[ing] to be penetrated, a straight catheter into Plaintiff's penis for the sole purpose of forcibly extracting urine from him," Complaint ¶ 108, at 14; in Count IX, Favela alleges that Soto, as well as Memorial Medical, Dr. Wilhelm, Proctor, Pitts, Reveles, and Branch, committed false imprisonment by "intentionally confin[ing]" him at the hospital without his consent.  Complaint ¶ 113, at 15.

As to Count VIII, the Court noted that Favela conceded that probable cause existed for Soto to conduct a traffic stop, and thus probable cause supported Favela's arrest.  See June 27 MO at 120, 398 F. Supp. 3d at 942-943.  The Court reasoned:

Favela's lawful arrest removes any potential for assault by Soto under New Mexico law. See N.M. Stat. Ann. § 30-3-1(B) (stating that assault must involve an unlawful act). Further, it is undisputed that Favela was given multiple opportunities to voluntarily and naturally provide a urine sample to Memorial Medical, and the Court has concluded that Soto had no part in the catheterization. Soto also did not threaten to catheterize Favela. The catheterization was a result of only Favela's uncooperative behavior.

June 27 MO at 120, 398 F. Supp. 3d at 943. The Court also concluded that Soto did not commit battery, because he was not involved in the catheterization. See June 27 MO at 121, 398 F. Supp. 3d at 943. Although Soto helped remove Favela's handcuffs "so he could be placed in soft restraints," soft restraints were necessary, because of "Favela's uncooperative nature." June 27 MO at 121, 398 F. Supp. 3d at 943. The Court further noted that, although the catheterization may be considered offensive conduct, it does not constitute battery unless it is done unlawfully. See June 27 MO at 120, 398 F. Supp. 3d at 943.

As to Count IX, the Court held that, because Soto had probable cause to arrest Favela, Soto could not have committed false imprisonment. See June 27 MO at 121, 398 F. Supp. 3d at 944. The Court noted that "New Mexico law informs that false imprisonment, which includes false arrest, 'occurs when a person intentionally confines or restrains another person without consent and with knowledge that he has no lawful authority to do so.'" June 27 MO at 121, 398 F. Supp. 3d at 943 (quoting Santillo v. N.M. Dep't of Pub. Safety, 2007-NMCA-159, ¶ 12, 173 P.3d 6, 10 (emphasis added by June 27 MO)). The Court reasoned that, because probable cause supports Favela's arrest, it "cannot be said that Soto intentionally confined Favela knowing he had no lawful authority to do so." June 27 MO at 123, 398 F. Supp. 3d at 944. Because Favela stipulated to the dismissal of the City of Las Cruces ex rel. Las Cruces Police Department, and the Court terminated Dollar and Soto as Defendants, the only Defendants remaining are Memorial Medical, Dr. Wilhelm, Proctor, Pitts, Reveles, and Branch.

1.    **The MSJ.**

On September 13, 2019, Memorial Medical, Proctor, Pitts, Reveles, and Branch filed the MSJ, asking the Court to "render judgment as a matter of law in favor of them as to all of the remaining claims and causes of action asserted against them." MSJ at 23. As to Counts II and III, Memorial Medical, Proctor, Pitts, Reveles, and Branch argue that Favela "cannot adduce any evidence" that they violated his Fourth Amendment rights. MSJ at 9. As to Count VI, Memorial Medical, Proctor, Pitts, Reveles, and Branch argue that "Mr. Favela cannot adduce any evidence from which the Court could infer the Hospital failed to screen Dr. Wilhelm's competency" or to supervise her. MSJ at 18. Memorial Medical, Proctor, Pitts, Reveles, and Branch contend that Count VI simply reiterates the claims that other Counts bring. See MSJ at 22-23. Furthermore, Pitts and Branch argue that there is no evidence supporting any claims brought against them, because Pitts and Branch were not "present during" and did not participate[] in the" catheterization. MSJ at 23. As to Count VII, Memorial Medical argues that Favela has no evidence to support his NMUPA claim against it. See MSJ at 18.

There are three state law claims: Count V, a lack-of-informed-consent claim; Count VIII, an assault-and-battery claim; and Count IX, a false-imprisonment claim. As to Count V, Memorial Medical, Proctor, Pitts, Reveles, and Branch assert that they owed "no duty as a matter of law to obtain [Favela's] consent" to perform a catheterization, which they argue was "necessary to protect Mr. Favela's health and life." MSJ at 12. As to Count VIII, Memorial Medical, Proctor, Pitts, Reveles, and Branch argue that Favela's assault and battery claims "fail as a matter of law," because Favela was incapable of consenting and needed immediate treatment when they performed the catheterization. MSJ at 20. As to Count IX, Memorial Medical, Proctor, Pitts, Reveles, and Branch argue that there "was probable cause to restrain Mr. Favela," which "negates any claim for

false imprisonment." MSJ at 21. According to Favela, "there is no dispute there was probable cause from the outset and further reasonable cause because of the threat to Mr. Favela's health and the threat he presented to himself and the Hospital staff." MSJ at 22.

### 2. The MSJ Response.

In the Plaintiff's Response to Defendants' Motion for Summary Judgment, filed September 27, 2019 (Doc. 91)("MSJ Response"), Favela concedes that the Defendants are entitled to summary judgment on Counts II, III, and IV against Memorial Medical, Proctor, Pitts, Reveles, and Branch, as well as on Count VI against Memorial Medical and Count VII against Memorial Medical and Dr. Wilhelm. See MSJ Response ¶¶ IV.a, IV.d, IV.e, IV.g, at 16, 21, 21, 23. As to Count V, Favela argues that there was no medical emergency and that he was capable of consenting, so Dr. Wilhelm had a duty to obtain Favela's consent. See MSJ Response ¶ IV.c, at 20. Favela also contends that liability should extend to Medical Memorial under the theory of apparent agency. See MSJ Response at ¶ IV.b, at 16. As to Count VIII, Favela argues that, "because Mr. Favela was no longer under arrest when Officer Soto said he would not be charged, and because Mr. Favela was able to consent and refused that consent, the Defendants' offensive touching of him without consent met the elements of assault and battery." MSJ Response ¶ IV.f, at 21. As to Count IX, Favela concedes "that from the time he was initially detained through his arrest, the police had probable cause to detain him." MSJ Response ¶ IV.g, at 21. Favela maintains, however, that Medical Memorial, Dr. Wilhelm, Proctor, Pitts, Reveles, and Branch did not have probable cause, because they knew that he had refused treatment. See MSJ Response ¶ IV.g, at 22-23. Favela concedes that there is no evidence supporting any claims brought against Pitts, but he maintains that there is evidence supporting his claims against Branch. See MSJ Response ¶ IV.g, at 23-24. According to Favela, the "evidence supports that Primary Nurse

Branch was personally involved in Mr. Favela's care during the crucial time of determining whether there was a medical emergency, whether Mr. Favela was unable to consent, and whether restraints were necessary," and therefore the Court should not dismiss the claims against Branch. See MSJ Response ¶ IV.g, at 24.

**3.**     <u>**The MSJ Reply**</u>.

In the Defendants' Reply in Support of Summary Judgment, filed October 11, 2019 (Doc. 106)("MSJ Reply"), Memorial Medical, Proctor, Pitts, Reveles, and Branch contend that, based on Favela's concessions, summary judgment is proper for Counts II, III, IV, VI, and VII, and for all claims against Pitts. See MSJ Reply at 1. Memorial Medical, Proctor, Pitts, Reveles, and Branch argue that Favela "concedes summary judgment should be granted as to [his] federal claims (and others) and does not object to the Court's continued exercise of supplemental jurisdiction." MSJ Reply at 1 n.2. Memorial Medical, Proctor, Pitts, Reveles, and Branch maintain that "a district court may exercise supplemental jurisdiction over state claims in the absence of any triable federal claims 'when the nature and extent of pretrial proceedings, judicial economy, convenience, and fairness would be served by retaining jurisdiction.'" MSJ Reply at 1 n.2 (quoting <u>Thatcher Enters. v. Cache Ct. Corp.</u>, 902 F.2d 1472, 1478 (10th Cir. 1990)). Memorial Medical, Proctor, Pitts, Reveles, and Branch argue:

> Given the facts (1) the Court is well-versed in the facts and law of this case, (2) the expense and time associated with having to begin anew in state court after this case has been pending in federal court for more than two years, and (3) Plaintiff has not objected to the Court retaining supplemental jurisdiction over the state law claims, maintaining jurisdiction over those claims remains fully within the gambit of the Court's discretion and is appropriate under the circumstances.

MSJ Reply at 1 n.2. Memorial Medical, Proctor, Pitts, Reveles, and Branch argue that their statement of facts "remains uncontroverted," and that the few facts that Favela contests "are immaterial and properly disregarded." MSJ Reply at 3-5.

As to Count V, Memorial Medical first argues that Favela did not allege in his Complaint that Dr. Wilhelm was Memorial Medical's apparent agent, and that neither the "New Mexico Court of Appeals [n]or the New Mexico Supreme Court [has ever] extended vicarious liability on a theory of apparent authority to a hospital based on an independent contractor's alleged failure to obtain the informed consent of a patient." MSJ Reply at 8. They contend, moreover, that "there is no competent summary judgment evidence to support [that Favela] thought Dr. Wilhelm was an apparent employee or agent of" Memorial Medical. MSJ Reply at 9. Accordingly, Memorial Medical maintains that it "had no duty to obtain Plaintiff's informed consent or to ensure Dr. Wilhelm did." MSJ Reply at 9. Second, Memorial Medical argues that Favela does not offer evidence disputing that Medical Memorial's staff believed that he was suffering a medical emergency and that Favela had "elevated vital signs" when he was admitted. MSJ Reply at 9. Third, Memorial Medical avers that "the undisputed evidence shows [that Favela] was unable to consent." MSJ Reply at 10.

As to Count VIII, Memorial Medical, Proctor, Pitts, Reveles, and Branch argue that Favela "has given the Court no reason to set aside its prior conclusion the catherization [sic] was not offensive in light of the medical need for it." MSJ Reply at 11. Moreover, Memorial Medical, Proctor, Pitts, Reveles, and Branch assert that "testimony and the medical records unequivocally establish [that Favela] could not consent and the catherization [sic] was critical to ensure his life and health. There is no issue for trial on the assault and battery claim." MSJ Reply at 11. As to Count IX, Memorial Medical, Proctor, Pitts, Reveles, and Branch argue that "it is undisputed the

Hospital staff believed it had authority to keep [Favela] until all of the necessary medical treatment was performed." MSJ Reply at 12. According to them, Favela does not dispute that, given that he "passed out and continued to (at the very least) appear to lose consciousness and not be able to fully orient himself, it was reasonable for Hospital staff to complete the medical treatment." MSJ Reply at 12. Last, Branch argues that there "is no evidence [she] was involved in the catheterization; summary judgment is proper as to all of the claims against her." MSJ Reply at 12.

### 4. **The Hearing.**

At the November 1, 2019, hearing, Favela again confirmed that the Court should enter summary judgment for the federal claims. See Draft Transcript of Hearing (taken November 1, 2019) at 19:8-17 (Coronado)("Tr.")[7]; id. at 3:20-4:24 (Court, Morrow). In addition, the parties agreed that the Court should enter summary judgment on Counts VIII and IX in favor of Pitts. See Tr. at 4:17-18 (Morrow). The Court noted that it is inclined to enter summary judgment on the federal claims and then remand the state law claims. See Tr. at 2:2-12 (Court). The Court explained that it does not think that the United States Court of Appeals for the Tenth Circuit "wants me to keep jurisdiction over the case, and I normally don't do things that the Tenth Circuit doesn't want me to do." Tr. at 2:13-16 (Court). Memorial Medical, Proctor, Pitts, Reveles, and Branch confirmed that only Counts V, VIII, and IX remain, which include, respectively, state law claims for lack of informed consent, assault and battery, and false imprisonment. See Tr. at 4:19-24 (Morrow). Memorial Medical, Proctor, Pitts, Reveles, and Branch argued that the Court should retain jurisdiction over the three remaining Counts, because the Court already took "a position as

---

[7]The Court's citations to the transcripts of both hearings refer to the court reporter's original, unedited version; any final transcripts may contain slightly different page and/or line numbers.

to the facts and the law regarding two of the three" Counts -- assault and battery and false imprisonment -- in the June 27 MO. Tr. at 5:6-8 (Morrow). Memorial Medical, Proctor, Pitts, Reveles, and Branch said that much of the June 27 MO is "directly on point with the assault and battery claims and the false imprisonment claims that remain pending before this court." Tr. at 6:25-7:3 (Morrow). They added that, based on the Court's past cases, it is a "rare thing for a case to be pending before the court for a period of two years, to get within weeks of trial and for the court to . . . decline to issue supplemental jurisdiction." Tr. at 7:6-10 (Morrow).

The Court noted that, when it issued the June 27 MO dismissing two state law claims against Soto, it "still had federal claims." Tr. 7:12 (Morrow). The Court explained:

> I'm going to have to think long and hard about the opinion that the Supreme Court's issued that you all are struggling with as to whether -- when a hospital has to get consent and when it doesn't have to get consent. It seems to me that's kind of a classic state issue. It seems [to] me it ought to be something that really the state [court] decides, not me. It's an interesting issue, I wouldn't mind deciding it, and you know, if I wasn't staring all these Tenth Circuit cases in the face then I might be inclined to judicial economy. But I don't know. I'm not sure it's even economical at this point. It seems to me that we still have a lot of work ahead.

Tr. at 7:25-8:12 (Court). Memorial Medical, Proctor, Pitts, Reveles, and Branch noted that they did not remove the case, and that "it was the plaintiff who made the decision within the last few weeks to abandon his federal claims." Tr. at 8:12-14 (Morrow). The Court responded that it "hate[s] to penalize the plaintiff for abandoning claims." Tr. at 8:15-16 (Court). Memorial Medical, Proctor, Pitts, Reveles, and Branch argued that, as to the "New Mexico case law regarding informed consent, the New Mexico Court of Appeals has taken a firm stance on exactly the issue that is before the court." Tr. at 9:24-102 (Morrow). The Court responded that the "tricky thing" is that the Court must confront an <u>Erie R.R. Co. v. Tompkins</u>, 304 U.S. 64 (1938), problem and predict "what the Supreme Court of New Mexico would do." Tr. at 10:3-7 (Court). The Court

noted, however, that the Court of Appeals of New Mexico cases would be helpful. <u>See</u> Tr. at 10:8-11 (Court). Memorial Medical, Proctor, Pitts, Reveles, and Branch asserted that the Supreme Court of New Mexico has not overruled <u>Johnson v. Sears, Roebuck & Co.</u>, 1992-NMCA-039, 832 P.2d 797, or <u>Cooper v. Curry</u>, 1978-NMCA-104, 589 P.2d 201, and that "both of those cases remain good law." Tr. at 10:17 (Morrow). The Court said that the Tenth Circuit has held that, "'[w]hen all federal claims have been dismissed, the court may and usually should decline to exercise jurisdiction over any remaining state claims.'" Tr. at 11:6-8 (Court)(quoting <u>Kock v. City of Del City</u>, 660 F.3d 1228, 1248 (10th Cir. 2011)(quoting <u>Smith v. Enid ex rel. Enid City Comm'n</u>, 149 F.3d 1151, 1156 (10th Cir. 1998))).

Memorial Medical, Proctor, Pitts, Reveles, and Branch argued that Favela has yet to ask the Court to decline to exercise supplemental jurisdiction. <u>See</u> Tr. at 11:24-25 (Morrow). They maintain that judicial economy weighs in favor of exercising supplemental jurisdiction, because although Favela

> argues that the court should re-evaluate its previous evaluation of the assault and battery claim, [] the court has already determined that the catheterization at issue was not an assault because an assault requires an unlawful act, and there was not an unlawful act here. Further, the court has already determined that the catheterization was justified.

Tr. at 12:8-15 (Morrow). The Court responded that parties may "concede certain facts" when one party files a motion for summary judgment, but that, when there is another motion for summary judgment, parties "may not concede those facts" or the facts may be different. Tr. 12:20-25 (Court). The Court added that it is "a little reluctant to just take something I said in the federal context and run with it in the state context." Tr. at 13:1-3 (Court). Memorial Medical, Proctor, Pitts, Reveles, and Branch responded that, in the June 27 MO, the Court cited "directly to New Mexico statutes," and to "New Mexico law regarding assault and battery," and that the "facts have

- 19 -

not changed." Tr. at 13:5-11 (Morrow). According to them, the "only allegation now is that plaintiff [says] that maybe he was faking, which he now says three or four years after the fact and certainly that was not the circumstance known by any hospital staff at the time." Tr. at 13:14-18 (Morrow). Memorial Medical, Proctor, Pitts, Reveles, and Branch argued that

> in fairness to the parties and in creating a situation where it would not prejudice the defendants who have already been before the court for two and a half years, the assault and battery claim should be found in favor of the defendants.
>
> Similar situation with the false imprisonment claim. The facts have not changed. The facts that are contested have not changed. The facts that are uncontested have not changed. And in particular, those are the facts that this Court can and should rely on when finding in favor of the defendants, the current defendants, in the false imprisonment claim.

Tr. at 14:6-18 (Morrow). They noted that the only claim that the Court did not decide in the June 27 MO is the informed consent claim. See Tr. at 15:16-20 (Morrow). Memorial Medical, Proctor, Pitts, Reveles, and Branch concluded by asking the Court "to hold consistently on the assault and battery and false imprisonment claims and if any of the claims need to be remanded to state court, the lack of informed consent claim could be the only one that was remanded." Tr. at 15:22-16:1 (Morrow).

Favela said that he agrees "with the court's summary of all the reasons why this case should be sent back to [] state district court for a decision." Tr. at 16:11-14 (Coronado). Favela noted that, with respect to the June 27 MO, the issue before the Court was whether the Las Cruces Police Department's "motion for summary judgment was a valid motion based upon qualified immunity." Tr. at 17:6-8 (Coronado). Favela added that, when the Court issued the June 27 MO, the "facts with respect to the hospital defendants were not ripe for decision" and that, in the interim, the parties have "had so much time to conduct discovery and flesh out some of the other facts." June 27 MO at 17:9:-12 (Coronado). Favela argued that judicial economy does not warrant

exercising supplemental jurisdiction, because: (i) the case was "stayed for quite some time," during which time "nothing really was happening in the case"; and (ii) "all the witnesses except for the experts are located in Las Cruces, New Mexico," and most of the Defendants, except for those "who have left the jurisdiction and gone to work somewhere else," remain in Las Cruces. Tr. at 17:23-18:2 (Coronado). Favela noted that a motion is pending before the Court to transfer the case to Las Cruces and that he does not oppose the motion. See Tr. at 18:4-10 (Coronado); Defendants' Motion for Intra-District Transfer of Proceedings, filed September 16, 2019 (Doc. 90). Memorial Medical, Proctor, Pitts, Reveles, and Branch noted that they filed the motion to transfer, see Tr. at 18:17-18 (Morrow), and the Court responded that it does not "mind trying a case in Las Cruces," Tr. at 18:12-13 (Court). Favela then argued that the false imprisonment and assault and battery issues, which the Court addressed in the June 27 MO,

> were case specific to Las Cruces PD, and not to the hospital defendants. So I would be in favor of the court sending this case back to the state court to have the state court issues addressed before the court for the reasons you stated and also because of the issues [] involving informed consent that are better left decided by state court.

Tr. at 19:11-17 (Coronado).

The Court observed that Favela wants the Court to decline to exercise jurisdiction, and it then asked Favela:

> Would you agree if I ask you to put an order together dismissing with prejudice or consenting to the motion for summary judgment on those federal counts and the counts you have agreed to, the ones you have consented to, so we can help [Memorial Medical, Proctor, Pitts, Reveles, and Branch] clear out the things that [they have] won here in federal court? Would you agree to put together a motion and granting her motion for summary judgment on those counts?

Tr. at 21:3-11 (Court). Favela responded: "Yes, I would, Your Honor." Tr. at 21:12 (Coronado). The Court explained that it would write an opinion "stating why I declined to exercise federal [] supplemental jurisdiction in this case," which Memorial Medical, Proctor, Pitts, Reveles, and

Branch can appeal, but that the case "will be remanded back to the [state] court." Tr. at 21:18-25 (Court). The Court observed that "it would just be so unusual for me to keep this case." Tr. at 23:1-2 (Court). The Court then tasked Favela with preparing an order granting summary judgment on and dismissing with prejudice the Counts that he concedes in the MSJ Response. See Tr. at 23:7-11 (Court). The Court directed Favela to send the order to Memorial Medical, Proctor, Pitts, Reveles, and Branch to sign off on the order and submit it to the Court. See Tr. at 23:11-13 (Court). The Court said that it would then dismiss the federal claims and write a "relatively short opinion and order then remanding the case back to the Third Judicial District" of New Mexico. Tr. at 23:15-17 (Court).

5.    **The Remand Order.**

Favela prepared an order, which Memorial Medical, Proctor, Pitts, Reveles, and Branch submitted to the Court. See Remand Order 1-3. In the Remand Order, the Court granted in part the MSJ, and dismissed with prejudice the following claims: (i) Counts II, III, IV, VIII, and IX against Pitts; (ii) Counts II, III, and IV against Proctor, Reveles, and Branch; and (iii) Counts VI and VII against Memorial Medical. See Remand Order at 2. Because only Counts V, VIII, and IX -- which are all state law claims -- remain, the Court also declined to exercise supplemental jurisdiction and now remands the case. See Remand Order at 3. The Court stated at the November 1, 2019, hearing that it would write a short opinion explaining why the Court declines to exercise supplemental jurisdiction and is thus remanding the case. See Tr. at 23:15-17 (Court). This Memorandum Opinion is the Court's promised opinion.

## LAW REGARDING SUPPLEMENTAL JURISDICTION

It is a fundamental precept of American law that the federal courts are "courts of limited jurisdiction." Exxon Mobil Corp. v. Allapattah Servs., Inc., 545 U.S. 546, 552 (2005). Federal

courts "possess only that power authorized by Constitution and statute." <u>Kokkonen v. Guardian Life Ins. Co. of Am.</u>, 511 U.S. 375, 377 (1994). Among the powers that Congress has bestowed upon the courts is the power to hear controversies arising under federal law -- federal-question jurisdiction -- and controversies arising between citizens of different states -- diversity jurisdiction. <u>See</u> 28 U.S.C. §§ 1331-32. Section 1367 additionally grants the federal courts power to hear claims over which the court lacks original jurisdiction, if those claims are part of the same constitutional "case or controversy" as claims over which the court has original jurisdiction. 28 U.S.C. § 1367(a). <u>See</u> <u>Bonadeo v. Lujan</u>, 2009 WL 1324119, at *18 (D.N.M. Apr. 30, 2009)(Browning, J.).

      1.    <u>**Congressional Authority to Exercise Supplemental Jurisdiction.**</u>

Although a statutory basis is necessary for federal courts to exercise jurisdiction over a controversy, "it is well established -- in certain classes of cases -- that, once a court has original jurisdiction over some claims in the action, it may exercise supplemental jurisdiction over additional claims that are part of the same case or controversy." <u>Exxon Mobil Corp. v. Allapattah Servs., Inc.</u>, 545 U.S. at 552. The Supreme Court of the United States of America has long subscribed to the concept of supplemental jurisdiction recognized in two common-law doctrines, pendent jurisdiction and ancillary jurisdiction; section 1367's passage codified those jurisdictional forms, and also allowed courts to hear cases under pendent-party jurisdiction, which the Supreme Court had previously disallowed in <u>Finley v. United States</u>, 490 U.S. 545 (1989). Federal courts may exercise pendent jurisdiction over state law claims when "state and federal claims . . . derive from a common nucleus of operative fact." <u>United Mine Workers v. Gibbs</u>, 383 U.S. 715, 725 (1966). Supplemental jurisdiction gives federal courts the flexibility to hear a cause of action after the introduction of third parties, whose insertion into the litigation does not have the support of

any independent grounds for federal jurisdiction, when those parties share a common interest in the outcome of the litigation and are logical participants in it.  See Owen Equip. & Erection Co. v. Kroger, 437 U.S. 365, 375 n.18 (1978).

In 1988, the Honorable William H. Rehnquist, then-Chief Justice of the Supreme Court, created the Federal Courts Study Committee to analyze the federal court system and to recommend reforms.  See James v. Chavez, 2011 WL 6013547, at *5 (D.N.M. Nov. 21, 2011)(Browning, J.). In response to the Committee's findings regarding pendent, ancillary, and pendent-party jurisdiction, Congress codified the doctrines when it passed the Judicial Improvements Act of 1990:

> [I]n any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.  Such supplemental jurisdiction shall include claims that involve the joinder or intervention of additional parties.

28 U.S.C. § 1367(a).  In enacting 28 U.S.C. § 1367, Congress conferred upon federal courts "supplemental forms of jurisdiction . . . [that] enable them to take full advantage of the rules on claim and party joinder to deal economically -- in single rather than multiple litigation -- with matters arising from the same transaction or occurrence."  Report of the Federal Courts Study Committee, Part II.2.B.2.b. (April 2, 1990), reprinted in 22 Conn. L. Rev. 733, 787 (1990).

## 2.     The District Courts' Discretion to Exercise Supplemental Jurisdiction.

The Tenth Circuit has followed the Supreme Court's lead in classifying supplemental jurisdiction not as a litigant's right, but as a matter of judicial discretion.  See Estate of Harshman v. Jackson Hole Mountain Resort Corp., 379 F.3d 1161, 1165 (10th Cir. 2004)(citing City of Chi. v. Int'l Coll. of Surgeons, 522 U.S. 156, 173 (1997)).  In circumstances where the supplemental

jurisdiction statute may support supplemental jurisdiction, the district court retains discretion to decline to exercise that jurisdiction. The traditional analysis, based on the Supreme Court's opinion in <u>United Mine Workers v. Gibbs</u>, compelled courts to consider "judicial economy, convenience and fairness to litigants" when deciding whether to exercise supplemental jurisdiction. 383 U.S. at 726.

Similarly, Congress' supplemental jurisdiction statute enumerates four factors that the court should consider:

(1)  the claim raises a novel or complex issue of State law,

(2)  the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,

(3)  the district court has dismissed all claims over which it has original jurisdiction, or

(4)  in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

28 U.S.C. § 1367(c). In applying these factors, district courts should seek to exercise supplemental jurisdiction in an effort to "vindicate values of economy, convenience, fairness, and comity. . . ." <u>Estate of Harshman v. Jackson Hole Mountain Resort Corp.</u>, 379 F.3d at 1164. Numerous courts have acknowledged that 28 U.S.C. § 1367(c) necessarily changes the district courts' supplemental jurisdiction discretion analysis and that, unless one of the conditions of 28 U.S.C. § 1367(c) exists, courts are not free to decline jurisdiction. <u>See</u> <u>Itar-Tass Russian News Agency v. Russian Kurier</u>, Inc., 140 F.3d 442, 447 (2d Cir. 1998)("[S]ection 1367 has indeed altered Gibbs' discretionary analysis."); <u>McLaurin v. Prater</u>, 30 F.3d 982, 985 (8th Cir. 1994)("The statute plainly allows the district court to reject jurisdiction over supplemental claims only in the four instances described therein."); <u>Exec. Software N. Am. v. U.S. Dist. Ct.</u>, 24 F.3d 1545, 1557 (9th Cir. 1994)("By

codifying preexisting applications of *Gibbs* in subsections (c)(1)-(3), however, it is clear that Congress intended the exercise of discretion to be triggered by the court's identification of a factual predicate that corresponds to one of the section 1367(c) categories."), overruled on other grounds by Cal. Dep't of Water Res. v. Powerex Corp., 533 F.3d 1087 (9th Cir. 2008); Palmer v. Hosp. Auth., 22 F.3d 1559, 1569 (11th Cir. 1994)("[S]upplemental jurisdiction must be exercised in the absence of any of the four factors of section 1367(c). . . ."); Bonadeo v. Lujan, 2009 WL 1324119, at *9 ("28 U.S.C. § 1367(c) changed the district courts' supplemental jurisdiction discretion analysis to prohibit courts from declining jurisdiction unless one of the conditions of 28 U.S.C. § 1367(c) exists."). At least one other district court in the Tenth Circuit besides this Court has reached the same conclusion. See Gudenkauf v. Stauffer Commc'ns, Inc., 896 F. Supp. 1082, 1084 (D. Kan. 1995)(Crow, J.)("[A]ny exercise of discretion declining jurisdiction over pendent claims or parties cannot occur until 'triggered' by the existence of one of the four conditions enumerated.").

The Tenth Circuit has held that district courts should presume to decline jurisdiction over state claims when federal claims no longer remain: "When all federal claims have been dismissed, the court may, and usually should, decline to exercise jurisdiction over any remaining state claims." Koch v. City of Del City, 660 F.3d 1228, 1248 (10th Cir. 2011)(quoting Smith v. City of Enid ex rel. Enid City Comm'n, 149 F.3d at 1156). That conclusion is consistent with the Supreme Court's statement that

> [n]eedless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law. Certainly, if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well.

United Mine Workers of Am. v. Gibbs, 383 U.S. at 726 (footnote omitted).

The Tenth Circuit has recognized that a district court does not abuse its discretion when it declines to exercise supplemental jurisdiction over a claim "under 28 U.S.C. § 1367(c)(3) . . . where it has dismissed all claims over which it has original jurisdiction." Muller v. Culbertson, 408 F. App'x 194, 197 (10th Cir. 2011)(unpublished).[8]  The Court previously has stated that a district court should usually decline to exercise supplemental jurisdiction when 28 U.S.C. § 1367(c) applies.  See Armijo v. New Mexico, No. CIV 08-0336 JB/ACT, 2009 WL 3672828, at *4 (D.N.M. Sept. 30, 2009)(Browning, J.)("The Supreme Court and the Tenth Circuit have not only acknowledged such a result, they have encouraged it.").  The Court consistently has declined to exercise supplemental jurisdiction when it dismisses all of a case's federal claims with prejudice.  See, e.g., McGarry v. Bd. of Cty. Comm'rs for Cty. of Lincoln, 294 F. Supp. 3d 1170, 1206 (D.N.M. 2018)(Browning, J.)("The only remaining claim before the Court is McGarry's NMTCA claim. . . .  The Court declines to exercise supplemental jurisdiction over that claim."); Parrish v. Roosevelt Cty. Board of Cty. Comm'rs, No. CIV 15-0703 JB/GJF, 2017 WL 6759103, at *20 (D.N.M. Dec. 31, 2017)(Browning, J.)("The Court declines to exercise supplemental jurisdiction over Parrish's remaining state-law breach-of-contract claim."); Martinez v. Guadalupe Cty, 200 F. Supp. 3d 1216, 1265 (D.N.M. 2016)(Browning, J).  The Court has also declined to

---

[8]Muller v. Culbertson is an unpublished Tenth Circuit opinion, but the Court can rely on an unpublished Tenth Circuit opinion to the extent its reasoned analysis is persuasive in the case before it.  See 10th Cir. R. 32.1(A), 28 U.S.C. ("Unpublished opinions are not precedential, but may be cited for their persuasive value.").  The Tenth Circuit has stated: "In this circuit, unpublished orders are not binding precedent, . . . and . . . citation to unpublished opinions is not favored. . . .  However, if an unpublished opinion . . . has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision."  United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005).  The Court concludes that Muller v. Culbertson, Mountain States Media, LLC v. Adams Cty., Nard v. City of Okla. City, Douglas v. Norton, and Wallin v. Dycus have persuasive value with respect to a material issue, and will assist the Court in its preparation of this Memorandum Opinion and Order.

dismiss state law claims when it dismisses a party's federal claims without prejudice.  See Young

v. City of Albuquerque, 77 F. Supp. 3d 1154, 1189 (D.N.M. 2014)(Browning, J.)("[T]he Court

would normally remand those [state law] claims to state court.  To give the Plaintiffs an

opportunity to amend the Complaint to add federal claims against Dear and any other individuals,

however, the Court will not remand the state-law claims to state court at this point.").

> **3.        Whether an Issue is Novel.**

Under 28 U.S.C. § 1367(c)(1), a district court "may decline to exercise supplemental

jurisdiction over a claim" if "the claim raises a novel or complex issue of state law."

28 U.S.C. § 1367(c)(1).  What makes a state law issue novel is unclear from binding Tenth Circuit

caselaw.  See, e.g., Roe v. Cheyenne Mountain Conference Resort, Inc., 124 F.3d 1221, 1236-37

(10th Cir. 1997)(not distinguishing between "novel" and "complex" and dismissing a state law

claim on § 1367(c)(1) grounds and because no federal law claims remained); Anglemyer v.

Hamilton Cty. Hosp., 58 F.3d 533, 541 (10th Cir. 1995)(dismissing a state law claim as novel and

complex, merely because a plaintiff alleged a violation of the Kansas Risk Management Act, Kan.

Stat. Ann. §§ 65-4921 to 4940).[9]  A discernible test for novelty is also not apparent from studying

Professors Charles Alan Wright and Arthur Miller's Federal Practice and Procedure.  See generally

---

[9]The Tenth Circuit concluded that the issue was novel and complex without elaborating a test, writing:

> However, we do not have to decide whether the court insufficiently took the extent of the pretrial proceedings into consideration because there is an independent reason for dismissing Ms. Anglemyer's pendent state claims.  In her complaint (Count III), she alleged the hospital violated the Kansas Risk Management Act.  We believe the Kansas courts are the appropriate forum to decide this novel and complex issue of state law.

Anglemyer v. Hamilton Cty. Hosp., 58 F.3d 533, 541 (10th Cir. 1995).

13D Charles Alan Wright & Arthur R. Miller, <u>Federal Practice and Procedure</u> § 3567.3, at 417-421 nn. 60-61 (3d. ed. 2008)(collecting cases).  The only general rule that Professors Wright and Miller recognize for the novelty test is that, "[a]s a general matter, common law contract and tort claims do not present novel or complex questions of state law."  13D Wright & Miller, <u>supra</u> § 3567.3, at 417 n.60.  <u>See</u>, <u>e.g.</u>, <u>Blakely v. United States</u>, 276 F.3d 853 (6th Cir. 2002)("This case does not present complex or novel issues of state law.  It involves a fraud claim.").  <u>But</u> <u>cf.</u> <u>Wallin v. Dycus</u>, 224 F. App'x 734, 740 (10th Cir. 2007)(unpublished), <u>as amended nunc pro tunc</u> (March 5, 2008)(affirming a district court for dismissing a state law claim as novel, because it required the court to determine whether Colorado law recognized that a jailer owed a duty of care to protect a prisoner's health in tort).  Otherwise, they acknowledge a hodgepodge of different factors that federal courts have found operative when considering whether a claim is novel.  <u>See</u>, 13D Wright & Miller, <u>supra</u> § 3567.3, at 417 n.60 (citing <u>Dream Palace v. Cty. of Maricopa</u>, 384 F.3d 990, 1022 (9th Cir. 2004)(determining a state issue was novel, because it concerned "issues of the balance of power between state and local authorities in Arizona"); <u>Arpin v. Santa Clara Valley Transp. Agency</u>, 261 F.3d 912, 927 (9th Cir. 2001)(concluding novelty existed, because it raised "an issue of first impression as to how [a state law] provision is to be applied"); <u>Doe v. Sundquist</u>, 106 F.3d 702, 708 (6th Cir. 1997)(concluding an issue was novel, because it involved interpretation of the state constitution and a new state statute); <u>Wilson v. PFS, LLC</u>, 493 F. Supp. 2d 1122, 1126 (S.D. Cal. 2007)(Hayes, J.)(determining an issue novel or complex, because there is conflicting state law interpretations of the law); <u>Kadetsky v. Egg Harbor Tp. Bd. of Educ.</u>, 164 F. Supp. 2d 425, 437 (D.N.J. 2001)(Orlofsky, J.)(concluding an issue novel, because it turned on "application of a recent change in New Jersey state law"); <u>Rockey v. Courtesy Motors, Inc.</u>, 199 F.R.D. 578, 596 (W.D. Mich. 2001)(Scoville, M.J.)(concluding an issue is novel, because

"there is not a single published state-court opinion on point")). <u>See</u> <u>also</u> 13D Wright & Miller,

<u>supra</u> § 3567.3, at 416 ("Occasionally, a court appears to decline supplemental jurisdiction simply

because the supplemental claim involves questions of state law.").  Some courts, however, have

bucked one or more of these factors.  <u>See</u> <u>e.g.</u>, <u>Schwarm v. Craighead</u>, 233 F.R.D. 655, 659 (E.D.

Cal. 2006)(Shubb, J.)(exercising supplemental jurisdiction, even though California courts had not

yet interpreted the statute at issue, because "the court here faces a single unexceptional question

of statutory interpretation"); <u>Hunter by Conyer v. Estate of Baecher</u>, 905 F. Supp. 341, 343 (E.D.

Va. 1995)(Clarke, J.)("It is true that state caselaw concerning the [Virginia Residential Landlord

and Tenant Act, Va. Code Ann. §§ 55-248.2 to 248.50] generally and in the lead paint context

specifically is sparse.  Nevertheless, the lack of caselaw does not make the VRLTA unintelligible

to this Court.").  Perhaps recognizing that what is novel is unfixed, Wright and Miller note that

"each case is decided on its own facts."  13D Wright & Miller, <u>supra</u> § 3567.3, at 417-18.  <u>See</u> <u>id.</u>

at 400 n.27 (citing Karen Nelson Moore, <u>The Supplemental Jurisdiction Statute: An Important but</u>

<u>Controversial Supplement to Federal Jurisdiction</u>, 41 Emory L.J. 31, 62-63 (1992)("In particular,

it may be relatively easy for a district judge to conclude that a novel or complex issue of State law

is involved and to exercise essentially unreviewable discretion to dismiss such a claim.")).  This

uncertainty is not helpful for litigants.  <u>Cf.</u> <u>Teague v. Lane</u>, 489 U.S. 288, 332 (1989)(Brennan, J.,

dissenting)(noting that "predictability in the law" permits "litigants and potential litigants" to act

with knowledge, and with assurance that "they will not be treated unfairly as a result of frequent

or unanticipated changes in the law").  The Court, accordingly, deems it prudent to outline a test

for 28 U.S.C. § 1367(c)(1)'s novelty requirement.[10]

---

[10]28 U.S.C. § 1367(c)(1)'s novelty and complexity requirements are separate tests -- that is, "novel or complex" is disjunctive, so it should not be read as "novel and complex." 28

The origin of 28 U.S.C. § 1367(c)(1) is rooted in the seminal <u>United Mine Workers of Am.</u> <u>v. Gibbs</u>, 383 U.S. 715 (1966)("<u>Gibbs</u>"). In that case, the Supreme Court created a two-part test for what was then known as pendent jurisdiction. <u>See</u> <u>Gibbs</u>, 383 U.S. at 725. The test's first consideration turned on constitutional concerns -- the federal court's subject matter jurisdiction over the state claim. <u>See</u> <u>Gibbs</u>, 383 U.S. at 725. To satisfy that constitutional requirement, the Supreme Court determined that "the state and federal claims must derive from a common nucleus of operative fact." <u>See</u> <u>Gibbs</u>, 383 U.S. at 725. The test's second part turned on more pedestrian but nonetheless crucial practical concerns. <u>See</u> 383 U.S. at 726. The "justification" in exercising jurisdiction "lies in considerations of judicial economy, convenience and fairness to litigants." 383 U.S. at 726. Thus, "[n]eedless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties by procuring for them a surer-footed reading of applicable law." <u>Gibbs</u>, 383 U.S. at 726 (citing <u>Strachman v. Palmer</u>, 177 F.2d 427, 437 (1st Cir. 1949)(Macgruder, C.J., concurring)("Federal courts should not be overeager to hold on to the determination of issues that might be more appropriately left to settlement in state court

---

U.S.C. § 1367(c)(1). <u>See</u> <u>Ameritox, Ltd. v. Millennium Labs., Inc.</u>, 803 F.3d 518, 536 n.27 (11th Cir. 2015). The United States Court of Appeals for the Eleventh Circuit has written:

> Additionally, § 1367(c)(1) grants district courts the discretion to decline to exercise supplemental jurisdiction if the claim raises a novel *or* complex issue of State law. Thus, even if the claims were not complex -- and they are complex -- the claims' novelty would be sufficient to vest the District Court with discretion.

<u>Ameritox, Ltd. v. Millennium Labs., Inc.</u>, 803 F.3d at 536 n.27. That conclusion is also supported by the plain meaning of both words. Novel, as explored below, generally means new or perhaps notably new. <u>See</u> <u>infra</u>, 36-37. Complex on the other hand, typically means complicated, involved, intricate, or not easily analyzed. <u>See</u> <u>Oxford English Dictionary</u> (online ed. 2018)(defining complex as "consisting of parts or elements not simply co-ordinated, but some of them involved in various degrees of subordination; complicated, involved, intricate; not easily analysed or disentangled"). Something can easily be new without being complicated. With these divergent meanings, it is unlikely that Congress meant for those words to be read together to form one test.

litigation.")).   The Supreme Court's thought is that state courts either are more adept at adjudicating state law matters or as a matter of respecting our federal system, state sovereigns -- where possible, convenient, and just -- should decide state law matters.  See Gibbs, 383 U.S. at 726.

Congress' enactment of 28 U.S.C. § 1367 supersedes Gibbs, at least in part.  See Wright & Miller supra, § 3567.3, at 400 ("These statutory factors do not completely mesh with the examples provided in Gibbs.").  See also Exxon Mobil Corp. v. Allapattah Servs., Inc., 545 U.S. 546.  The underlying practical considerations animating Gibbs, however, appear to remain intact.  See  Estate of Harshman v. Jackson Hole Mountain Resort Corp., 379 F.3d at 1164 ("Seeking to vindicate values of economy, convenience, fairness, and comity underlying the judicially-created doctrine of pendent jurisdiction, Congress granted statutory authority to district courts to hear claims that form part of the same case or controversy.").  The Court proceeds, accordingly, with those considerations of economy, convenience, fairness, and comity in mind.

Black's Law dictionary does not define novel.  See Black's Law Dictionary 1169 (9th ed. 2009).  It is more a colloquial word for new than a legal word.  See Pac. Operators Offshore, LLP v. Valladolid, 565 U.S. 207, 223 (2012)(Scalia, J., dissenting)("Substantial nexus is novel legalese with no established meaning in the present context."); Sch. Dist. of Abington Tp. v. Schempp, 374 U.S. 203, 304 (1963)("The principles which we reaffirm and apply today can hardly be thought novel or radical.  They are, in truth, as old as the Republic itself.").  In this context, however, the Court concludes that novel cannot mean only new, because such a meaning would make supplemental jurisdiction completely discretionary and § 1367(c) plain language does allow that expansive meaning.  See 28 U.S.C. § 1367(c).  Every case is new in some way.  There are, at least, always new parties and new facts, and thus the legal analysis is also new for every case, as how

the law applies to those facts must be new. See McGarry v. Board of Cty Comm'rs for Cty. of Lincoln, 294 F. Supp. 3d at 1188 n.13 ("Cases differ. Many cases, such as this one, have so many facts that are unlikely to ever occur again in a significantly similar way."). Thus, if newness, alone, is the test, courts would always or almost always have discretion to decline supplemental jurisdiction, which cannot be the test. See supra, Moore, The Supplemental Jurisdiction Statute: An Important but Controversial Supplement to Federal Jurisdiction, 41 Emory L.J. at 62-63.

Novel does not just mean new, however. See Oxford English Dictionary (online ed. 2018)(defining novel as "interestingly new or unusual") available at http://www.oed.com/ view/Entry/128758?rskey=g8PS24&result=2&isAdvanced=false#eid; Merriam-Webster, (online ed. 2018)(defining novel as "original or striking especially in conception or style") available at https://www.merriam-webster.com/dictionary/novel?src=search-dict-hed. Novel, accordingly, means both new and noteworthy. Some of the cases construing novel have attuned to that noteworthy component. See Dream Palace v. Cty. of Maricopa, 384 F.3d at 1022 (determining a state issue was novel, because it concerned "issues of the balance of power between state and local authorities in Arizona"); Doe v. Sundquist, 106 F.3d at 708 (concluding an issue was novel, because it involved interpretation of the state constitution). As the state's controlling document, interpreting a state constitution, especially on a matter that a state court had not yet considered, would matter a great deal to that sovereign. Similarly, adjudicating a new issue which upsets the balance of power between the state and local authorities would be of great importance to that state. In contrast, a regular tort claim, albeit with new issues, might be of less concern to the state, especially if the litigants are private actors. To be sure, a district court's ruling is binding only on the parties and can be only persuasive authority in subsequent cases. That does not mean, however, that state courts would not want to decide the issue first. A first reasoned decision in an area of

law can act as a powerful anchor to a position or a legal rule, requiring litigants opposed to that position to overcome it -- both in court and in settlement negotiations.

With those thoughts in mind, the Court concludes that a state law issue is novel when it is: (i) new; and (ii) concerns a notable state matter. This test is subject to a sliding scale. If a case merely has new facts, but the Court is equipped with settled caselaw, the Court is unlikely to determine that there is a novel issue even if it involves a high-stakes state matter. For example, if the Court is confronted with a state constitutional issue that involves fairly original facts, the Court will not deem the issue novel if the Supreme Court of New Mexico has interpreted the state constitutional provision at issue. The Court is also unlikely to conclude an issue is novel, merely because there are no state court cases interpreting a relevant statute. While such a scenario might be sufficiently new under the first prong of the Court's test, any given state statute does not necessarily concern a sufficiently notable state matter. If, for example, statutory interpretation would require the court only to determine the rights or duties between private parties, such as when the Court is interpreting a statute like the Uniform Commercial Code, the Court is less likely to find the issue a notable state matter. If, on the other hand, the outcome of the Court's statutory interpretation would greatly affect the balance of power between state and local authorities, the Court is more likely to determine that a matter is notable.

The Court deems that this test is appropriate, as it not only accounts for 28 U.S.C. § 1367(c)(1)'s meaning of novel, but also respects the federalism and comity considerations articulated in United Mine Workers v. Gibbs. See United Mine Workers v. Gibbs, 383 U.S. at 726 ("Needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties by procuring for them a surer-footed reading of applicable law."). The state sovereign would be less concerned with a federal court deciding a state issue that has limited

impact on a state law's application or meaning, but would be more concerned if the federal court's determination skews the state's jurisprudence on a significant state issue for years to come. Those considerations are especially significant when the issue is currently being litigated in state courts. See Rhines v. Weber, 544 U.S. 269, 274 (2005)(defining comity as the principle that "one court should defer action on causes properly within its jurisdiction until the courts of another sovereignty with concurrent powers, and already cognizant of the litigations, have had an opportunity to pass on the matter"); Harjo v. City of Albuquerque, 307 F. Supp. 3d 1163, 1222 (D.N.M. Mar. 30, 2018)(Browning, J.). The Court, accordingly, adopts for the foregoing test.

## ANALYSIS

The Court concludes that it will not exercise supplemental jurisdiction, because the Court has dismissed all claims over which it has original jurisdiction. The Tenth Circuit views supplemental jurisdiction not as a litigant's right, but as a matter of judicial discretion. See Estate of Harshman v. Jackson Hole Mountain Resort Corp., 379 F.3d at 1165 (citing City of Chi. v. Int'l Coll. of Surgeons, 522 U.S. at 173). In circumstances where the supplemental jurisdiction statute, 28 U.S.C. § 1367, may support supplemental jurisdiction, the district court retains discretion to decline to exercise that jurisdiction. Congress' supplemental jurisdiction statute enumerates four factors that the court should consider:

(1)     the claim raises a novel or complex issue of State law,

(2)     the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,

(3)     the district court has dismissed all claims over which it has original jurisdiction, or

(4)     in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

28 U.S.C. § 1367(c). In applying these factors, district courts should seek to exercise supplemental jurisdiction in an effort to "vindicate values of economy, convenience, fairness, and comity. . . ." Estate of Harshman v. Jackson Hole Mountain Resort Corp., 379 F.3d at 1164. Numerous courts have acknowledged that 28 U.S.C. § 1367(c) necessarily changes the district courts' supplemental jurisdiction discretion analysis and that, unless one of the conditions of 28 U.S.C. § 1367(c) exists, courts are not free to decline jurisdiction. See See Itar-Tass Russian News Agency v. Russian Kurier, Inc., 140 F.3d at 447; McLaurin v. Prater, 30 F.3d at 985; Exec. Software N. Am. v. U.S. Dist. Ct., 24 F.3d at 1557, overruled on other grounds by Cal. Dep't of Water Res. v. Powerex Corp., 533 F.3d 1087; Palmer v. Hosp. Auth., 22 F.3d at 1569; Bonadeo v. Lujan, 2009 WL 1324119, at *9; Gudenkauf v. Stauffer Commc'ns, Inc., 896 F. Supp. at 1084.

The Tenth Circuit has held that district courts should presume to decline jurisdiction over state claims when federal claims no longer remain: "When all federal claims have been dismissed, the court may, and usually should, decline to exercise jurisdiction over any remaining state claims." Koch v. City of Del City, 660 F.3d at 1248 (quoting Smith v. City of Enid ex rel. Enid City Comm'n, 149 F.3d at 1156). The Court consistently has declined to exercise supplemental jurisdiction when it dismisses all of a case's federal claims with prejudice. See, e.g., McGarry v. Bd. of Cty. Comm'rs for Cty. of Lincoln, 294 F. Supp. 3d at 1206 ("The only remaining claim before the Court is [a state law claim]. . . . The Court declines to exercise supplemental jurisdiction over that claim."); Parrish v. Roosevelt Cty. Board of Cty. Comm'rs, 2017 WL 6759103, at *20 ("The Court declines to exercise supplemental jurisdiction over Parrish's remaining state-law breach-of-contract claim."); Martinez v. Guadalupe Cty, 200 F. Supp. 3d at 1265.

The remaining claims are Counts V, VIII, and IX. See Remand Order at 2-3. The Court declines to exercise supplemental jurisdiction over these claims. See 28 U.S.C. § 1367(c)(3);

Carlsbad Tech., Inc. v. HIF Bio, Inc., 556 U.S. 635, 639 (2009)("A district court's decision whether to exercise that jurisdiction after dismissing every claim over which it had original jurisdiction is purely discretionary."); United States v. Botefuhr, 309 F.3d 1263, 1273 (10th Cir. 2002)(concluding that, if a district court has not already spent a good deal of time and energy on a state law claim, then it "should normally dismiss supplemental state law claims after all of the federal claims have been dismissed").   In Count V, Favela alleges that Memorial Medical and Dr. Wilhelm failed to obtain his informed consent to treatment, as state law requires, or should have known that any consent was given "under duress and/or revoked by Plaintiff prior to treatment," Complaint ¶ 95, at 13, and thus "failed to comport with professional standards," Complaint ¶ 96, at 13.  See id. ¶¶ 93-96, at 13.  At the November 1, 2019, hearing, the Court noted that Count V -- in which Favela alleges that Memorial Medical and Dr. Wilhelm treated Favela without obtaining informed consent, see Complaint ¶ 93, at 13 -- raises an issue of law that the Supreme Court of New Mexico has not addressed, see Tr. at 10:1-7 (Court), which is whether a hospital owes a duty to obtain a patient's informed consent to treatment ordered by a non-employee physician.  The Court noted that deciding this issue would require the Court to predict "what the Supreme Court of New Mexico would do." Tr. at 10:3-7 (Court)(citing Erie R.R. Co. v. Tompkins, 304 U.S. at 64).  Although the Court of Appeals of New Mexico has addressed the informed consent issue, see Johnson v. Sears, Roebuck & Co., 1992-NMCA-039, 832 P.2d 797; Cooper v. Curry, 1978-NMCA-104, 589 P.2d 201, the Supreme Court of New Mexico has not.  "Under  28 U.S.C. § 1367(c), a district court may decline to exercise supplemental jurisdiction if the claim raises a novel or complex issue of state law."   Nielander v. Bd. of Cty. Comm'rs of Cty. of Republic, Kan., 582 F.3d 1155, 1172 (10th Cir. 2009).  Moreover, the Court has consistently declined to exercise supplemental jurisdiction when it dismisses all of a case's federal claims with

prejudice. See, e.g., McGarry v. Bd. of Cty. Comm'rs for Cty. of Lincoln, 294 F. Supp. 3d at 1206; Parrish v. Roosevelt Cty. Bd. of Cty. Comm'rs, 2017 WL 6759103, at *20; Martinez v. Guadalupe Cty, 200 F. Supp. 3d at 1265. The Court concludes that the New Mexico courts are better suited to address Count V and thus declines to exercise supplemental jurisdiction.

Memorial Medical, Proctor, Pitts, Reveles, and Branch argue that the Court should retain jurisdiction over Counts VIII and IX, because the Court already took "a position as to the facts and the law regarding" these Counts in the June 27 MO. Tr. at 5:6-8 (Morrow). In Count VIII, Favela alleges that Memorial Medical, Dr. Wilhelm, and Memorial Medical personnel acted in concert to commit assault and battery against Favela by physically inserting a straight catheter into him to extract urine. See Complaint ¶¶ 108-11, at 15. In Count IX, Favela alleges that Memorial Medical, Dr. Wilhelm, and Memorial Medical personnel intentionally and unlawfully confined him in room 18 of Memorial Medical without his consent or a valid arrest, constituting false imprisonment. See Complaint ¶¶ 113-16, at 15. Each of these claims arises under New Mexico state law. See Remand Order at 2-3. Memorial Medical, Proctor, Pitts, Reveles, and Branch argue that much of the June 27 MO's analysis is "directly on point with the assault and battery claims and the false imprisonment claims that remain pending before this court." Tr. at 6:25-7:3 (Morrow). Favela counters that, when the Court issued the June 27 MO, the "facts with respect to the hospital defendants were not ripe for decision" and that, in the interim, the parties have "had so much time to conduct discovery and flesh out some of the other facts." June 27 MO at 17:9:-12 (Coronado). Moreover, the June 27 MO addressed issues that "were case specific to Las Cruces PD, and not to the hospital defendants." Tr. at 19:11-17 (Coronado).

The Court will decline to exercise supplemental jurisdiction over Counts VII and IX for the remaining Defendants. At the November 1, 2019, hearing, the Court noted that parties may

"concede certain facts" when one party files a motion for summary judgment, but that, when there is another motion for summary judgment, the parties "may not concede those facts" or the facts may be different. Tr. 12:20-25 (Court). That the Court granted summary judgment to Soto on Counts VIII and IX in the June 27 MO, see June 27 MO at 118, 398 F. Supp. 3d at 942, does not necessitate that the Court grant summary judgment to the remaining Defendants on the same Counts. Furthermore, when the Court issued the June 27 MO dismissing Counts VIII and IX against Soto, the case "still had federal claims." Tr. 7:12 (Morrow). Now, however, there are no federal claims remaining. See Remand Order at 2; Tr. at 4:19-24 (Morrow). The Tenth Circuit instructs that, "'[w]hen all federal claims have been dismissed, the court may and usually should decline to exercise jurisdiction over any remaining state claims.'" Tr. at 11:6-8 (Court)(quoting Kock v. City of Del City, 660 F.3d at 1248 (quoting Smith v. Enid ex rel. Enid City Comm'n, 149 F.3d at 1156)). See Armijo v. New Mexico, 2009 WL 3672828, at *4 ("The Supreme Court and the Tenth Circuit have not only acknowledged such a result, they have encouraged it."). The Court concludes that it will decline to exercise supplemental jurisdiction over Counts VIII and IX with respect to Memorial Medical, Proctor, Reveles, and Branch.

The Court also has considered and weighed the values of judicial economy, convenience, fairness, and comity. In this case, after dismissing Favela's federal law claims, the Court concludes that remanding the remaining claims to the state court where Favela filed them would best promote fairness and comity. See United Mine Workers of Am. v. Gibbs, 383 U.S. at 726 ("Needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law."). As this Court explained in Armijo v. New Mexico, "[t]he New Mexico state courts are more experienced and knowledgeable about the contours of state law. Also, federal courts should strive to avoid deciding

issues of state law when, as here, it is possible to do so." 2009 WL 3672828, at *4. The Court

recognizes that, although Memorial Medical, Proctor, Pitts, Reveles, and Branch did not remove

this case to federal court, see Tr. at 9:6-7 (Morrow); Notice of Removal, filed May 5, 2017

(Doc. 1)(stating that the City of Las Cruces, Dollar, and Soto removed this case on the basis of

federal-question jurisdiction), Favela originally filed this case in state court, see Complaint at 1.

Remanding the case to state court would return it to Favela's selected forum. Accordingly, the

Court will remand the case to the County of Doña Ana, Third Judicial District Court, State of New

Mexico.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Jose R. Coronado
Law Offices of Jose R. Coronado
Las Cruces, New Mexico

   *Attorney for the Plaintiff*

Damian L. Martínez
Haley R. Grant
Holt Mynatt Martínez P.C.
Las Cruces, New Mexico

   *Attorneys for Defendants City of Las Cruces ex rel. Las Cruces Police Department,
      Matthew Dollar, and Manuel Soto*

John Scott Mann
Kathryn Brack Morrow
Mann Morrow, PLLC
Las Cruces, New Mexico

   *Attorneys for Defendants PHC-Las Cruces, Inc. d/b/a Memorial Medical Center, James
      Proctor, R.N., Jamie Pitts, R.N., Jose Reveles, R.N., and Cassandria Branch, R.N.*